Exhibit A

STATE OF MINNESOTA

COUNTY OF HENNEPIN

Susan Iliff; Betty Lees; Linda Cobb; Nancy
Lawrence; Patricia Johnson; Gwenneth Larson;
Patricia Noel; Sharifah Doyle-El; and
HOME Line, a Minnesota Nonprofit
Corporation, on behalf of themselves and all
others similarly situated,

                Plaintiffs,

v.

Dominium Management Services, LLC; St.
Anthony Leased Housing Development II,
LLC; St. Anthony Leased Housing Associates
II, Limited Partnership; St. Anthony Leased
Housing Associates II, LLC; Coon Rapids
Leased Housing Development IV, LLC; Coon
Rapids Leased Housing Associates IV, LLLP;
Coon Rapids Leased Housing Associates IV,
LLC; St. Paul Leased Housing Development
VI, LLC; St. Paul Leased Housing Associates
VI, LLLP; St. Paul Leased Housing Associates
VI, LLC; Crystal Leased Housing
Development I, LLC; Crystal Leased Housing
Associates I, LLLP; Crystal Leased Housing
Associates I, LLC; Cottage Grove Leased
Housing Development I, LLC; Cottage Grove
Leased Housing Associates I, LLLP; Cottage
Grove Leased Housing Associates I, LLC;
Woodbury Leased Housing Development II,
LLC; Woodbury Leased Housing Associates
II, LLLP; Woodbury Leased Housing
Associates II, LLC; Minneapolis Leased
Housing Development IX, LLC; Minneapolis
Leased Housing Associates IX, LLLP;
Minneapolis Leased Housing Associates IX,
LLC; Minneapolis Leased Housing
Development IV, LLC; Minneapolis Leased
Housing Associates IV, Limited Partnership;
Minneapolis Leased Housing Associates IV,
LLC; St. Paul Leased Housing Development
IX, LLC; St. Paul Leased Housing Associates

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Court File No.

Case Type: Other Civil /
Consumer Protection

**SUMMONS**

IX, LLLP; St. Paul Leased Housing Associates
IX, LLC; St. Paul Leased Housing
Development X, LLC; St. Paul Leased
Housing Associates X, LLLP; St. Paul Leased
Housing Associates X, LLC; St. Paul Leased
Housing Development VIII, LLC; St. Paul
Leased Housing Associates VIII, LLLP; St.
Paul Leased Housing Associates VIII, LLC;
Champlin Leased Housing Development IV,
LLC; Champlin Leased Housing Associates
IV, LLLP; Champlin Leased Housing
Associates IV, LLC; Columbia Heights Leased
Housing Development III, LLC; Columbia
Heights Leased Housing Associates III, LLLP;
Columbia Heights Leased Housing Associates
III, LLC; Lexington Leased Housing
Development I, LLC; Lexington Leased
Housing Associates I, LLLP; Lexington
Leased Housing Associates I, LLC; Blaine
Leased Housing Development III, LLC; Blaine
Leased Housing Associates III, LLLP; Blaine
Leased Housing Associates III, LLC; Spring
Lake Park Leased Housing Development I,
LLC; Spring Lake Park Leased Housing
Associates I, LLLP; Spring Lake Park Leased
Housing Associates I, LLC; Minnetonka
Leased Housing Development II, LLC;
Minnetonka Leased Housing Associates II,
LLLP; Minnetonka Leased Housing Associates
II, LLC; St. Cloud Leased Housing
Development III, LLC; St. Cloud Leased
Housing Associates III, LLLP; St. Cloud
Leased Housing Associates III, LLC;
Dominium Development & Acquisition, LLC;
Dominium, Inc., Dominium Holdings I, LLC;
and Dominium Holdings II, LLC,

Defendants.

THIS SUMMONS IS DIRECTED TO: St. Paul Leased Housing Associates VI, LLLP, via Dan
Bolles, individual contact for Registered Agent St. Paul Leased Housing Associates VI LLC, at
2905 Northwest Blvd, Suite 150, Plymouth, MN 55441.

1.      **You are being sued**. The Plaintiffs have started a lawsuit against you. The *Complaint* is
attached to this *Summons*. Do not throw these papers away. They are official papers that start a

lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.      **You must reply, in writing, AND get a copy of your reply to the person/business who is suing you within 21 days to protect your rights.** Your reply is called an *Answer*. Getting your reply to the Plaintiff is called service. You must serve a copy of your *Answer or Answer and Counterclaim* (Answer) within 21 days from the date you received the *Summons* and *Complaint*.

ANSWER: You can find the *Answer* form and instructions on the MN Judicial Branch website at www.mncourts.gov/forms under the "Civil" category. The instructions will explain in detail how to fill out the *Answer* form.

3.      **You must respond to each claim.** The *Answer* is your written response to the Plaintiff's *Complaint*. In your *Answer* you must state whether you agree or disagree with each paragraph of the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say that in your *Answer*.

4.      SERVICE: **You may lose your case if you do not send a written response to the Plaintiff.** If you do not serve a written *Answer* within 21 days, you may lose this case by default. You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything they asked for in their *Complaint*. If you agree with the claims stated in the *Complaint*, you don't need to respond. A default judgment can than be entered against you for what the Plaintiff asked for in the *Complaint*.

To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at this address:

> Craig S. Coleman
> Faegre Drinker Biddle & Reath LLP
> 2200 Wells Fargo Center
> 90 South 7th Street
> Minneapolis, MN 55402

5.      Carefully read the Instructions (CIV301) for the *Answer* for your next steps.

6.      **Legal Assistance.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help:

- Visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county.

- Court Administration may have information about places where you can get legal assistance.

**NOTE: Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case.**

7. **Alternative Dispute Resolution (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written *Answer,* even if you expect to use ADR.

Dated: February 4, 2021                    FAEGRE DRINKER BIDDLE & REATH LLP


                                           *s/Craig S. Coleman*
                                           Craig S. Coleman, Bar No. 0325491
                                           craig.coleman@faegredrinker.com
                                           Michael F. Cockson, Bar No. 0280549
                                           michael.cockson@faegredrinker.com
                                           Evelyn Snyder, Bar No. 0397134
                                           evelyn.snyder@faegredrinker.com
                                           Rachel L. Cardwell, Bar No. 0400029
                                           rachel.cardwell@faegredrinker.com
                                           2200 Wells Fargo Center
                                           90 South Seventh Street
                                           Minneapolis, MN 55402
                                           Telephone:   +1 612 766 7000
                                           Facsimile:   +1 612 766 1600


                                           HOUSING JUSTICE CENTER


                                           *s/James W. Poradek*
                                           James W. Poradek, Bar No. 0290488
                                           jporadek@hjcmn.org
                                           Margaret Kaplan, Bar No. 0328601
                                           mkaplan@hjcmn.org
                                           275 East Fourth Street, Suite 605
                                           Saint Paul, MN 55101
                                           Telephone:   +1 612 600-4028

                                           **Attorneys for Plaintiffs**

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Susan Iliff; Betty Lees; Linda Cobb; Nancy
Lawrence; Patricia Johnson; Gwenneth Larson;
Patricia Noel; Sharifah Doyle-El; and
HOME Line, a Minnesota Nonprofit
Corporation, on behalf of themselves and all
others similarly situated,

Court File No.

Case Type: Other Civil /
Consumer Protection

Plaintiffs,

v.

**CLASS ACTION COMPLAINT**

Dominium Management Services, LLC; St.
Anthony Leased Housing Development II,
LLC; St. Anthony Leased Housing Associates
II, Limited Partnership; St. Anthony Leased
Housing Associates II, LLC; Coon Rapids
Leased Housing Development IV, LLC; Coon
Rapids Leased Housing Associates IV, LLLP;
Coon Rapids Leased Housing Associates IV,
LLC; St. Paul Leased Housing Development
VI, LLC; St. Paul Leased Housing Associates
VI, LLLP; St. Paul Leased Housing Associates
VI, LLC; Crystal Leased Housing
Development I, LLC; Crystal Leased Housing
Associates I, LLLP; Crystal Leased Housing
Associates I, LLC; Cottage Grove Leased
Housing Development I, LLC; Cottage Grove
Leased Housing Associates I, LLLP; Cottage
Grove Leased Housing Associates I, LLC;
Woodbury Leased Housing Development II,
LLC; Woodbury Leased Housing Associates
II, LLLP; Woodbury Leased Housing
Associates II, LLC; Minneapolis Leased
Housing Development IX, LLC; Minneapolis
Leased Housing Associates IX, LLLP;
Minneapolis Leased Housing Associates IX,
LLC; Minneapolis Leased Housing
Development IV, LLC; Minneapolis Leased
Housing Associates IV, Limited Partnership;
Minneapolis Leased Housing Associates IV,
LLC; St. Paul Leased Housing Development
IX, LLC; St. Paul Leased Housing Associates

IX, LLLP; St. Paul Leased Housing Associates
IX, LLC; St. Paul Leased Housing
Development X, LLC; St. Paul Leased
Housing Associates X, LLLP; St. Paul Leased
Housing Associates X, LLC; St. Paul Leased
Housing Development VIII, LLC; St. Paul
Leased Housing Associates VIII, LLLP; St.
Paul Leased Housing Associates VIII, LLC;
Champlin Leased Housing Development IV,
LLC; Champlin Leased Housing Associates
IV, LLLP; Champlin Leased Housing
Associates IV, LLC; Columbia Heights Leased
Housing Development III, LLC; Columbia
Heights Leased Housing Associates III, LLLP;
Columbia Heights Leased Housing Associates
III, LLC; Lexington Leased Housing
Development I, LLC; Lexington Leased
Housing Associates I, LLLP; Lexington
Leased Housing Associates I, LLC; Blaine
Leased Housing Development III, LLC; Blaine
Leased Housing Associates III, LLLP; Blaine
Leased Housing Associates III, LLC; Spring
Lake Park Leased Housing Development I,
LLC; Spring Lake Park Leased Housing
Associates I, LLLP; Spring Lake Park Leased
Housing Associates I, LLC; Minnetonka
Leased Housing Development II, LLC;
Minnetonka Leased Housing Associates II,
LLLP; Minnetonka Leased Housing Associates
II, LLC; St. Cloud Leased Housing
Development III, LLC; St. Cloud Leased
Housing Associates III, LLLP; St. Cloud
Leased Housing Associates III, LLC;
Dominium Development & Acquisition, LLC;
Dominium, Inc.; Dominium Holdings I, LLC;
and Dominium Holdings II, LLC,

                    Defendants.

_____

        Plaintiffs Susan Iliff, Betty Lees, Linda Cobb, Nancy Lawrence, Patricia Johnson,

Gwenneth Larson, Patricia Noel, and Sharifah Doyle-El, on behalf of themselves and all others

similarly situated, along with HOME Line, allege as follows:

                              -2-

## INTRODUCTION

1.      This class action is intended to redress Defendants' fraudulent and illegal business model that diverts millions of dollars earmarked for affordable housing into corporate profits, thereby cheating tenants and taxpayers of millions of dollars.

2.      Defendants are a constellation of affiliated companies owned and/or controlled by a common enterprise and operated by the same individuals, referred to collectively herein as "Dominium." Dominium is one of the largest developers and providers of low-income housing in the country. One of Dominium's primary target populations is senior citizens, and many of its Minnesota properties focus on renting to seniors. For example, in marketing its "Legends" brand of affordable housing for seniors, Dominium promotes the availability of underground heated parking that is highly desirable to Minnesotans senior citizens because of the state's extreme winters: "Dominium senior apartments set the new benchmark for quality and affordability, offering the freedoms of maintenance-free living combined with luxurious amenities such as granite counters, a built-in washer/dryer in every apartment, and underground heated parking."[1]

3.      Dominium's business model depends on at least two sources of public funding, both of which impose significant regulatory obligations. First, Dominium regularly applies for and receives Low-Income Housing Tax Credits ("LIHTC") to help finance the development or acquisition of low-income housing. Second, Dominium charges its low-income tenants rent based on their income and then receives additional rent based on government established formulas in the form of federal and/or state rent subsidies. Both sources of funding are highly regulated and subject to complex sets of rules. Dominium promises to its to tenants in its standard lease addendum that it is and will operate the premises "in accordance with the requirements of the low-income housing

---

[1] Dominium - Twin Cities Senior Living, https://www.dominiumapartments.com/find-apartment.html (last visited Feb. 3, 2021).

credit program under Section 42 of the Internal Revenue Code of 1986, as amended (the 'Program')." (Exhibit A, Dominium Lease Agreement at 14.)

4.    LIHTC are federal income tax credits awarded to developers by state and local "allocator" agencies ("Allocators"), in a process pursuant to Section 42 of the Internal Revenue Code and requirements established by the Internal Revenue Service ("IRS").

5.    The amount of LIHTC available to an applicant selected by the Allocator to receive LIHTC is based primarily on a project's "eligible basis," which is the amount spent for constructing or acquiring and rehabilitating low-income housing. The higher the eligible basis, the more LIHTC a project may be awarded. The eligible basis is generally calculated using costs associated with acquisition, construction, and/or rehabilitation, including eligible "soft" costs. This process creates the public benefit of increasing the supply of affordable housing.

6.    When it comes to construction or acquisition costs associated with parking spaces or structures in Minnesota, LIHTC applicants have a simple but unavoidable choice (*see* 26 U.S.C. § 42(d)(4)(B) and applicable law):

      a. **exclude parking costs** from the eligible basis, in which case tenants **may** be separately charged for parking; or

      b. **include parking costs** in the eligible basis, in which case tenants **may not** be separately charged for parking.

7.    Developers must choose one option or the other. They cannot "double dip" when financing parking costs. A developer may receive LIHTC to subsidize the construction, acquisition, or rehabilitation of parking structures that will be made available for tenant use as part of their base rent. Alternatively, developers may forego receiving LIHTC subsidies for parking improvements and charge tenants separately for parking. Thus, a developer may choose to finance

its parking costs with either LIHTC or separate tenant charges—but not both. This choice is fundamental to the LIHTC system because the government confers LIHTC to make parking available at no cost to low-income tenants.

8.      To avoid making this fundamental choice, Dominium has instead engaged in fraudulent misrepresentations in order to receive LIHTC for parking construction costs while collecting rent for parking spaces from tenants. Dominium engages in impermissible double-dipping by simultaneously obtaining tax credits and charging low-income tenants for the parking those credits were designed to provide at no additional cost to tenants. Dominium accomplishes this scheme by misrepresenting its eligible cost basis so that approximately 90% of its parking costs are financed by LIHTC while it still makes tenants pay monthly rent for parking. Dominium does this by significantly under-reporting its costs related to the parking construction and improvements to Allocators. Dominium thereby has engaged in fraud and deception and has been unjustly enriched.

9.      Dominium has misrepresented the costs related to parking construction and improvements at the following Minnesota affordable housing properties that it developed, owns, and manages, and for which it applied and was awarded LIHTC (together, the "Dominium Properties"):

   a.   The Legends at Silver Lake Village, 2500 38th Ave NW, St. Anthony, MN 55421;

   b.   River North, 10940 Crooked Lake Blvd NW, Coon Rapids, MN 55433;

   c.   The Cambric, 720 East 7th Street, St. Paul, MN 55106;

   d.   The Cavanagh, 5401 51st Ave N, Crystal, MN 55429;

   e.   The Legends of Cottage Grove, 6999 East Point Douglas Road S, Cottage Grove, MN 55016;

   f.   The Legends of Woodbury, 570 Settlers Ridge Parkway, Woodbury, MN 55129;

     g.  1500 Nicollet, 1500 Nicollet Ave S, Minneapolis, MN 55403;

     h.  A-Mill Artist Lofts, 315 Main Street SE, Minneapolis, MN 55414;

     i.  The Legends at Berry, 777 Berry Street, St. Paul, MN, 55114;

     j.  Millberry Apartments, 778 Berry Street, St. Paul, MN, 55114;

     k.  Union Flats, 787 Hampden Ave, St. Paul, MN, 55114;

     l.  Legends of Champlin, 11635 Theatre Drive, Champlin, MN 55316;

     m.  Grand Central Flats/Lofts (FKA Columbia Heights Workforce), 1069 Grandview Way NE, Columbia Heights, MN 55421;

     n.  Landings of Lexington, 9400 Lexington Ave, Lexington, MN 55014;

     o.  Legends of Blaine, 10826 Austin Street NE, Blaine, MN 55449;

     p.  Legends of Spring Lake Park, 1066 Co Hwy 10 NE, Spring Lake Park, MN 55432;

     q.  Preserve at Shady Oak, 10987 Bren Road E, Minnetonka, MN 55343; and

     r.  The Bluffs at Liberty Glen, 1075 24th Street SE, St. Cloud, MN 56304.

This list is not exhaustive, and Plaintiffs have reason to believe that Dominium's misconduct extends to other properties.

     10.    To redress this misconduct, Plaintiffs hereby file this class action on behalf of tenants from whom Dominium has unlawfully collected millions of dollars. Plaintiffs seek a permanent injunction prohibiting Defendants from continuing to violate the law. In addition, because parking charges were a material term of the affected tenants' leases, Plaintiffs seek to disgorge all rent and other charges collected from such tenants or, at the very least, all parking charges and profits Dominium wrongfully received from such tenants.

## PARTIES

### Plaintiffs

11.    Plaintiff Susan Iliff is 64-years-old and resides in Dominium's River North complex in Coon Rapids, Minnesota. Ms. Iliff has lived at River North since the building opened in 2016 and has paid $75 per month for a parking space since she moved in. Due to her emphysema and cystic lung disease, secure, heated, covered parking was integral for Ms. Iliff when she sought affordable housing. As a 64-year-old disabled woman, she needs security and added protection from the elements during the winter months when accessing her vehicle.

12.    Plaintiff Betty Lees is a 78-year-old retiree who resides in Dominium's River North complex in Coon Rapids, Minnesota. Ms. Lees has lived at River North since on or about July 1, 2017, and she has paid $75 per month for a parking space since she moved in. Having secure, heated, underground parking was an important consideration for Ms. Lees when she sought affordable housing. She values security and protection from the elements during the winter months, making underground parking a necessity.

13.    Plaintiff Linda Cobb is a 67-year-old retiree who resides in Dominium's Legends at Silver Lake Village complex in St. Anthony, Minnesota. Ms. Cobb has lived at Legends at Silver Lake since on or about June 2015, and she has paid $80 per month for a parking space since she moved in. Having covered parking is very important to Ms. Cobb because she frequently uses her car and needs protection from inclement weather, especially sleet and snow in the wintertime in Minnesota. Covered parking was important to Ms. Cobb when she sought affordable housing in 2015.

14.    Plaintiff Nancy Lawrence is a 74-year-old retiree who resides in Dominium's River North complex in Coon Rapids, Minnesota. Ms. Lawrence has lived at River North since

-7-

on or about January 2017, and she has paid $75 per month for a parking space since she moved in. Because Ms. Lawrence did not have covered parking in her prior living arrangement, having covered parking was an extremely important consideration for her when seeking affordable housing and ultimately choosing to live at River North for safety and protection from the elements during the winter months.

15.     Plaintiff Patricia Johnson is a 69-year-old retiree who resides in Dominium's River North complex in Coon Rapids, Minnesota. Ms. Johnson has lived at River North since on or about January 2017, and she has paid $75 per month for a parking space since she moved in. Having covered parking is very important for Ms. Johnson and was an important consideration when Ms. Johnson chose sought affordable housing and decided to live at River North.

16.     Plaintiff Gwenneth Larson is a 79-year-old retiree who resides in Dominium's River North complex in Coon Rapids, Minnesota. Ms. Larson has lived at River North since on or about July 2017, and has paid $75 per month for a parking space since she moved in. Having secure and covered parking was an important consideration for Ms. Larson when she sought affordable housing in 2017. As a 79-year-old woman who works as a crossing guard for an elementary school during the week, she values security and protection from the elements during the winter months in part to ensure she makes it to her crossing duties on time.

17.     Plaintiff Patricia Noel is a 78-year-old retiree who resides in Dominium's Legends of Champlin complex in Champlin, Minnesota. Ms. Noel has lived at Legends of Champlin since on or about April 2018, and has paid $75 per month for a parking space since she moved in. Having secure, covered parking was an important consideration for Ms. Noel when she sought affordable housing in 2018. She values security and protection from the elements during the winter months.

-8-

18.     Plaintiff Sharifah Doyle-El is a 38-year-old single mother of four who resides in Dominium's 1500 Nicollet complex in Minneapolis, Minnesota. Ms. Doyle-El has lived at 1500 Nicollet since on or about December 2019. She paid $140 per month for a parking space since she moved in until on or about December 2020, and has since paid $145 per month for a parking space. Having secure, covered parking in her apartment complex was a necessity for Ms. Doyle-El when she sought housing in 2019. She needed a reserved space so that she did not have to locate daily street parking downtown Minneapolis, which she has found to be inconsistent, unsafe, and overall cost prohibitive due to the time limitations of parking meters. A reserved parking space provides her security, consistency, and accessibility, in addition to protection from the elements during the winter months, all of which are extremely important to Ms. Doyle-El. Covered parking with a reserved space was an important consideration for Ms. Doyle-El when choosing affordable housing in 2019.

19.     Plaintiff HOME Line is a non-profit tenant advocacy organization headquartered in Bloomington, Minnesota. Among other services, HOME Line operates a hotline for tenants to address rental housing problems. HOME Line advocates for affordable-housing tenants, seeks to expand the supply of affordable housing, and works to improve the quality of affordable housing. HOME Line also provides education and training programs designed to promote fair and affordable housing.

### Defendants

20.     Defendants are all Dominium entities headquartered at the same address in Plymouth, Minnesota. The Dominium entities include a connected web of developers, owners, project sponsors, parent companies, and guarantors who have submitted fraudulent LIHTC applications to the government for the Dominium Properties. The Dominium enterprise also

includes an overarching management company that manages all Dominium Properties and enters into fraudulent lease agreements with residents of the Dominium Properties on behalf of the Dominium owners. All Defendants are co-conspirators of the illegal and fraudulent conduct described in this complaint.

21.     Dominium entities operate as part of a common enterprise controlled by the same individuals and operated for their profit. Dominium's business practices indicate that the named Defendants do not maintain formally independent operations and are not separately operated. Defendants function as alter egos of one another and use separate corporate structures as a fiction for the sole purpose of avoiding liability while Dominium's managers and operators commit the illegal and fraudulent practices described in this complaint. Upon information and belief, Defendants are insufficiently capitalized, fail to observe corporate formalities, have non-functioning officers and directors, lack corporate records, and are a façade for the illegal and fraudulent practices described in this complaint.

22.     Piercing the corporate veil of Defendants is necessary to avoid injustice and fundamental unfairness. Allowing Defendants to adhere to the fiction of a separate, independently-operated corporate entities would sanction a fraud, promote injustice, and promote inequitable consequences.

*The Legends at Silver Lake Village – Developer & Owner*

23.     Defendant St. Anthony Leased Housing Development II, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Anthony Leased Housing Development II, LLC is the developer of The Legends at Silver Lake Village.

-10-

24.     Defendant St. Anthony Leased Housing Associates II, Limited Partnership is a Minnesota limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Anthony Leased Housing Associates II, Limited Partnership is the owner of The Legends at Silver Lake Village.

25.     Defendant St. Anthony Leased Housing Associates II, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Anthony Leased Housing Associates II, LLC is the registered agent and general partner of Defendant St. Anthony Leased Housing Associates II, Limited Partnership. As general partner of the limited partnership, it is jointly and severally liable for all obligations of St. Anthony Leased Housing Associates II, Limited Partnership under Min. Stat. § 321.0404.

*River North – Developer & Owner*

26.     Defendant Coon Rapids Leased Housing Development IV, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Coon Rapids Leased Housing Development IV, LLC is the developer of River North.

27.     Defendant Coon Rapids Leased Housing Associates IV, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Coon Rapids Leased Housing Associates IV, LLLP is the owner of River North.

28.     Defendant Coon Rapids Leased Housing Associates IV, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Coon Rapids Leased Housing Associates IV, LLC is the

-11-

registered agent and general partner of Defendant Coon Rapids Leased Housing Associates IV, LLLP.

*The Cambric – Developer & Owner*

29.     Defendant St. Paul Leased Housing Development VI, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Development VI, LLC is the developer of The Cambric.

30.     Defendant St. Paul Leased Housing Associates VI, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Associates VI, LLLP is the owner of The Cambric.

31.     Defendant St. Paul Leased Housing Associates VI, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Associates VI, LLC is the registered agent and general partner of Defendant St. Paul Leased Housing Associates VI, LLLP.

*The Cavanagh – Developer & Owner*

32.     Defendant Crystal Leased Housing Development I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Crystal Leased Housing Development I, LLC is the developer of The Cavanaugh.

33.     Defendant Crystal Leased Housing Associates I, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite

150, Plymouth, Minnesota 55441. Crystal Leased Housing Associates I, LLLP is the owner of The Cavanaugh.

34.     Defendant Crystal Leased Housing Associates I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Crystal Leased Housing Associates I, LLC is the registered agent and general partner of Defendant Crystal Leased Housing Associates I, LLLP.

*The Legends of Cottage Grove – Developer & Owner*

35.     Defendant Cottage Grove Leased Housing Development I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Cottage Grove Leased Housing Development I, LLC is the developer of The Legends of Cottage Grove.

36.     Defendant Cottage Grove Leased Housing Associates I, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Cottage Grove Leased Housing Associates I, LLLP is the owner of The Legends of Cottage Grove.

37.     Defendant Cottage Grove Leased Housing Associates I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Cottage Grove Leased Housing Associates I, LLC is the registered agent and general partner of Defendant Cottage Grove Leased Housing Associates I, LLLP.

*The Legends of Woodbury – Developer & Owner*

38.     Defendant Woodbury Leased Housing Development II, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150,

-13-

Plymouth, Minnesota 55441. Woodbury Leased Housing Development II, LLC is the developer of The Legends of Woodbury.

39.     Defendant Woodbury Leased Housing Associates II, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Woodbury Leased Housing Associates II, LLLP is the owner of The Legends of Woodbury.

40.     Defendant Woodbury Leased Housing Associates II, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Woodbury Leased Housing Associates II, LLC is the registered agent and general partner of Defendant Woodbury Leased Housing Associates II, LLLP.

*1500 Nicollet – Developer & Owner*

41.     Defendant Minneapolis Leased Housing Development IX, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Minneapolis Leased Housing Development IX, LLC is the developer of 1500 Nicollet.

42.     Defendant Minneapolis Leased Housing Associates IX, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Minneapolis Leased Housing Associates IX, LLLP is the owner of 1500 Nicollet.

43.     Defendant Minneapolis Leased Housing Associates IX, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Minneapolis Leased Housing Associates IX, LLC is the registered agent and general partner of Defendant Minneapolis Leased Housing Associates IX, LLLP.

*A-Mill Artist Lofts – Developer & Owner*

44.     Defendant Minneapolis Leased Housing Development IV, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Minneapolis Leased Housing Development IV, LLC is the developer of A-Mill Artist Lofts.

45.     Defendant Minneapolis Leased Housing Associates IV, Limited Partnership is a Minnesota limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Minneapolis Leased Housing Associates IV, Limited Partnership is the owner of A-Mill Artist Lofts.

46.     Defendant Minneapolis Leased Housing Associates IV, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Upon information and belief, Minneapolis Leased Housing Associates IV, LLC is the general partner of Defendant Minneapolis Leased Housing Associates IV, Limited Partnership.

*The Legends at Berry – Developer & Owner*

47.     Defendant St. Paul Leased Housing Development IX, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Development IX, LLC is the developer of The Legends at Berry.

48.     Defendant St. Paul Leased Housing Associates IX, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Associates IX, LLLP is the owner of The Legends at Berry.

49.     Defendant St. Paul Leased Housing Associates IX, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Associates IX, LLC is the registered agent and general partner of Defendant St. Paul Leased Housing Associates IX, LLLP.

*Millberry Apartments – Developer & Owner*

50.     Defendant St. Paul Leased Housing Development X, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Development X, LLC is the developer of Millberry Apartments.

51.     Defendant St. Paul Leased Housing Associates X, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Associates X, LLLP is the owner of Millberry Apartments.

52.     Defendant St. Paul Leased Housing Associates X, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Associates X, LLC is the registered agent and general partner of Defendant St. Paul Leased Housing Associates X, LLLP.

*Union Flats – Developer & Owner*

53.     Defendant St. Paul Leased Housing Development VIII, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Development VIII, LLC is the developer of Union Flats.

-16-

54.     Defendant St. Paul Leased Housing Associates VIII, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Paul Leased Housing Associates VIII, LLLP is the owner of Union Flats.

55.     Defendant St. Paul Leased Housing Associates VIII, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Upon information and belief, St. Paul Leased Housing Associates VIII, LLC is the registered agent and general partner of Defendant St. Paul Leased Housing Associates VIII, LLLP.

*Legends of Champlin – Developer & Owner*

56.     Defendant Champlin Leased Housing Development IV, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Champlin Leased Housing Development IV, LLC is the developer of Legends of Champlin.

57.     Defendant Champlin Leased Housing Associates IV, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Champlin Leased Housing Associates IV, LLLP is the owner of Legends of Champlin.

58.     Defendant Champlin Leased Housing Associates IV, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Champlin Leased Housing Associates IV, LLC is the registered agent and general partner of Defendant Champlin Leased Housing Associates IV, LLLP.

-17-

*Grand Central Flats/Lofts (FKA Columbia Heights Workforce) – Developer & Owner*

59.     Defendant Columbia Heights Leased Housing Development III, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Columbia Heights Leased Housing Development III, LLC is the developer of Grand Central Flats/Lofts (FKA Columbia Heights Workforce).

60.     Defendant Columbia Heights Leased Housing Associates III, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Columbia Heights Leased Housing Associates III, LLLP is the owner of Grand Central Flats/Lofts (FKA Columbia Heights Workforce).

61.     Defendant Columbia Heights Leased Housing Associates III, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Columbia Heights Leased Housing Associates III, LLC is the registered agent and general partner of Defendant Columbia Heights Leased Housing Associates III, LLLP.

*Landings of Lexington – Developer & Owner*

62.     Defendant Lexington Leased Housing Development I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Lexington Leased Housing Development I, LLC is the developer of Landings of Lexington.

63.     Defendant Lexington Leased Housing Associates I, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite

150, Plymouth, Minnesota 55441. Lexington Leased Housing Associates I, LLLP is the owner of Landings of Lexington.

64.     Defendant Lexington Leased Housing Associates I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Lexington Leased Housing Associates I, LLC is the registered agent and general partner of Defendant Lexington Leased Housing Associates I, LLLP.

*Legends of Blaine – Developer & Owner*

65.     Defendant Blaine Leased Housing Development III, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Blaine Leased Housing Development III, LLC is the developer of Legends of Blaine.

66.     Defendant Blaine Leased Housing Associates III, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Blaine Leased Housing Associates III, LLLP is the owner of Legends of Blaine.

67.     Defendant Blaine Leased Housing Associates III, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Blaine Leased Housing Associates III, LLC is the registered agent and general partner of Defendant Blaine Leased Housing Associates III, LLLP.

*Legends of Spring Lake Park – Developer & Owner*

68.     Defendant Spring Lake Park Leased Housing Development I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite

-19-

150, Plymouth, Minnesota 55441. Spring Lake Park Leased Housing Development I, LLC is the developer of Legends of Spring Lake Park.

69.     Defendant Spring Lake Park Leased Housing Associates I, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Spring Lake Park Leased Housing Associates I, LLLP is the owner of Legends of Spring Lake Park.

70.     Defendant Spring Lake Park Leased Housing Associates I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Spring Lake Park Leased Housing Associates I, LLC is the registered agent and general partner of Defendant Spring Lake Park Leased Housing Associates I, LLLP.

*Preserve at Shady Oak – Developer & Owner*

71.     Defendant Minnetonka Leased Housing Development II, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Minnetonka Leased Housing Development II, LLC is the developer of Preserve at Shady Oak.

72.     Defendant Minnetonka Leased Housing Associates II, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Minnetonka Leased Housing Associates II, LLLP is the owner of Preserve at Shady Oak.

73.     Defendant Minnetonka Leased Housing Associates II, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150,

-20-

Plymouth, Minnesota 55441. Minnetonka Leased Housing Associates II, LLC is the registered agent and general partner of Defendant Minnetonka Leased Housing Associates II, LLLP.

*The Bluffs at Liberty Glen – Developer & Owner*

74.     Defendant St. Cloud Leased Housing Development III, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Cloud Leased Housing Development III, LLC is the developer of The Bluffs at Liberty Glen.

75.     Defendant St. Cloud Leased Housing Associates III, LLLP is a Minnesota limited liability limited partnership with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Cloud Leased Housing Associates III, LLLP is the owner of The Bluffs at Liberty Glen.

76.     Defendant St. Cloud Leased Housing Associates III, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. St. Cloud Leased Housing Associates III, LLC is the registered agent and general partner of Defendant St. Cloud Leased Housing Associates III, LLLP.

*Parent Companies, Project Sponsors, and Guarantors for All Dominium Properties*

77.     Defendant Dominium Development & Acquisition, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Dominium Development & Acquisition, LLC is the "Project Sponsor / Parent Company" on several Dominium Properties' LIHTC applications.

78.     Defendant Dominium, Inc. is a Minnesota corporation with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Dominium, Inc. is the "Project Sponsor / Parent Company" on several Dominium Properties' LIHTC applications.

79.     Defendant Dominium Holdings I, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Dominium Holdings I, LLC is the "Guarantor" on several Dominium Properties' LIHTC applications.

80.     Defendant Dominium Holdings II, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Dominium Holdings II, LLC is the "Guarantor" on several Dominium Properties' LIHTC applications.

*Management Company for All Dominium Properties*

81.     Defendant Dominium Management Services, LLC is a Minnesota limited liability company with its principal place of business at 2905 Northwest Boulevard, Suite 150, Plymouth, Minnesota 55441. Dominium Management Services, LLC is the "Management Company" on all Dominium Properties' LIHTC applications. Dominium Management Services, LLC is identified as the "Authorized Management Agent," the "Owner's Authorized Agent," the "Agent for Owner," the "Agent for the Owner of the Apartments," the "Owner's Agent," and the "Landlord" on many, and on information and belief all, lease agreements and addenda entered into with residents of the Dominium Properties.

## JURISDICTION AND VENUE

82.     This is a civil case in which the Court has original jurisdiction under Minn. Stat. § 484.01.

83.     The Court has personal jurisdiction over Defendants because Defendants maintain their principal place of business in Minnesota, transact business here, use real or personal property

here, and have committed acts in and outside of Minnesota that have caused injury here. Minn. Stat. § 543.19.

84.    Venue is proper in Hennepin County because the cause of action arose in part in Hennepin County and because Defendants maintain offices and business places there. Minn. Stat. § 542.09.

85.    Plaintiffs have standing to assert the statutory claims recited herein under the Minnesota Private Attorney General Statute. Minn. Stat. § 8.31, subd. 3(a).

## FACTS

### A.    Background: The Low-Income Housing Tax Credit Program

86.    The LIHTC program was established by the Tax Reform Act of 1986. The program was adopted to encourage private investment in much needed affordable rental housing, for which it is the largest source of federal assistance.[2] Proper functioning of the LIHTC program provides the public benefit of creating decent, safe, affordable housing. It also creates a public benefit to reputable developers that compete for the limited amount of LIHTC.

87.    LIHTC are federal income tax credits that may be claimed for a ten-year period, beginning with either the taxable year in which a building is placed in service or, at the election of the taxpayer, the succeeding taxable year. 26 C.F.R. § 1.42-1T(a)(1).

88.    Since 2010, the LIHTC program has financed approximately 50,000 housing units annually.[3]

---

[2] U.S. GOV'T ACCOUNTABILITY OFF., GAO-16-360, LOW-INCOME HOUSING TAX CREDIT: SOME AGENCY PRACTICES RAISE CONCERNS AND IRS COULD IMPROVE NONCOMPLIANCE REPORTING AND DATA COLLECTION (2016) [hereinafter "GAO 2016 REPORT"] at 1.

[3] U.S. GOV'T ACCOUNTABILITY OFF., GAO-18-637, LOW-INCOME HOUSING TAX CREDIT: IMPROVED DATA AND OVERSIGHT WOULD STRENGTHEN COST ASSESSMENT AND FRAUD RISK MANAGEMENT (2018) [hereinafter "GAO 2018 REPORT"] at 1.

-23-

89.     The LIHTC program is jointly administered by the IRS and the Allocators—typically state or local housing finance agencies such as the Minnesota Housing Finance Agency. Although the IRS provides the general regulatory framework governing administration of the program, Allocators are charged with LIHTC allocation and most program oversight.

90.     Each state receives an annual LIHTC allocation based on population. Subject to federal guidelines, Allocators then set their own priorities for allocating LIHTC by issuing a Qualified Allocation Plan ("QAP"). Among other factors, QAPs may prioritize projects serving lower income tenants, projects located in areas of particular need, and projects serving low-income tenants for the greatest period of time. Allocators must also consider the reasonableness of costs and other factors in scoring LIHTC proposals.

91.     Affordable housing developers apply to Allocators for LIHTC by preparing and submitting a detailed application. LIHTC may be used for projects constructing new affordable housing developments or acquiring and rehabilitating existing properties for affordable housing.

92.     Using the QAP, an Allocator evaluates and scores developers' LIHTC applications, awarding LIHTC to owners of qualifying affordable housing projects that reserve all or a portion of their units for low-income individuals.[4]

93.     Generally speaking, the amount of LIHTC awarded depends on a project's "eligible basis." The eligible basis includes depreciable project costs for the portion of the housing to be dedicated to affordable housing. In the River North project, for instance, the basis included $26.5 million of the $31.4 million total cost of the development. (Exhibit B, River North's Form 8069, Low-Income Housing Credit Allocation and Certification [hereinafter "River North LIHTC

---

[4] Although there are two types of LIHTC—a four-percent and nine-percent credit—the distinction is immaterial for purposes of this action.

App."] at 15-17.) Developers must accurately describe costs to ensure that Allocators can determine the appropriate credit at different stages: at application, at allocation, and when placed-in-service.[5]

94.    Certain costs may be included in a project's eligible basis, while others may not. *See* 26 U.S.C. § 42(d)(4)(B). Because eligible basis determines the amount of LIHTC, the key principle is that developers should receive tax credit for costs and lost opportunity involved in providing affordable housing rented at below-market rates. That is, eligible basis is used to measure the amount that the government extends in LIHTC to bridge the financial gap between project costs and rent that developers agree to forego to benefit low-income tenants. In the River North project's application materials submitted to its Allocator, Minnesota Housing Finance Agency, it was projected that investors would contribute approximately $8.5 million to receive the LIHTC, that rents would cover a mortgage loan of nearly $19 million (from about $1.7 million in subsidized loans from the City of Coon Rapids), and that the remaining development costs would be covered by a deferral of Dominium's developer fee (to be repaid over time from cash flow). (Exhibit B, River North LIHTC App. at 3, 12, 17.) When a project is placed in service, the developer must submit a final cost certification to the Allocator detailing a project's total costs and eligible basis.[6]

95.    Once LIHTC have been calculated and awarded, the Allocator is responsible for monitoring compliance, and the developer must comply with a host of ongoing reporting

_____

[5] GAO 2016 REPORT at 9.

[6] GAO 2018 REPORT at 5.

-25-

requirements. Though LIHTC are claimable for a period of ten years, a portion may be recaptured if the project does not comply for fifteen years.[7]

**B.   Economics of LIHTC**

96.    Once a project has been awarded LIHTC, a developer identifies an investor willing to contribute equity financing in exchange for a limited partnership or membership interest in the owner. For example, a developer may obtain a single investor, or in many instances, have an investor that is a fund managed by a syndicator who acts as an intermediary between a developer and investors.[8]

97.    The equity obtained from private investors, in combination with debt supported by the rents and various sources of public subsidy, is then used to construct new affordable housing developments or acquire and rehabilitate existing properties.

98.    Attracting private equity using LIHTC enables developers to build and sustain quality affordable housing. Equity contributions lessen the debt burden on LIHTC projects, reduce the need for costlier sources of financing, and in turn enable property owners to sustainably offer lower rents to tenants. Thus, LIHTC have significant economic value and can result in substantial equity investments, a process that facilitates further investment in affordable housing if structured appropriately, but risks misdealing and profiteering if not.

99.    LIHTC provide significant benefit to investors. The greatest benefit to investors is that LIHTC can be used to offset income tax liabilities over a ten-year credit period, often on a dollar-for-dollar basis. As such, an investor is typically granted a limited partnership interest or a membership interest in a limited liability company, while the developer stays on as the general

---

[7] GAO 2016 REPORT at 8.

[8] GAO 2018 REPORT at 5.

partner or managing member to control all phases of the development.[9]  This is the model followed by Dominium.

## C.   Dominium

100.   Dominium describes itself as "one of the nation's largest and most innovative affordable housing development and management companies."[10] Dominium's portfolio contains 30,000 apartments spanning 22 states and more than $3 billion in properties.[11]

101.   By 2025, Dominium "expects to be the country's pre-eminent private developer, owner, and property manager of affordable housing," at which time it to hopes to have grown to 40,000 units.[12]

102.   Given its longstanding focus on affordable housing, obtaining favorable sources of financing is a critical part of Dominium's business model. Dominium utilizes tax-exempt bonds, tax increment financing, LIHTC, HOME financing, and other loans and grants awarded through government programs.[13]

103.   Indeed, Dominium boasts an in-house team of financing experts that "understands the inner workings of each of these sources of funding."[14]

---

[9] *Id.*

[10] Dominium – At a Glance, https://www.dominiumapartments.com/about-dominium.html (last visited Feb. 3, 2021).

[11] *Id.*

[12] *Id.*

[13] Dominium – A Variety of Financial Tools,
https://www.dominiumapartments.com/development/development-and-acquisition.html (last visited Feb. 3, 2021).

[14] *Id.*

-27-

104.    A sophisticated understanding of government programs has proven lucrative for Dominium. The company was originally founded in 1972 as a developer of Section 8 subsidized housing, shifting its business model in 1990 to focus on the LIHTC program to acquire and develop affordable housing.[15]

105.    Dominium's strategy was effective. By 2011, Dominium's portfolio included 20,000 units.[16]

106.    But Dominium's business model is not limited to acquisition and development. Rather, Dominium employs a comprehensive, vertically integrated approach to real estate development. One arm of the business, Dominium Construction & Architectural Services ("DCAS"), provides contracting, construction, and architectural services. Dominium's construction professionals run point "from start to finish"; its architects "from concept to completion."[17]

107.    Another arm, Dominium Management Services, LLC, provides management services for all of its properties. As part of its management operations, Dominium Management Services, LLC hires, trains, and supervises site staff; maintains building and grounds; charges, collects, and deposits rent; pays property insurance, invoices for normal property operations, and real estate taxes; produces and delivers financial statements; and finds, qualifies, leases to, and manages tenants. Notably, Dominium illegally operated in Minnesota as a management company

---

[15] Dominium – Company History, https://www.dominiumapartments.com/about-dominium/history.html (last visited Feb. 3, 2021).

[16] *Id.*

[17] Dominium – Construction and Architectural Services, https://www.dominiumapartments.com/development/construction-and-architectural-services.html (last visited Feb. 3, 2021).

for the majority of its existence—from 1978 to 2017—until the Minnesota Department of Commerce ordered Dominium to cease and desist from engaging in unlicensed real estate activity and pay civil penalties to the state.[18]

108.    Thus, in addition to possessing a sophisticated understanding of the LIHTC program, Dominium is also intimately involved at every stage of its projects, including all aspects of budgeting and cost management as well as contracting with tenants and engaging in property management.

109.    Dominium boasts its expertise in project and market due diligence, purchase contract negotiations, financial partner due diligence, architectural design, contractor bidding and selection, construction management, budget and schedule oversight, budget management, and portfolio maintenance.[19]

110.    Dominium represents to tenants that this comprehensive approach "delivers excellent performance."[20]

111.    Upon closer examination, Dominium's expertise lies in manipulating the LIHTC application and award process and defrauding its tenants of millions of dollars.

---

[18] *In the Matter of the Unlicensed Real Estate Activity of Dominium Management Services, LLC*, 2017 WL 11446478 (Minn. Dept. Comm. Jan. 3, 2017) (Dominium Management Services, LLC entered into a Consent Cease and Desist Order because it had been illegally operating as a real estate property management company, as defined in Minn. Stat. § 82.55, subd. 19(a), since 1978 without a real estate broker license, in violation of Minn. Stat. § 82.81, subd. 1 (2014).)

[19] Dominium – Development / Expertise and Process
https://www.dominiumapartments.com/development/expertise-and-process.html (last visited Feb. 3, 2021).

[20] Dominium – About, https://www.dominiumapartments.com/about-dominium.html (last visited Feb. 3, 2021).

**D.    Dominium Defrauds the LIHTC Program & Its Tenants**

112.   Dominium's fraudulent and illegal business model thrives due to a well-recognized and uncorrected lack of regulatory oversight. For example, the GAO reports that "some LIHTC projects have been scrutinized for high or fraudulent development costs."[21] But such scrutiny is an anomaly because "[n]o federal agency monitors or assesses LIHTC development costs, which are key to evaluating the efficiency and effectiveness of the tax credit program."[22] This is precisely the regulatory gap that allows Dominium's fraud to thrive. Although the "IRS is the only federal agency responsible for overseeing the LIHTC program, it does not assess the performance of the program."[23] GAO noted that a lack of oversight, collection of standardized data, and cost-certification controls render the LIHTC program particularly susceptible to the type of fraud committed by Dominium. Although "the extent of fraud in the LIHTC program is not known, federal legal actions involving LIHTC projects in Florida highlight the risk of unscrupulous developers, contractors, and subcontractors inflating costs and obtaining excess program resources for personal financial gain."[24] But such enforcement actions are few and far between. Like many public programs, the LIHTC program works best when participants act in good faith—less so when participants are willing to cheat the system.

113.   Dominium's fraud begins with the LIHTC application process, where it intentionally misrepresents its development costs to Minnesota Housing Finance Agency in order to maximize the LIHTC award it receives for a given project, despite Dominium's certification

---

[21] GAO 2018 REPORT at 65.

[22] *Id.* at 63.

[23] *Id.*

[24] *Id.* at 46.

-30-

that it has complied with all applicable laws and regulations, that all information contained in its application is "true, correct, and complete," and that "any misrepresentations and/or fraudulent information" made in its application "may result in termination of HTC [Low Income Housing Tax Credit] by Minnesota Housing" and may "bar [Dominium] and related parties from future program participation," including being reported to the IRS. (Exhibit B, River North LIHTC App. at 5.)

114.    Dominium intentionally engages in cost-shifting in the application process. Dominium knowingly misrepresents the cost of developing parking by shifting the vast majority of its actual parking development and construction costs into its eligible basis. This misrepresentation is not a matter of interpretation, and Dominium instead claims that approximately 90% or more of the costs of constructing parking are actually construction costs for residential rental housing which are improperly included in its eligible basis to inflate its tax credit award.

115.    This misrepresentation is fraudulent because Dominium's intentional scheme is to charge its tenants monthly rent for parking, which is prohibited when the developer includes construction costs in its eligible basis. Amenities like parking or common areas can only be included in eligible basis if tenants are *not* charged for their use and are made available to "all residential units." *See* 26 U.S.C. § 42(d)(4)(B).

116.    Thus, LIHTC developers like Dominium have a simple choice:

   a. **exclude parking costs** from the eligible basis, in which case tenants **may** be charged additional rent for parking; or

   b. **include parking costs** in the eligible basis, in which case tenants **may not** be charged rent for parking.

117.    Despite this clear mandate, Dominium states that it is excluding its parking costs from its eligible basis on its LIHTC application, but it actually fraudulently shifts the vast majority of its parking costs into its eligible basis—thereby receiving inflated LIHTC—and proceeds to charge tenants for parking. Because Dominium financed nearly all of its parking costs through LIHTC, it is unlawful for it to charge tenants for that parking.

118.    Dominium employed this scheme at all the "Dominium Properties" listed *supra* at pp. 5-6, and likely employed this scheme at additional properties.

119.    Dominium markets underground, heated parking as an important part of its "new benchmark for quality and affordability"[25] and separately charges its tenants for that parking.

120.    Dominium promises tenants in its standard lease addendum: "The premises are to be operated in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended (the 'Program')." (Exhibit A, Dominium Lease Agreement at 14.)

121.    In each LIHTC application for the foregoing properties, Dominium deliberately misrepresented its parking costs to Minnesota Housing Finance Agency by underreporting its parking costs by orders of magnitude.

122.    Dominium's River North application is demonstrative. There, Dominium proposed building 116 underground, heated parking spaces, for which it would charge tenants $75 per month per space. (Exhibit B, River North LIHTC App. at 10.) This charge is lawful only if Dominium excluded the full construction costs related to parking facilities from its eligible basis, which it intentionally did not do. Dominium represented in its River North application that its total parking

---

[25] Dominium – Twin Cities Senior Living, https://www.dominiumapartments.com/senior-living.html (last visited Feb. 3, 2021).

-32-

costs were $255,000 for 116 parking spaces—or $2,198.28 per parking space—and, therefore, excluded $255,000 from eligible basis. (*Id.* at 14.) This figure is so grossly understated that it cannot be an honest mistake. Instead, it is the heart of Dominium's fraudulent scheme to double-dip.

123. For example, the average construction costs for an underground parking space in a 2012 analysis of twelve American cities ranged from $26,000-$48,000, with an average of $34,000 per space.[26] In 2013, on average, the hard costs for standalone structured parking in Minneapolis were estimated to exceed $20,000 per space, with parking incorporated into a mixed-use building running even higher.[27] In 2019, the average cost of structured parking in Minneapolis was approximately $22,981.00 per parking space.[28] In a stark contrast, a review of the Dominium's LIHTC applications for 18 of its properties in Minnesota reveals that Dominium only reported actual construction costs averaging a mere $3,709 per space. Only fraud and deception explain the wide difference between the actual costs reflected in these studies and the figures set forth in Dominium's LIHTC applications. The pattern of Dominium's consistent misrepresentations related to the costs of constructing parking demonstrate an intentional scheme to defraud Plaintiffs and induce them to pay for parking that Dominium is legally obligated to provide without charge.

124. Conservatively applying the average Minneapolis price per stall in 2019 of $22,981, Dominium's cost to construct parking would be expected to be $2,665,796 for the River North

---

[26] Donald Shoup, *The High Cost of Minimum Parking Requirements, in* PARKING: ISSUES AND POLICIES, 5 TRANSP. AND SUSTAINABILITY 87, 90 (2014).

[27] *Minneapolis East Downtown Parking Lot Study*, HR&A Advisors, Inc. (*prepared for* City of Minneapolis, Dep't of Cmty. Plan. and Econ. Dev.) (Mar. 22, 2013) at 7, http://www2.minneapolismn.gov/www/groups/public/@cped/documents/webcontent/wcms1p-118839.pdf.

[28] *Parking Structure Cost Outlook for 2019,* WGI (May 23, 2019) https://wginc.com/parking-outlook/.

complex, more than ten times the amount reported by Dominium in its River North application of $255,000. By drastically understating its parking construction costs at just $255,000, Dominium excluded $255,000 from its eligible basis and effectively shifted the remaining $2,410,00 of its actual parking costs into its eligible basis, allowing it to obtain LIHTC to fund the majority of its parking construction costs even as it intended to charge tenants for parking. Its fraudulent misstatements of its parking costs allowed Dominium to obtain equity from an investor for the LIHTC for parking construction costs while then charging its tenants parking rent of $75 per month. Dominium's fraudulent scheme relied on payments from tenants that they should not have been required to pay absent Dominium's fraud. Dominium has engaged in this deceptive and fraudulent practice at all properties at issue in this action, and likely more.

125.    Because the vast majority of Dominium's parking construction costs were subsidized with LIHTC, Dominium was required to provide the parking to its tenants at no additional cost. Instead, Dominium charges its tenants $75 per month for parking. (*See, e.g.,* Exhibit A, Dominium Lease Agreement at 1.) Parking charges are a material term in the affected tenants' leases and Dominium has promised its tenants that their apartment units will be "operated in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended," and warrants that tenants' rights "are subject to the requirements that must be met under the Program in order for the Landlord to qualify to take the cost of the premise into basis for calculation of Landlord's tax credit." (*Id.* at 24.)

126.    This was a direct, fraudulent misrepresentation to each tenant, including all tenants who were charged separate fees for LIHTC-financed parking. Instead of complying with the law, Dominium fraudulently and deceptively charged Plaintiffs and class members separate fees for LIHTC-financed parking.

-34-

127.    Dominium's misrepresentations to the Allocators is also actionable. There is a causal nexus between Dominium's affirmative misrepresentations in its LIHTC applications regarding its parking costs because that scheme depends on wrongly profiting from the parking payments made by tenants who should not have been required to pay for LIHTC-financed parking. In addition to fraudulent statements in its applications, Dominium falsely certified its eligible basis for each of the Dominium Properties when they were placed in service.

128.    In addition to making actionable misrepresentations to Allocators and tenants, Dominium failed to disclose its fraud and deception to tenants who were charged for LIHTC-financed parking. Dominium's relationships with its tenants and its legal obligations as a provider of affordable housing constitute the type of special circumstances making its omissions fraudulent.

129.    When Dominium promised to operate its properties in accordance with the law yet charged tenants separately for parking, Dominium had a duty to disclose to tenants that Dominium was not, in fact, operating its properties in accordance with the law or that Dominium was otherwise illegally charging tenants for LIHTC-financed parking.

130.    Dominium had a duty to state the lawful amount it was allowed to charge tenants for parking because Dominium has special knowledge about its misrepresentations in the LIHTC applications and the fact that Dominium was prohibited from charging its tenants for LIHTC-financed parking.

131.    Dominium has a special legal obligation to its tenants based on Dominium's promise to operate its properties in accordance with the law and as a provider of affordable housing whose business is predicated on public funds supporting that mission.

132.    Moreover, Dominium's fraudulent scheme has impacted all of its dealings with low-income tenants and goes to the core of the leases between Dominium and its tenants. Tenants

-35-

enter leases with Dominium relying on its duty not to charge them unlawful rent and believing they can rely on Dominium's obligations to comply with the law governing affordable housing. And, for many tenants, safe and secure parking is integral to their choice of where to live, so parking cannot be separated from their full leases. Dominium uses affordable housing to induce tenants to sign leases allowing it to charge not only rent, but parking rent. Thus, Dominium's fraudulent parking scheme cannot be separated from its leases.

133.    Plaintiffs and class members, as reasonable consumers, had no reason to question— much less scrutinize—the lawfulness of Dominium's charging rent for parking in light of Dominium's promise that their properties would be operated in accordance with the requirements of the LIHTC program. Implicit in each tenant's lease and included as a covenant of good faith and fair dealing, is the representation that Dominium had the legal right and authority to separately charge tenants for parking. Plaintiffs and class members reasonably relied on the false representations of Dominium and its employees in agreeing to make additional rent payments for parking at the Dominium Properties.

134.    Dominium has fraudulently concealed and perpetuated its scheme of unlawfully collecting parking rent while continuing to receive LIHTC, falsely certifying on an annual basis its compliance with LIHTC program requirements. And tenants reasonably rely on Dominium's obligation to operate in compliance with the law in dealing with it and paying both rent and parking rent.

135.    Dominium's fraudulent scheme has resulted in the wrongful charging of tenants for parking rent at each of its buildings from time they were placed-in-service to the present. Dominium's fraudulent and deceptive conduct is on-going, long-standing, pervasive, and widespread. Dominium has been misrepresenting its eligible costs in its LIHTC applications and

annual certifications for years. Accordingly, it has been illegally charging its tenants for LIHTC-financed parking for years. Dominium has pervasively engaged in this fraudulent and deceptive conduct at every property at issue in this action. Upon information and belief, Dominium has engaged in the same or similar conduct at its tens of thousands of units nationwide. Far from a discreet or transactional fraud and deception, Dominium's fraudulent scheme has been and remains widespread. In Dominium's own words, "Dominium specializes in project and residential **compliance under various governmental programs** such as Section 8, FMHA 515, public housing, **state agency funded properties and Section 42-Low Income Housing Tax Credit (LIHTC) properties**."[29]

136.    This lawsuit has substantial public benefit. Dominium's fraud and deception has a profoundly adverse effect on the public. Dominium's misrepresentations about its parking costs and its compliance with LIHTC laws are widely broadcast in its submissions to governmental agencies and in its communications to the public. Dominium is profiting at the expense of low-income tenants including elderly individuals. Low-income tenants are often vulnerable and less able to absorb Dominium's illegal parking charges. Dominium specifically targets senior citizens and/or disabled persons at many of its properties, boasting that underground heated parking is a "luxurious" amenity offered. Dominium's misconduct goes to the core concerns animating the Private Attorney General Statute, *see* Minn. Stat. § 8.31, subd. 3a, and Minnesota's consumer fraud and deceptive trade practices laws, all of which reflect Minnesota's strong interest in providing remedies against those who prey on consumers.

---

[29] Dominium LinkedIn Profile, https://www.linkedin.com/company/dominium (last visited Feb. 3, 2021) (emphasis added).

137. The Minnesota legislature has determined that preying on senior citizens and disabled persons is a particularly pernicious behavior such that offending defendants are subject to heightened penalties and restitution. *See* Minn. Stat. § 325F.71, subd. 2. Dominium's misconduct is the very definition of predatory conduct that takes advantage of elderly, senior citizens, disabled persons, and the vulnerable. Many of Dominium's tenants fit the statutory definition of senior citizens and disabled persons, and Dominium knows it. Indeed, Dominium specifically targets such individuals with its unlawful scheme.

138. Dominium has been unjustly enriched by intentionally and wrongly charging tenants for parking, which should have been included in lease agreements without charge. Its ill-gotten profits from that scheme include parking rents and all rents paid by affected tenants.

139. In addition to defrauding its substantial tenant population, as one of the largest private providers of affordable housing, Dominium is illegally diverting limited and critical affordable housing funds to its shareholders as ill-gotten gains rather than further and proper investment in affordable housing. Moreover, because other developers compete for the same funds, other developers and their tenants are adversely affected to the extent that Dominium's fraud and deception limit the available funds for new construction or rehabilitation of affordable housing.

140. The public benefit sought in this action includes injunctive relief to prevent Dominium from further harm to the public, disgorgement of Dominium's ill-gotten gains, and rescissionary damages. Both injunctive relief and damages will serve a strong deterrent to Dominium and any other current or prospective bad actors seeking to engage in such misconduct. To the extent that this class action redresses Dominium's fraud and deception and prevents other actors from engaging is a similar conduct, the public will be well served.

E.     **Plaintiffs' Allegations**

141.     Plaintiff Susan Iliff has suffered a particularized and concrete injury of paying unlawful parking rent of $75 per month at Dominium's River North complex since on or about 2015. Dominium covenanted to Ms. Iliff in her lease agreement that it was operating in accordance with the law, specifying that it was operating in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended. But that covenant was an intentional misrepresentation of material fact. Dominium knowingly failed to abide by the LIHTC laws and regulations by charging Ms. Iliff $75 per month for parking while also obtaining LIHTC benefits for the majority of its parking costs. Dominium's misrepresentation to Ms. Iliff was material as it was critically important to her when choosing an apartment in 2015 that she not only obtain covered, secure parking as a disabled woman in her mid-60s, but that she also enter into a contract with a landlord who was abiding by the law. Dominium intentionally misled Ms. Iliff into believing that she entered into a legal lease agreement that required her to pay $75 per month for a parking space.

142.     Plaintiff Betty Lees has suffered a particularized and concrete injury of paying unlawful parking rent of $75 per month at Dominium's River North complex since on or about July 1, 2017. Dominium covenanted to Ms. Lees in her lease agreement that it was operating in accordance with the law, specifying that it was operating in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended. But that covenant was an intentional misrepresentation of material fact. Dominium knowingly failed to abide by the LIHTC laws and regulations by charging Ms. Lees $75 per month for parking while also obtaining LIHTC benefits for the majority of its parking costs. Dominium's misrepresentation to Ms. Lees was material as it was critically important to Ms. Lees when

-39-

choosing an apartment in 2017 that she not only obtain secure, heated parking as a woman in her late-70s living through harsh Minnesota winters, but that she also enter into a contract with a landlord who was abiding by the law. Dominium intentionally misled Ms. Lees into believing that she entered into a legal lease agreement that required her to pay $75 per month for a parking space.

143.    Plaintiff Linda Cobb has suffered a particularized and concrete injury of paying unlawful parking rent of $80 per month at Dominium's Legends of Silver Lake complex since on or about June 2015. Dominium covenanted to Ms. Cobb in her lease agreement that it was operating in accordance with the law, specifying that it was operating in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended. But that covenant was an intentional misrepresentation of material fact. Dominium knowingly failed to abide by the LIHTC laws and regulations by charging Ms. Cobb $80 per month for parking while also obtaining LIHTC benefits for the majority of its parking costs. Dominium's misrepresentation to Ms. Cobb was material as it was critically important to Ms. Cobb when choosing an apartment in 2015 that she not only obtain protected parking as a woman in her mid-60s living through harsh Minnesota winters, but that she also enter into a contract with a landlord who was abiding by the law. Dominium intentionally misled Ms. Cobb into believing that she entered into a legal lease agreement that required her to pay $80 per month for a parking space.

144.    Plaintiff Nancy Lawrence has suffered a particularized and concrete injury of paying unlawful parking rent of $75 per month at Dominium's River North complex since on or about January 2017. Dominium covenanted to Ms. Lawrence in her lease agreement that it was operating in accordance with the law, specifying that it was operating in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue

-40-

Code of 1986, as amended. But that covenant was an intentional misrepresentation of material fact. Dominium knowingly failed to abide by the LIHTC laws and regulations by charging Ms. Lawrence $75 per month for parking while also obtaining LIHTC benefits for the majority of its parking costs. Dominium's misrepresentation to Ms. Lawrence was material as it was critically important her when choosing an apartment in 2017 that she not only obtain safe and heated parking as a woman in her mid-70s living through harsh Minnesota winters, but that she also enter into a contract with a landlord who was abiding by the law. Dominium intentionally misled Ms. Lawrence into believing that she entered into a legal lease agreement that required her to pay $75 per month for a parking space.

145.    Plaintiff Patricia Johnson has suffered a particularized and concrete injury of paying unlawful parking rent of $75 per month at Dominium's River North complex since on or about January 2017. Dominium covenanted to Ms. Johnson in her lease agreement that it was operating in accordance with the law, specifying that it was operating in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended. But that covenant was an intentional misrepresentation of material fact. Dominium knowingly failed to abide by the LIHTC laws and regulations by charging Ms. Johnson $75 per month for parking while also obtaining LIHTC benefits for the majority of its parking costs. Dominium's misrepresentation to Ms. Johnson was material as it was critically important her when choosing an apartment in 2017 that she not only obtain covered parking as a woman in her late-60s living through harsh Minnesota winters, but that she also enter into a contract with a landlord who was abiding by the law. Dominium intentionally misled Ms. Johnson into believing that she entered into a legal lease agreement that required her to pay $75 per month for a parking space.

146.    Plaintiff Gwenneth Larson has suffered a particularized and concrete injury of paying unlawful parking rent of $75 per month at Dominium's River North complex since on or about July 2017. Dominium covenanted to Ms. Larson in her lease agreement that it was operating in accordance with the law, specifying that it was operating in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended. But that covenant was an intentional misrepresentation of material fact. Dominium knowingly failed to abide by the LIHTC laws and regulations by charging Ms. Larson $75 per month for parking while also obtaining LIHTC benefits for the majority of its parking costs. Dominium's misrepresentation to Ms. Larson was material as it was critically important her when choosing an apartment in 2017 that she not only obtain covered, secure parking as a woman in her late-70s living through harsh Minnesota winters, but that she also enter into a contract with a landlord who was abiding by the law. Dominium intentionally misled Ms. Larson into believing that she entered into a legal lease agreement that required her to pay $75 per month for a parking space.

147.    Plaintiff Patricia Noel has suffered a particularized and concrete injury of paying unlawful parking rent of $75 per month at Dominium's Legends of Champlin complex since on or about April 2018. Dominium covenanted to Ms. Noel in her lease agreement that it was operating in accordance with the law, specifying that it was operating in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended. But that covenant was an intentional misrepresentation of material fact. Dominium knowingly failed to abide by the LIHTC laws and regulations by charging Ms. Noel $75 per month for parking while also obtaining LIHTC benefits for the majority of its parking costs. Dominium's misrepresentation to Ms. Noel was material as it was critically important her when choosing an

-42-

apartment in 2018 that she not only obtain safe and covered parking as a woman in her late-70s living through harsh Minnesota winters, but that she also enter into a contract with a landlord who was abiding by the law. Dominium intentionally misled Ms. Noel into believing that she entered into a legal lease agreement that required her to pay $75 per month for a parking space.

148.    Plaintiff Sharifah Doyle-El has suffered a particularized and concrete injury of paying unlawful parking rent of $140-145 per month at Dominium's 1500 Nicollet complex since on or about December 2020. Dominium covenanted to Ms. Doyle-El in her lease agreements that it was operating in accordance with the law, specifying that it was operating in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended. But that covenant was an intentional misrepresentation of material fact. Dominium knowingly failed to abide by the LIHTC laws and regulations by charging Ms. Doyle-El $140-145 per month for parking while also obtaining LIHTC benefits for the majority of its parking costs. Dominium's misrepresentation to Ms. Doyle-El was material as it was critically important her when choosing an apartment in 2019 that she not only obtain safe and covered parking as a single mother with two young children living through harsh Minnesota winters in downtown Minneapolis, but that she also enter into a contract with a landlord who was abiding by the law. Dominium intentionally misled Ms. Doyle-El into believing that she entered into a legal lease agreement that required her to pay $140-145 per month for a parking space.

149.    Plaintiff HOME Line has suffered particularized and concrete injury directly connected to the tenant, consumer, and consumer fraud and deceptive trade practices protections under Minnesota law. Dominium fraudulently charging tenants monthly parking rent has injured HOME Line by: (1) undermining HOME Line's advocacy, education, and training programs designed to promote fair and affordable housing; (2) requiring HOME Line to divert scarce

-43-

resources away from their usual activities and instead to devote substantial time to gathering data, reviewing data, interviewing witnesses, and developing materials to track Dominium's practices; (3) frustrating HOME Line's missions of preserving affordable housing and stopping bad management practices; and (4) harming the tenant communities that HOME Lines serves.

## CLASS ALLEGATIONS

150.    Plaintiffs bring all claims herein pursuant to Minn. R. Civ. P. 23. The requirements of Minn. R. Civ. P. 23 are each satisfied with respect to the class defined below.

### A.    Class Definition

151.    Plaintiffs seek to represent a class defined as all tenants of the Dominium Properties located in Minnesota who have paid parking rent.

### B.    The Rule 23.01 Prerequisites

152.    **Numerosity.** The class is so numerous that joinder of all members is impracticable. Plaintiffs estimate the class to include thousands of individuals that paid additional rent for parking. The number and identities of all class members can be determined through appropriate discovery in the possession of Defendants.

153.    **Commonality.** There are questions of law or fact common to the class, which include but are not limited to the following:

a.    Whether Defendants unlawfully charged Plaintiffs and class members for parking spaces and/or structures which it financed in whole or in part with the assistance of LIHTC;

b.    Whether Defendants should be enjoined from future unlawful parking charges;

c.    Whether a causal nexus exists such that Plaintiffs and class members are persons harmed by Defendants' fraudulent misrepresentations or omissions;

-44-

d.      Whether Defendants intended to deceive Plaintiffs and class members by negotiating, entering into, and enforcing leases that required unlawful additional payments for parking;

e.      Whether Defendants' conduct violated Minnesota law, including the Prevention of Consumer Fraud Act and Uniform Deceptive Trade Practices Act;

f.      Whether Defendants were unjustly enriched by charging additional rent for leasing parking spaces and/or stalls that were constructed with the assistance of LIHTC; and

g.      Whether Plaintiffs and class members have been damaged and, if so, the proper measure of damages.

154.    **Typicality.** Plaintiffs' claims are typical of the claims of the class as a whole. Like Plaintiffs, class members were injured by paying additional fees for parking that had been constructed or rehabilitated using LIHTC. Thus, Plaintiffs and class members have all suffered the same or similar injury as a result of Defendants' fraudulent and deceptive practices.

155.    **Adequacy of Representation.** Plaintiffs are committed to pursuing this action and have retained counsel who are qualified, experienced, and capable of conducting the litigation and representing the interests of the entire class. Plaintiffs know of no conflicts of interest among class members.

C.      **The Proposed Class Satisfies the Rule 23.02(c) Prerequisites for Damages**

156.    The common questions of law and fact enumerated above predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual class members will prosecute separate actions is remote given the excessive time and considerable expense

-45-

necessary to conduct such litigation, especially given the relatively modest amount of monetary, injunctive, and equitable relief at issue for each individual class member.

**D.     The Proposed Class Satisfies the Rule 23.02(b) Prerequisites for Injunctive Relief**

157.    Defendants have acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate final injunctive and equitable relief with respect to the class as a whole. Many class members continue to live and pay additional fees for parking at the Dominium Properties and are therefore in danger of being harmed again. Defendants should be ordered to notify class members that it will cease collecting additional rent payments for parking.

158.    Defendants' ongoing and systematic practices are applied uniformly to class members, making declaratory relief appropriate.

**E.     The Proposed Class Satisfies the Rule 23.02(a) Prerequisites**

159.    The prosecution of separate actions by or against individual class members would create a risk of:

a.      inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants; and

b.      adjudications with respect to individual class members which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

**COUNT ONE**
**Minnesota Prevention of Consumer Fraud Act**

160.    Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

161.    The residential properties and related services offered by Dominium, including parking, are merchandise as defined in Minn. Stat. § 325F.68, subd. 2.

-46-

162.    The leasing of residential property and provision of related services by Dominium to Plaintiffs and class members constitutes a sale under Minn. Stat. § 325F.68, subd. 4.

163.    Defendants are persons as defined in Minn. Stat. § 325F.68, subd. 3.

164.    By intentionally and systematically misrepresenting its parking-related costs in LIHTC applications in order to charge tenants for parking while obtaining tax credits, Defendants fraudulently charged tenants for parking rent which they could not lawfully charge. Defendants thereby made material misrepresentations to the Allocators in order to perpetrate fraud on the tenants.

165.    Defendants intended that the Allocators rely on these fraudulent misrepresentations. Defendants knew that these fraudulent misrepresentations were false when made. These fraudulent misrepresentations were profitable because Dominium knew it could wrongly induce tenants to pay parking rent.

166.    Having elected to finance its parking costs with LIHTC, Defendants were not permitted to charge tenants separately for parking because Defendants represented to tenants that the premises were, are, and would be "operated in accordance with the requirements of the low-income housing credit program under Section 42 of the Internal Revenue Code of 1986, as amended (the "Program")." That statement was a misrepresentation of material fact. Defendants knew that that statement was false when it was made. That misrepresentation is material—and indeed, critically important—to tenants in deciding where to live and in all aspects of their relationships with Dominium.

167.    Defendants' misrepresentations stand in a causal nexus to the harm suffered by the affected tenants. Indeed, the central feature of Dominium's fraudulent scheme was to profit by

-47-

obtaining both LIHTC premised on an inflated eligible basis *and* collecting payment for parking from tenants. So, tenants' payments are linked at the core of Dominium's fraud.

168.    Because the misrepresentations were made at the point of contract formation, the Court is empowered to rescind the contracts and disgorge Defendants' ill-gotten gains, including the full amount of rent paid by affected tenants as restitution and rescissionary damages. At the very least, Defendants should not be allowed to profit from their fraud. Accordingly, the Court is empowered to disgorge all profits Defendants made on affected tenant leases.

169.    Defendants intentionally and fraudulently charged Plaintiffs and class members additional fees for parking. Accordingly, the Court is empowered to award as damages all fraudulently charged parking fees.

170.    In making affirmative misrepresentations to tenants, Defendants failed to disclose to its tenants that, because the vast majority of its parking costs were mischaracterized in its LIHTC application as eligible basis, Defendants could not charge tenants additional fees for parking. Defendants had a duty to make such disclosure. Defendants had special knowledge of material facts to which the affected tenants did not have. Defendants should have said enough to prevent the words communicated from misleading the affected tenants.

171.    As a result of Defendants' fraudulent misrepresentations and omissions to the Allocators and affected tenants, Plaintiffs and other class members suffered damages.

172.    Defendants knew or should have known that their conduct was directed to one or more senior citizens or disabled persons. One or more senior citizens or disabled persons are more vulnerable to Defendants' conduct than other members of the public because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered physical, emotional, or economic damage resulting from the defendant's conduct. Defendants'

-48-

conduct caused senior citizens or disabled persons to suffer damages. In addition to foregoing damages, Defendants are subject to civil penalties under Minn. Stat. § 325F.71, subd. 2 for each violation.

## COUNT TWO
**Minnesota Uniform Deceptive Trade Practices Act: Deceptive Lease Agreements**

173.    Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

174.    By entering residential lease agreements for leaseholds that were professed to be operated in accordance with the LIHTC Program but charged additional monthly fees for parking, Defendants intentionally engaged in conduct creating a likelihood of confusion or misunderstanding among Plaintiffs and class members.

175.    In the course of business, Defendants caused likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of the parking sold to Plaintiffs and class members at the Dominium Properties.

176.    Defendants knowingly, intentionally, and maliciously misled Plaintiffs and class members into believing they could lawfully charge additional rent for parking at the Dominium Properties.

177.    As a result of Defendants' deceptive practices and false and misleading statements, Plaintiffs and class members have suffered damages including, without limitation, paying additional monthly fees for parking that should have been provided as part of their base rent.

## COUNT THREE
**Unjust Enrichment**

178.    Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

179.    As enumerated herein, Defendants fraudulently misrepresented their development costs to Allocators. As a result, Defendants obtained LIHTC for costs related to constructing and/or rehabilitating parking.

180.    Having obtained LIHTC to finance its parking construction costs, Defendants were required to provide those parking facilities to its tenants at no additional cost. 26 U.S.C. § 42(d)(4)(B). By promising to operate the properties in accordance with the LIHTC Program and charging additional fees for parking, Defendant received a benefit.

181.    Defendants deliberately misled Plaintiffs and class members into believing that Defendants could charge additional rent for parking. Defendants appreciated and knowingly received the benefit.

182.    Had Defendants not defrauded the state allocators, Plaintiffs and class members would not have paid additional rent for parking to Defendants.

183.    Had Defendants not deceived Plaintiffs and class members, Plaintiffs and class members would not have paid additional rent for parking to Defendants.

184.    Defendants generated millions of dollars of revenue by misleading Plaintiffs and class members to pay additional rent for parking.

185.    Defendants were knowingly and unjustly enriched at the expense and detriment of Plaintiffs and class members.

186.    Defendants have unjustly retained its ill-gotten profits and should be required to disgorge this unjust enrichment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the class, request relief as follows:

a.      Certification of the class as defined herein pursuant to Minn. R. Civ. P. 23.02(a)(1), (a)(2), (b), and (c), or a combination of the subsections;

b.      Appointment of Plaintiffs as class representatives and their undersigned counsel as class counsel;

c.      A permanent injunction enjoining Defendants from charging additional parking fees to its tenants when the underlying parking facilities have been financed in whole or in part by LIHTC for parking to Plaintiffs and class members;

d.      Damages in an amount exceeding $50,000, the exact amount to be determined at trial;

e.      Restitution of all charges paid by Plaintiffs and class members because of Defendants' fraudulent and deceptive business practices as described herein, including, without limitation, all rent, parking rent, and additional fees or charges;

f.      Disgorgement and restitution to Plaintiffs and class members of all monies wrongfully obtained by Defendants;

g.      Disgorgement and restitution of all profits made by Defendants by virtue of their fraud, deception, and unjust enrichment;

h.      Compensatory and actual damages in an amount according to proof at trial;

i.      Statutory damages and penalties, as provided by law;

j.      Enhanced statutory penalties under Minn. Stat. § 325F.71;

k.      Prejudgment interest commencing on the date of payment of the charges and continuing through the date of entry of judgment in this action;

l.      Costs and fees incurred in connection with the action, including attorneys' fees, expert witness fees, and other costs, as provided by law; and

m.      Whatever other relief the Court deems just and proper.

Dated: February 4, 2021                    FAEGRE DRINKER BIDDLE & REATH LLP


                                           /s/ Craig S. Coleman
                                           Craig S. Coleman, Bar No. 0325491
                                           craig.coleman@faegredrinker.com
                                           Michael F. Cockson, Bar No. 0280549
                                           michael.cockson@faegredrinker.com
                                           Evelyn Snyder, Bar No. 0397134
                                           evelyn.snyder@faegredrinker.com
                                           Rachel L. Cardwell, Bar No. 0400029
                                           rachel.cardwell@faegredrinker.com
                                           2200 Wells Fargo Center
                                           90 South Seventh Street
                                           Minneapolis, MN 55402
                                           Telephone:   +1 612 766 7000
                                           Facsimile:   +1 612 766 1600



                                           HOUSING JUSTICE CENTER


                                           /s/ James W. Poradek
                                           James W. Poradek, Bar No. 0290488
                                           jporadek@hjcmn.org
                                           Margaret Kaplan, Bar No. 0328601
                                           mkaplan@hjcmn.org
                                           275 East Fourth Street, Suite 605
                                           Saint Paul, MN 55101
                                           Telephone:   +1 612 600-4028

                                           **Attorneys for Plaintiffs**

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.211, subd. 2, against a party for claims made in violation of that statute.

/s/ Craig S. Coleman
_____

**DOMINIUM MANAGEMENT SERVICES, LLC**

2905 Northwest Blvd, Suite 150, Plymouth, MN  55441-2644                                    OWNER'S AUTHORIZED AGENT
Phone (763) 354-5500     Fax (763) 354-5519

## River North
# LEASE AGREEMENT

Resident(s)*: (List all persons, and their dates of birth, who will live in the apartment.)
   Susan C. Iliff  ███████

**Owner:** DMS

Reserved Parking # 89

Rental Dwelling Street Address: 10940 Crooked Lake NW Blvd          Apartment # 416
                        City: Coon Rapids            State MN     Zip Code 55433

Move-In Date: 12/14/2016     Lease Term: From: 12/01/2020     to: 11/31/2021   @ 12:00 Noon
Prorated Rent $ 0

Monthly Rent**: Apt. $1103     Garage $75     Pet $0     Other $15     Total Charges $1193

**The Monthly Rent and Total Charges noted above are subject to any increases in the Rent as provided in Paragraph 1, below.
LATE CHARGE is 8% of overdue Monthly Rent.  Rent is late if received after the 3rd day of each month.
For residents who receive a subsidy, the 8% late fee is based on the resident's portion of the rent per the HAP contract or interim change.

Any returned/dishonored/unpaid check (NSF) Fee $ 30          Notice Period: **Two Full Calendar Months**

Security Deposit $ 300    Pet Deposit $ 0    Other Deposit $ 0    Total Deposit $ 300    Bond $ 0

Resident acknowledges receipt of the keys and access materials listed below and agrees to indemnify and reimburse Management for
the replacement cost listed below for any loss or misplaced keys. Further, Resident agrees to indemnify and pay Management for
additional damages or charges (i.e. lock charges) relating to lost or misplaced keys and access materials including a delay or failure to
report such loss.

| Key, Opener, Fob | # Issued | Amount | Key, Opener, Fob | # Issued | Amount |
|---|---|---|---|---|---|
| Apt. Door Key | | $130 | Storage Locker Key | 90 | $25 |
| Bldg. Entrance Key | | $100 | Clubhouse Key | | $50 |
| Garage Key | | $25 | Pool Key | | $50 |
| Garage Door Opener | 1 | $55 | Other Recreational Keys | | $ |
| Mailbox Key | 1 | $25 | Other: | | $ |
| FOB | 1 | $105 | Other: | | $ |

These charges are due and payable at the time of the loss and prior to replacement of such keys.

**Utilities Included in Rent:**
☐ Gas ☐ Electricity ☐ Cooking Gas ☐ Cooking Electric ☒ Trash ☐ Cable ☐ Telephone ☒ Water and Sewer
**Utilities Paid by Resident:**
☒ Gas ☒ Electricity ☐ Cooking Gas ☒ Cooking Electric ☐ Trash ☒ Cable ☒ Telephone ☐ Water and Sewer

Additional Agreements:

Agent and Address for Maintenance Management and Rent Collection:

 River North Senior Apartments - 10940 Crooked Lake NW Blvd, Coon Rapids, MN 55433

Authorized Management Agent for Service of Process and to receive and give receipts for notices and demands: Dominium
Management Services, LLC.
Attention Senior Vice President of Property Management
Address for service of process:  2905 Northwest Blvd., Suite #150, Minneapolis, MN  55441-2644
*Where appropriate, singular terms used in this Lease include the plural, and pronouns of one gender include both genders.

MN-MR/S42-05-30-19



1 of 13



TERMS OF THIS LEASE:

1. **INCOME RESTRICTED APARTMENTS:** The provisions of this paragraph apply to Residents that are living in apartments that are part of an affordable housing program either under the low-income Housing Tax Credit/Section 42 (LIHTC) program and/or any tax-exempt Bond Compliance program.

**Resident Agrees to Provide Information.** Resident agrees to cooperate with the annual recertification requirements of the LIHTC program and/or any Tax-Exempt Bond Compliance program. Resident further agrees, when reasonably requested by Management, to provide information, at least annually, with income, family composition, and student status certification requirements. Failure to timely respond to and fully cooperate with the recertification requirement is a material violation of this lease and is good cause for termination of the Lease. Copies of all required income statements, including those furnished after the date of this Lease, shall be considered a part of this Lease. If Resident no longer qualifies under the tax credit compliance requirements for the apartment, or if it appears Resident was approved and permitted to sign a Lease based on information that was not accurate, or complete, in all ways so that Resident's occupancy is not permitted by the income limits or other compliance requirements of the tax credit program, Resident agrees to move within thirty (30) days of notification by Management.

**NOTE: The below sections about Rent Adjustments and Management's Right to Adjust Rent During Lease Term. Resident's Right to Terminate does not apply to properties in Saint Paul built after 2018.**

**Rent Adjustments.** At affordable rental properties, the rent that Management may charge is restricted to a rent limit published by the Department of Housing and Urban Development (HUD), less the utility allowance (U.A.) that is established for each property. These affordable housing programs limit the rent Management may charge, but allow Management to adjust rents in response to changes in limits as published by HUD. Each year HUD publishes the income limits, based on Area Median Gross Income (AMGI) that sets the maximum household income, based on the number of people in a household, that are eligible for the Housing Program. HUD also publishes, by bedroom type, a rent cap or limit on the rent that Management may charge. If the rent Resident is paying is below the rent cap level permitted by HUD, Management will have the right to implement a rent adjustment by giving proper notice equal to the Notice Period at the time of Resident's Lease renewal. Rents may also be adjusted during Resident's Lease term, to correspond to the annual notices Management receives from HUD with the rent limits for an income restricted apartments based on bedroom type, and the U.A. This means that residents signing a Lease for rents below the amount that HUD has established for the rent cap in that area for the affordable program, may see a rent adjustment at the time of the Resident's Lease renewal, and an adjustment to correspond to a date following HUD's publication of new tax-credit income limits, permitted rents and the U.A.

For residents that are signing a Lease at a property where the rent levels are already equal to the current HUD rent limit less the U.A. for the property, Management will implement rent adjustments in future periods in response to changes in the tax-credit/income limits, and the rent limits less the UA. At properties where rents are already equal to the permitted HUD rent caps,     rents are adjusted annually, and on an equal basis for comparable units, for all tenant households at the property when Management receives the latest HUD published AMGI and corresponding rent rates. This means that during the first year of occupancy, a tenant will likely receive a rent increase prior to his/her lease renewal date. Thereafter, rent increases will occur annually at the time new AMGI and rent rates are published by HUD, and the U.A. is implemented. A Resident's personal move-in date, or lease term date, does not establish when Management adjusts or changes the rent for leases where rents are at the HUD rent limit. At these properties, the annual adjustment of rent corresponds to a date after Management receives notification of AMGI, rent limits from HUD, and an annual UA implementation.

**Management's Right to Adjust Rent During Lease Term. Resident's Right to Terminate.** If the AMGI increases or the UA decreases during the lease term, Resident agrees that Management may implement a rent adjustment. Management agrees to implement any change in rent by giving Resident at least one full calendar month notice before any change or adjustment in rent. If Resident does not wish to remain a resident, and fulfill Resident's lease term at the adjusted rent, Resident will have at least 30-days to decide whether or not to stay at the community. If Resident wants to vacate, Resident may terminate the lease early, without any standard lease break fee, or fulfilling the lease term, by giving Management one full calendar month written notice. If Resident's decision is to vacate and the one full calendar month notice does not end before the date of a rent adjustment, Resident will need to pay the new, adjusted, rent for the month it goes into effect. This early termination option provides all Residents with a limited, must be exercised within 30 days of receiving the notice of rent adjustment, right to give one full month notice to vacate if Resident does not desire to pay the new rent. Resident must fulfill 6 months of tenancy, including the notice period.

(initials)

MN-MR/S42-05-30-19



Ex.A._002

2. **LEASE:** In consideration of the mutual agreements and provisions set forth below, Management hereby leases to Resident and Resident hereby leases from Management, for a private residence, the Apartment designated above, together with the fixtures and accessories belonging thereto (hereinafter "Apartment") for the above TERM. The term Management shall include all authorized agents, employees, representatives or assigns of the Owner or the managing agent.

3. **RENT:** Resident shall, on or before the first day of each month, pay to Management in advance as designated in this paragraph, or at Management's address indicated above as permitted by this Lease, by law or as otherwise designated by Management, the monthly total charges set forth above, without the requirement of demand or billing. Payments must be received by Management's Agent on or before the first day of each month. Payment will be accepted as made through the Dominium Online Portal or the electronic Walk in Payment System. Alternative payment methods are available for state or federal rent subsidy checks, emergency assistance checks, other forms of assistance checks, as required by law and in special circumstances. Please contact the Community Manager to determine applicability. Cash will not be accepted.

   Failure of Resident to make monthly rent payments or any other charges due shall constitute a material breach of the lease and result in Management's right to exercise all of its legal remedies including immediate eviction pursuant to law. Acceptance of partial payment of rent does not waive Management's right to collect the full amount of rent due.

4. **LATE CHARGES:** Resident agrees to pay Management the LATE CHARGE on rent not received by Management by midnight on the date due in this Lease. It is expressly agreed to between Management and Resident that acceptance by Management of less than the full amount of rent due from Resident does not waive Management's right to recover possession of the rental premises for nonpayment by Resident of balance of rent owed Management. Management reserves the right to adjust the late charge on sixty (60) day written notice to Resident.

5. **NSF or CHECKS RETURNED UNPAID:** Any payment that is returned for insufficient funds or unpaid for any reason (NSF) constitutes a nonpayment of rent and can result in immediate eviction pursuant to law. Additionally, Management reserves the right to adjust the NSF charge on sixty (60) day written notice to Resident. Resident agrees to pay the NSF fee shown above for any check returned, dishonored, or not paid to Management plus all applicable late charges.

6. **RESPONSIBILITY FOR RENT:** Each adult Resident listed above is JOINTLY AND SEVERALLY responsible for the payment of the total rent and other charges payable in one payment, or as otherwise required by Management's rent payment policies.

7. **CONTINUING DUTY TO PAY RENT:** If Resident is evicted because Resident violated a term of this lease, or if Resident moves out early, Resident must still pay the full monthly rent until the earliest to occur of the following: (1) the date this Lease ends and proper notice has been given; (2) the date the Apartment is re-rented, occupied, and rent is actually paid; provided, however, Resident will be responsible for the difference between the rent owed under this Lease and the rent received on any re-rental if the re-rental rent is less than the rent due hereunder; (3) if the Lease is month-to-month, the next Notice Period ends. For purposes of this Lease, Resident is "evicted" if Resident (a) vacates the apartment in response to Management's demand to leave/vacate the premises (b) vacates the Apartment after Management begins an eviction action against Resident; or (c) is forced to vacate the apartment as a result of a court order. (Note: Resident may be responsible for rent even after the ending date of the Lease stated above or a subsequent month-to-month or renewal tenancy if Resident does not give proper notice).

8. **SECURITY DEPOSIT:** Management may keep all or part of the security deposit: 1) for damage to the apartment beyond ordinary wear and tear; and 2) for rent or other money owed to Management. Management shall, within 21 days after termination of the tenancy and receipt of Resident's new mailing address or delivery instructions, return such deposit with interest to Resident in accordance with state law, or furnish to Resident a written statement showing the reasons for the withholding of the deposit or a portion thereof. Management is entitled to retain all deposits until the tenancy is terminated with proper notice. All Residents shall be jointly and severally liable for complying with the terms of this paragraph and this Lease and any Addendums thereto. Management shall have no responsibility for accounting to more than one Resident for the return of the security deposit. If more than one Resident individually occupies the premises, or there shall be a change in occupants or roommates during the term of a Lease, it shall be the sole responsibility of Resident to handle between themselves the payment and or division of any security deposit monies. If, at the end of the tenancy, Management receives more than one forwarding address for the return of the security deposit, Management may return all or any part of the security deposit to any one of the addresses provided to Management. Management shall not be responsible for returning any part of the security deposit should there be a change in the identity of any occupants (roommates) prior to the expiration of the Lease or prior to the time when all persons occupying the premises vacate. Extra cleaning, painting or treatment to remove stains or to treat stubborn odors or stains from tobacco, smoke, cooking odors, grease, or animals, are not considered normal wear and tear and these charges will be deducted from the deposit. If Management provides to Resident any cleaning or move-out instructions, Resident shall comply with such instructions. In accordance with Minnesota's Statute §504B.278, subd. 8, Resident is advised that Resident may not withhold any portion of the last month's rent on the grounds that the security deposit shall serve for payment of rent. In the event that multiple deposits are received, (i.e. for conditional acceptance, or

MN-MR/S42-05-30-19



3 of 13

one or more pet deposits,) all deposits may be commingled and applied to any amounts owed to Management under this Lease or any Addendum to Lease.

9. **MOVE-IN INSPECTION:** Resident acknowledges that the apartment, or an apartment similar to the apartment, has been inspected by Resident (or offered for inspection) prior to signing this lease and Resident has accepted the lease hereunder and is satisfied with the apartment's location and condition, including all present decorating, fixtures, and appliances in the apartment. With this lease Resident is provided a move-in inspection sheet for purposes of noting any damages or deficiencies in the apartment. Failure by Resident to return such form to Management within 48 hours of taking possession shall be deemed conclusive evidence that the apartment was received in good condition with no damages or deficiencies. The approval of any one Resident as to condition of the unit at move-in or move-out may be relied upon by Management as constituting the approval and agreement of all Residents who sign this lease. A note of a deficiency or defect in the apartment on the move-in inspection is not a request for repair or service. A separate notice and work order must be received by Management for Resident to request repairs or service to the apartment.

10. **OWNER'S DUTIES:** Management shall deliver the apartment in a condition that is fit for use as residential premises. Management agrees to keep the apartment in reasonable repair and make necessary repairs within a reasonable time after written notice by Resident except where damage is caused by intentional or negligent conduct of Resident or his/her guest(s). Management shall maintain the apartment and the common area premises in accordance with applicable health and safety codes except when a violation of health and safety codes has been caused by the intentional or negligent conduct of Resident or his/her guest(s). Management is entitled and shall periodically conduct inspections of the apartment to determine that Resident is properly maintaining the apartment and to schedule/perform necessary maintenance repairs or services. Management shall provide the utilities and services noted on the first page of this Lease. Management shall not be liable for injury or damage which may result from providing or failing to provide the above listed services. The agreed to rent and charges hereunder are for Resident's use of the apartment only. Management may, in its sole discretion, change the hours, terms, and conditions, and or discontinue the availability of any common area or amenity during the term of the Lease without Resident having a right to terminate the Lease or seek an adjustment or abatement in any rent or charge.

11. **OWNER'S RIGHT TO ENTER:** Management may enter the premises at any reasonable time to inspect, maintain or repair the apartment or do other necessary work, or to show the apartment to lenders, insurance companies, government or agency inspectors, or potential new residents or buyers. Management acknowledges Resident's rights under the Tenant's Right to Privacy Statute which provides Management shall make a good faith effort to give Resident reasonable advance notice under the circumstances of Management's intent to enter, subject to the exceptions set forth in the statute. If Management enters without prior notice and when Resident is not present, Management shall disclose the entry by placing a written disclosure of the entry in a conspicuous place on the premises. A request by Resident for work, repairs, or service at the apartment shall constitute notice to Resident that Management intends to enter the property for purposes of responding to Resident's request.

12. **DESTROYED OR UNLIVABLE APARTMENT:** If the apartment is destroyed, damaged, or otherwise uninhabitable and/or unfit to live in due to any cause, Management may, at its sole discretion, terminate this Lease with no obligation to transfer or relocate Resident. If the destruction of, or damage, was not caused by Resident, or Resident's guest(s), and Management terminates this Lease, rent will be prorated and the balance will be refunded to Resident. If the destruction of or damage to the premises is caused by Resident, then Resident shall be responsible for rent and utilities that are Resident's responsibility as well as other damages. If, in Management's discretion, Management believes the apartment can be rebuilt or restored within a reasonable period of time, Management may choose to continue the Lease and prorate the rent for the period of time when Resident may not occupy the unit. Resident shall be responsible for Resident's relocation and temporary living costs during such period of building or restoration.

13. **RESIDENT MAINTENANCE AND HOUSEKEEPING:** Resident is responsible for all tenant obligations as set by law, or in any Resident Handbook, Community Policy, or other operating guideline or instructions provided by Management including, but not limited to, the removal of trash and garbage from the Apartment to the appropriate collection point and maintaining the Apartment in a clean and sanitary condition. Air conditioning and heating equipment, where and when provided by Management, will be maintained by Management, however Resident must pay for any repair required due to Resident's misuse or neglect. Resident must not obstruct or place any personal property in front of any air conditioning, heating equipment or vents. Resident must use plumbing fixtures and facilities, electrical systems and other mechanical systems and appliances in the manner designed. Any damage to the Apartment or other areas of the apartment complex caused by Resident, or any of their guest(s) will be corrected, repaired or replaced at Resident's expense. Resident must immediately notify Management in writing of any needed maintenance or repair. If Management is required by state, county, local or other government authority to make any repairs or do any corrective maintenance or cleaning that is Resident's responsibility then those repairs, maintenance or cleaning will be done at Resident's expense.

14. **MOLD AND MILDEW:** Resident acknowledges that it is necessary for Resident to provide appropriate climate control, keep the Apartment clean, and take other measures to retard and prevent mold and mildew from accumulating in the Apartment. Resident agrees to clean and dust in the Apartment on a regular basis and to remove visible moisture accumulation on windows, walls and other surfaces as soon as reasonably possible. Resident agrees not to block or cover any of the heating, ventilation or air-conditioning ducts in the Apartment. Resident also agrees to immediately report to the management office: (i) any evidence of a water leak or

MN-MR/S42-05-30-19



Ex.A._004

excessive moisture in the Apartment, as well as in any storage room, garage or other common area; (ii) any evidence of mold- or mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area; (iii) any failure or malfunction in the heating, ventilation or air conditioning system in the Apartment; and (iv) any inoperable doors and windows. Resident further agrees that Resident shall be responsible for damage to the Apartment and Resident's property as well as injury to Residents resulting from Resident's failure to comply with the terms of the Mold and Mildew policy.

15. **SMOKE DETECTOR/CARBON MONOXIDE DETECTOR NOTICE:** Resident hereby acknowledges that, the Apartment is equipped with one or more smoke detector(s), carbon monoxide detector(s); that you have inspected the detector(s), and that you find it/them to be in proper working condition.

Upon discovery that a smoke detector and/or carbon monoxide detector is non-functional and requires maintenance, Resident agrees to **immediately** either provide any maintenance necessary to make the smoke detector/carbon monoxide detector functional or provide Management **written** notification of the required maintenance. For your safety, notify Management immediately. Any fines incurred by Management from City or Governmental agency will be passed onto and become the responsibility of the Resident in a case where smoke detector/carbon monoxide detector has been tampered with, covered, or dismantled.

Resident agrees to replace the smoke/carbon monoxide detector(s) battery, if any, at any time the existing battery becomes unserviceable. If after replacing the battery, the smoke detector/carbon monoxide detector will not operate or continues to make a "chirping" noise, you must inform Management in writing immediately of any deficiencies.

Resident agrees to reimburse Management, upon request, for the cost of a new smoke and/or carbon monoxide detector and the installation of in the event the existing detector(s) becomes damaged by Resident or Resident's guest(s) or invitees.

**Disclaimer:**
YOU ACKNOWLEDGE AND AGREE THAT OWNER OR AGENT IS NOT THE OPERATOR, MANUFACTURER, DISTRIBUTOR, RETAILER OR SUPPLIER OF THE SMOKE AND CARBON MONOXIDE DETECTOR(S). YOU ASSUME FULL AND COMPLETE RESPONSIBILITY FOR ALL RISK AND HAZARDS ATTRIBUTABLE TO, CONNECTED WITH OR IN ANY WAY RELATED TO THE OPERATION MALFUNCTION OR FAILURE OF THE SMOKE AND CARBON MONOXIDE DETECTOR(S), REGARDLESS OF WHETHER SUCH MALFUNCTION OR FAILURE IS ATTRIBUTABLE TO, CONNECTED WITH, OR IN ANY WAY RELATED TO THE USE, OPERATION, MANUFACTURE, DISTRIBUTION, REPAIR, SERVICING OR INSTALLATION OF SAID SMOKE AND CARBON MONOXIDE DETECTOR(S).

NO REPRESENTATION, WARRANTIES, UNDERTAKING OR PROMISES, WHETHER ORAL OR IMPLIED, OR OTHERWISE HAVE BEEN MADE BY MANAGEMENT, ITS AGENTS OR EMPLOYEES TO YOU REGARDING SAID SMOKE AND CARBON MONOXIDE DETECTOR(S), OR THE ALLEGED PERFORMANCE OF THE SAME. MANAGEMENT DOES NOT MAKE NOR ADOPT ANY WARRANTY OF ANY NATURE REGARDING SAID DETECTOR(S) INCLUDING EXPRESS OR IMPLIED WARRANTIES. MANAGEMENT AND OWNER SHALL NOT BE LIABLE FOR DAMAGES, LOSSES AND/OR INJURIES TO PERSON(S) OR PROPERTY CAUSED BY (1) YOUR FAILURE TO REGULARLY TEST THE DETECTOR(S); (2) YOUR FAILURE TO NOTIFY OWNER OF ANY PROBLEM, DEFECT, MALFUNCTION, OR FAILURE OF THE DETECTOR(S); (3) THEFT OF THE SMOKE AND CARBON MONOXIDE DETECTOR(S) OR ITS SERVICEABLE BATTERY; AND/OR (4) FALSE ALARMS PRODUCED BY THE DETECTOR(S).

16. **SATELLITE DISH OR ANTENNA SYSTEM:** The following rules and regulations will govern the installation and use of a satellite dish or antenna system at properties where federal law would give Residents a right to install such equipment. At sites where a central dish or similar system is provided, and the cost for accessing such dish or system is comparable to or less than the cost of an individually procured and operated satellite dish or antennae, Management may, subject to applicable law, prohibit any individual Resident installation. Where Resident installations are permitted, these rules apply:
    1. INSTALLATION: During the term of the lease, Resident will be allowed to install an individual satellite dish one meter or less in diameter or a traditional stick typed antenna on and totally within a balcony, balcony railing or patio. The dish or antenna must be located totally, within the premises being leased by Resident and cannot extend beyond the boundaries of the leased premises. No installation may drill any holes or otherwise attach to any portion of the structure or premises in a way that damages any portion of the premises. Management will not be bound by any agreement between Resident and a third-party provider. No dish or antenna may be installed on or in any common areas, including outside walls, outside windowsills, roofs, common area balconies, common area stairwells or any other common areas of the property.
    2. CENTRAL DISH. Management is not required to install a central dish or other device for Residents who cannot otherwise receive a satellite signal.
    3. DAMAGE TO PROPERTY. Resident shall assume total responsibility for any personal injury or physical damage to the property as a result of the installation of the dish or antenna. Resident is solely responsible for all installation and shall have the dish or antenna installed ONLY by a professional. Resident shall advise Management or representative of

MN-MR/S42-05-30-19





Management prior to installation with specifications of the installation and get written consent from Management prior to installation.

4. INDEMNIFICATION. Resident does hereby indemnify and hold Management, its employees, agents and assigns harmless from any claims, causes of action, costs, expenses, attorney's fees or damages of any kind or nature arising out of the installation, use or operation of the dish or antenna on the property.

5. INSURANCE. Resident shall be required to obtain and maintain liability insurance with respect to the installation, use and operation of the dish or antenna. Any liability insurance obtained by Resident shall name the Management as a co-insured and a copy of the policy shall be provided to Management.

6. EXTENSION DEVICES. Resident shall not use devices that extend the dish or antenna beyond the leased premises.

7. INSIDE HOOKUPS. The dish or antenna system must be a "stand-alone" system. The Resident or installer cannot splice into any existing wires or cables on the property. Resident shall not leave windows or doors ajar or open in any respect as a result of wires or cables that may be connected to the dish or antenna system. Resident, and any professional installer, may not run wires or cables from Apartment to outside area in a way that interferes with any closing of any window, door, or sleeve for any air conditioner, vent, or similar piping or system in apartment.

8. REMOVAL OF DISH/ANTENNA SYSTEM. Upon termination of the lease, Resident shall be responsible to completely remove the satellite dish or antenna system from the leased premises and to restore the premises to its original condition prior to the installation of the system, at no cost to the Management. Any damages caused by the system shall be the responsibility of the Resident and will be deducted from Resident's Security Deposit.

17. **USE:** The use of the Apartment is limited exclusively to the private residence of those persons who are listed on the Application and appear as Residents on the Lease as well as any dependents born to or legally adopted by occupant during the term of this Agreement. No other person may live, use, regularly stay at "or share" the apartment without the prior written consent of Management. No "Airbnb" or similar type of service/use. Any person given keys or access or regularly staying at, or given access to the apartment, requires Management's prior written consent. Such consent may be conditioned on such person being screened and signing this Lease as an additional Resident or as an approved, authorized guest/occupant. Persons who are not listed as Resident, or who have not received Management's written consent to be approved as an authorized guest or occupant may not receive mail or packages at the premises. Resident may use the Apartment and utilities, and other areas of the premises, for normal residential purposes only. All commercial and business uses are strictly prohibited without Management's prior written consent. Occasional working from home and telecommuting is permitted, but any other business activity is prohibited without Management's prior written consent. No daycare, or babysitting, is permitted other than occasional, limited, babysitting for friends or family without payment or consideration.

18. **KEYS:** All keys and access materials are the property of the Management. Keys and access materials are strictly for use by Management and authorized members of Resident's household. Resident will not duplicate keys or access materials or loan such materials to persons not authorized to occupy the Apartment. Resident is put on notice that allowing persons to use keys where Resident is not present, and such person has not been approved for access or occupancy by Management, is a violation of this Lease. If keys are lost or stolen, Resident will immediately notify Management. All keys will be surrendered to Management upon lease termination. Resident understands that charges will be assessed for additional keys requested in writing by Resident and/or any unreturned keys and Resident may be charged and assessed for costs to replace or rekey the premises, or to change locks, due to lost and or misplaced keys.

19. **RESPONSIBILITY FOR PERSONS AND PROPERTY:** Resident is solely responsible for the safety of Resident's family and all guests and their respective belongings. Management is not responsible for any damage or injury that occurs to Resident or Resident's guests or their personal property not caused by the willful or negligent act or omission of Management. Resident agrees to hold Management harmless from and indemnify Management against any and all liabilities, damages and expense arising from injury, damage or loss to or caused by Resident, Resident's family, guests, employees, agents, assigns, subtenants, visitors, licensees, animals or property of said persons in or about the Apartment buildings or grounds, from any cause whatsoever, growing out of or connected with the use and occupancy of or activities in or about the same. The hold harmless indemnification shall also run in favor of any subsidiaries and employees of Management.

20. **RENTER'S INSURANCE:** It is recommended that each Resident carry Renter's Insurance to protect themselves from personal property losses and to protect themselves from liabilities they may incur by living in rental property. Resident understands that the property insurance of the Owner/Management and the apartment complex does not and cannot protect their personal belongings against damage from: burglary, vandalism, fire, smoke, water, hail, wind, heat, freezing, lightning strike, electrical surge or failure, garage door malfunction, or other peril. Resident also understands, that by not having Renter's Insurance which includes personal liability insurance, Resident may be liable to third parties and to Management/Owner, or Managements' insurance company, for loss or damage including lost rent, caused by any act or omission of Resident, Resident's guest, household members, animals, or personal property, including but not limited to liability to neighbors for injury or damages, including moving costs or loss of use of a neighboring resident's apartment, reimbursement to Management of Management's deductible under Management's casualty insurance policy, etc. Renter's insurance with liability coverage is readily available and if it is not purchased, the renter is considered

MN-MR/S42-05-30-19



"self-insured." Resident acknowledges and fully understands the options stated above and take full responsibility for their own protection of the complex and the protection of other residents. Resident also acknowledges that without renter's insurance, Management and Owner's policy will not reimburse or pay Resident for loss of use of the apartment, or moving costs or expenses, should the Lease be cancelled due to causality or loss, or should Resident experience a temporary period of loss of use while repairs must be made to the apartment and it is not useable and available to Resident.

**INSURANCE CARRIED BY OWNER DOES NOT COVER PERSONAL PROPERTY OF RESIDENT. RESIDENT IS STRONGLY ENCOURAGED TO OBTAIN RENTER'S INSURANCE TO PROTECT RESIDENT AGAINST ANY AND ALL SUCH LOSSES.**

21. **SECURITY DISCLAIMER:** Management does not provide, guarantee or warrant security. Management does not represent that the dwelling or apartment community is safe from criminal activity by other residents or third parties. The existence of courtesy officers, courtesy patrols, alarm systems, emergency alert buttons, controlled-access vehicle gates, perimeter fences, lighting, or other systems are not a guarantee of personal safety or security, and they are not a guarantee against criminal activity. Management assumes no duties of security except to proceed with diligence to repair such systems after receiving written notice from Resident. Management reserves the right to cancel or reduce any security-related mechanism or personnel listed above, at any time.

22. **PETS AND ANIMALS:** Residents are not permitted to have animals or pets of any kind (no visiting animals or "pet-sitting" permitted) without the express written consent of the Management and compliance with Management's Pet/Animal Policies. It is the responsibility of the Resident to request Management's consent and voluntarily submit all associated deposits, rents, and fees and to provide all other information required about any animal (i.e. proof of vaccinations, veterinary information, etc.) see Management's Pet/Animal Policy for any animals permitted and pre-approval animal requirements. Management does make reasonable accommodations in its animal policies for approved assistance animals, but prior Management approval, and providing information about the animal, any needed disability/accommodation verification, and signing an Animal License Agreement is required for all pets, animals, and assistance animals.

23. **WATERBEDS:** Resident agrees not to keep or permit waterbeds or any other water-filled furniture on the premises, unless written consent of the Management is obtained and Resident is able to provide proof of Renter's Insurance.

24. **LIMITS ON ASSIGNMENTS AND SUBLEASES:** No re-renting or other assignment by Resident is allowed unless by specific written permission of Management which consent may be withheld or denied in Management's absolute discretion. Any assignment or sublease made without Management's written permission shall be void. Management may terminate the lease if Resident attempts to assign or sublease the Apartment without the written permission of Management. Management's consent to an assignment or sublease shall be valid only for that specific assignment or sublease, and any additional assignment or sublease will require the additional written permission of Management. Apartment is not to be used for home sharing/swapping or as an "Airbnb" or similar type of service.

25. **END OF TERM/MONTH-TO-MONTH LEASE:** Resident and Management shall determine not less than the Notice Period prior to the expiration of their Agreement whether or not the occupancy will continue and upon what terms. Either Resident or Management may elect not to continue this occupancy, in which case the other must be notified in writing not less than the Notice Period prior to the end of the term, on or before the first of the month prior to the expiration date of this Agreement. If a new Lease is not executed, and proper written notice of the lease termination has not been given, the Agreement will remain in effect as a month-to-month Lease with a Notice Period equal to the Notice Period stated on the first page of this Lease. If a new Lease is not executed, Management shall have the right to give notice, equal to the Notice Period, of an increase in rent for the month-to-month lease term, and/or notice of other changes in the terms and conditions of this Lease, or applicable Lease Addendums. If Resident does not give notice to vacate equal to the Notice Period, or otherwise sign a new Lease, the Lease will continue as a month-to-month Lease with all terms of this Lease remaining in effect except for any new rent, or other change in terms, that Management has given by notice equal to the Notice Period.

26. **RELEASE OF INFORMATION:** Resident understands that periodically, Management may receive requests for information regarding Resident's rental history, including but not limited to, financial information such as the amount and timeliness of Resident's rental payments, from such person or entities including, but not limited to, a mortgage company, future landlord, utility company, creditor or credit bureau/screening service. Resident hereby authorizes Management to release Resident's rental history information to persons or entities requesting such information and release Management from any and all manner of actions, suits, claims, debts, damages, and liability relating to or resulting from Management's action or failure to act in good accordance with this authorization and release.

27. **LEAD PAINT WARNING AND DISCLOSURE. HOUSING BUILT PRIOR TO 1978:** Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips and dust can pose health hazards if not handled in a proper manner. Lead exposure is especially harmful to young children and pregnant women. Federal law requires that any persons buying or renting property built

MN-MR/S42-05-30-19



7 of 13

before 1978 receives certain disclosures about the property and about lead. If these laws apply, these disclosures will be made to you and you are required to sign acknowledgments for them. Resident acknowledges further the importance of this warning, the material provided, and agrees to sign any Disclosure Acknowledgment requested.

28. **MILITARY TRANSFER:** If Resident is or becomes a member of the Armed Forces on extended active duty and receives change of station orders to permanently depart the local area, or is relieved from such active duty, than Resident may terminate this lease by giving written notice to Management. Such notice shall effectively terminate the lease 30 days after the next monthly rental payment is due. In such event, Resident agrees to furnish owner a certified copy of the official orders, which warrant termination of the lease. Military permission for base housing does not constitute a permanent change-of-station order. After move-out, such Resident shall be entitled to the refund of security deposit(s), less lawful deductions.

29. **DEATH OF RESIDENT:** In the event of death of the sole Resident of the apartment, this Agreement may be terminated by the Management or the Resident's personal representative by submitting two month's written notice of the desired termination date to the other. Providing that all rent is paid in full through the termination date, all of the deceased Resident's belongings are removed from the dwelling Apartment and the Apartment is cleaned and free of damage, the security deposit will be refunded to the deceased Resident's estate or personal representative. If the previous conditions are not met, deposits may be applied toward any outstanding balances due and/or damage and cleaning charges due hereunder.

30. **DEFAULT AND EVICTIONS:** If Resident violates any terms of this Lease or any additional Agreements with Management, including but not limited to, failure to pay rent as agreed, repeat late payments or NSF payments (i.e. twice in any 6 month period), improper use of the apartment, failure to maintain the Apartment in a sanitary and safe condition or any material or repeated violation of the Rules and Regulations, Management may terminate Resident's lease by written notice and/or may bring an immediate eviction action with or without prior notice. After notice of termination and/or eviction, Resident shall be responsible for payment of rent and other monthly charges for the full lease term including the Notice Period stated on the first page of this Lease. Additionally, in the event of any default in payments or of any other obligation in this Lease, Resident agrees to reimburse Management for all actually paid attorneys' fees by the Management, court costs, and other costs associated with such default including any and all costs of collection subject to the provisions herein on Lease enforcement costs and the cap on attorney's fees.

31. **RENT ESCROW/TENANT REMEDIES ACTION:** If the Resident initiates a rent escrow or tenant remedies action and Management is the prevailing party in the action occupant is liable for all actually paid costs and attorney fees incurred by Management subject to the provisions herein including the cap on attorney's fees.

32. **VACATING:** Upon termination of Resident's lease and after any renewals or extension thereof, Resident shall vacate and turn over full possession of the apartment to Management and return all keys no later than 12:00 noon on the last day of the lease term or vacate date or incur additional charges of $50 per hour until possession is relinquished.

At or prior to the termination of Resident's lease, Resident agrees to have carpets steam cleaned by a professional carpet cleaner or agrees to pay the actual costs to have the carpet professionally cleaned. If these amounts are not paid upon vacancy, these amounts will be withheld from the Resident's security deposit in addition to other damages and cleaning fees. **Resident is encouraged to perform an inspection of the apartment with a Management representative prior to relinquishing possession of Apartment.**

33. **LIMITS ON ACCEPTANCE:** Acceptance of keys to the Apartment shall not constitute an acceptance or surrender of the Apartment or cancellation of the monetary obligations under this Lease by Management prior to the expiration of the term of the lease. Acceptance by Management shall only be valid when written notice of such acceptance is provided by Management to Resident.

34. **CRIME-FREE/DRUG-FREE HOUSING:** In consideration of the execution or renewal of a lease, Management and Resident agree as follows:

    1. Resident, any members of the Resident's household or a guest or other person under the Resident's control shall not engage in illegal activity, including drug-related illegal activity, on or near the said premises. "Drug-related illegal activity" means the illegal manufacture, sale, distribution, purchase, use or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 or the Controlled Substance Act 21 U.S.C. 802) or possession of drug paraphernalia.

    2. Resident, any member of the Resident's household or a guest or other person under the Resident's control shall not engage in or condone any act intended to facilitate illegal activity, including drug-related illegal activity, on or near the said premises.

    3. Resident or members of the household will not permit the dwelling to be used for, or to facilitate illegal activity, including drug-related illegal activity, regardless whether the individual engaging in such activity is a member of the household.

MN-MR/S42-05-30-19



4. Resident or member of the household will not engage in the manufacture, sale, or distribution of illegal drugs at any locations, whether on or near the Apartment premises or otherwise.

5. Resident, any member of the Resident's household, or a guest or other person under the Resident's control shall not engage in acts of violence or threats of violence, including but not limited to the unlawful discharge of firearms, prostitution, criminal street gang activity, intimidation, or any other breach of the rental agreement that otherwise jeopardizes the health, safety or welfare of the landlord, his agents or tenants.

6. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL VIOLATION OF THE LEASE AND GOOD CAUSE FOR TERMINATION OF TENANCY. It is understood and agreed that a single violation shall be good cause for termination of the lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction.

35. **IMMEDIATE EVICTION FOR UNLAWFUL ACTIVITIES:** Resident acknowledges that state law prohibits certain unlawful activity at Resident rental premises and that such activity by Resident, or Resident's guest, household members, or visitors, mandates that Management bring an immediate eviction action. Resident's rights to possession of the Apartment, will terminate, if Resident, any member of Resident's household or any guest, or any person acting under his/her control, in the Apartment, any common areas, or areas surrounding the rental community, manufactures, sells, gives away, barters, delivers, exchanges, distributes, possesses, or uses any illegal drugs or controlled substances, engages in any prostitution or prostitution related activity, unlawfully uses or possess any firearm, or allows stolen property on the premises. Further Management advises Resident that Management will not tolerate or permit to continue conduct that is harassing, threatening, or discriminatory, as directed at Management's staff, agents, other residents, or neighbors and such conduct will be considered a basis for an immediate termination of Lease and eviction.

36. **POSSESSION:** Management shall not be liable for failure or delay in giving Resident possession of the Apartment if such failure is due to factors beyond Management's control. Resident shall not be responsible for payment of rent until the Apartment is available to Resident.

37. **MANAGEMENT'S LEGAL RIGHTS AND REMEDIES – NO ESTOPPEL OR WAIVER:** Management may use its legal rights and remedies in any combination. By using one or more of these rights or remedies Management does not give up any other rights or remedies it might have. No forbearance, delay, or other action or inaction by Management shall be found to "waive" any right of Management without an express written agreement plainly stating a knowing waiver by Management that is signed by a person with authority to execute agreements on behalf of Management. Management's consent, permission, or approval of any act of Resident shall serve only as consent, permission, or approval of that specific act and shall not serve as consent, permission, or approval of any other past, present, or future act or consent if such conduct is otherwise prohibited by law, this lease, or any other agreement with Management. Acceptance of present, future or past due rent or other charges shall not constitute a waiver of any past, present or future breach by Resident of any terms of this Lease or other agreement with Management.

38. **NO LIMITATIONS OF REMEDIES:** Management's exercise of any right or remedy shall not impair Management's right to exercise any additional rights or remedies.

39. **REPRESENTATIONS OF RESIDENT:** This Lease is entered into by Management based upon written, and any oral representations, made by Resident in his/her rental application, and in any related paperwork relating to income and asset qualification or student status for this Lease. If any of the representations are false, misleading or incomplete in any way, Management shall be entitled to terminate this Lease and Resident may be evicted.

40. **ATTORNEY'S FEES AND ENFORCEMENT COSTS:** If Management brings any legal action against Resident, Resident must pay Management's actual attorney's fees paid up to a cap not to exceed $1,500.00 of actual attorney's fees paid, and shall reimburse any and all other legal costs, expenses, and disbursements, including fees and expenses paid to a collection agency, and sheriff's fees, service fees, court costs, even if rent is paid after a legal action is started. These costs shall be in addition to the cap on attorney's fees. In the event Resident brings any court action or starts any administrative action against Management, and Management successfully defends or prevails on such action, Management shall be entitled to recover its actual attorney's fees paid up to a cap of $1,500.00. The right to recover attorney's fees shall be limited to seeking reimbursement of actual attorney's fees paid and shall be limited, in all cases and events, to a cap of $1,500.00 for actual attorney's fees paid.

41. **NOTICES:** Any and all notices desired or required to be made by Resident must be sent electronically, first class, certified mail, or hand delivered to Management at the above stated address or to such other address or such other place as Management shall, from time to time, designate. All notices required to be given to Resident by Management shall be deemed given when sent electronically, mailed to Resident at the Apartment listed above, passed through the door of the Apartment, left with any adult at the Apartment, or posted on the Apartment door. Any notices provided to Resident shall not require technical accuracy.

MN-MR/S42-05-30-19



9 of 13

42. **SUBORDINATION:** The Agreement is and shall be subordinated to any present and/or future mortgage debt secured by the premises and Resident hereby empowers Management with the authority to execute on behalf of Resident any and all documents necessary to subordinate this Agreement.

43. **NO ORAL AGREEMENTS:** This Agreement may not be amended or altered by any oral agreement. Any amendments must be in writing and bear the signature of an authorized signatory for Management. Additionally, any and all waivers, acceptance and approvals by Management must be in writing and signed by Management. Oral waivers, acceptances or approvals shall be ineffective.

44. **BINDING ON HEIRS:** This Agreement shall be binding on the heirs and assigns of both Management and Resident. Management may assign this Agreement.

45. **ABANDONED PROPERTY:** Twenty-Eight (28) days after the Management has either received a notice of abandonment, or it has become reasonably apparent that the Apartment has been abandoned; the Management may sell or dispose of any personal property left by Resident in whatever way the Management wishes. In the event the that Management determines it is economically feasible and worth Management's administrative time and effort to conduct a sale, Management will conduct a sale in the manner provided by statute with the notices required by statue. Residents are advised, however, in most circumstances, it is not worth the time, inconvenience, and administrative effort for Management's managing agents to attempt to conduct a sale of abandoned property and in most cases abandoned property is disposed of and/or donated without any effort by Management to conduct a sale and recover any funds for the personal property or belongings of Resident that are abandoned in the Apartment, or in any garage, storage area, or locker, or otherwise in a space rented by or used by, Resident.

Prior to any sale or disposal, the Management must return the Resident's property within 24 hours after the Resident's written demand, or 48 hours (not counting weekends and holidays) if Management has moved the Resident's property somewhere other than the building.

46. **TENANCY ADDENDUM:** If Resident is a participant in the section 8 voucher program, or any similar program accepted by Management, and such program includes a Tenancy Addendum, that Tenancy Addendum is made part of this Lease.

47. **GENERAL COMMUNITY RULES----NOTE: This list may not be all inclusive. See the Resident Handbook for additional "Rules and Regulations". The Resident Handbook is incorporated into this Agreement by reference.**
   a. General Community Rules may be added to or amended by Management with a thirty (30) day written notification to Resident.
   b. Resident may be assessed service fees, damages and other charges for violations of General Rules at the discretion of Management.
   c. Resident agrees to complete, sign, and return a move-in inspection form to Management upon obtaining possession of Apartment.
   d. Laundry facilities may be used only at times directed by Management, and in accordance with posted restrictions.
   e. All trash and garbage is to be placed inside the provided dumpsters. All boxes should be flattened before disposal. Placing oversized items such as furniture in or around the dumpster area is not permitted. Resident agrees to comply with any recycling programs or requirements in place at the rental premises.
   f. Except as may be otherwise required by law, no sign, signal, illumination, advertisement, notice or any other lettering or equipment shall be exhibited, inscribed, painted, affixed, or exposed on a window or any part of the outside or inside of the Apartment or the Building without the prior written permission of Management.
   g. No awnings or other projections including air conditioners, TV or radio antennae or wiring shall be attached to or extended from the outside walls, or roof of the building.
   h. Resident shall not alter any lock or install a new lock, knocker, peephole or other attachments on any door of the Apartment without the written permission of Management. No security system, alarm, monitoring system service, or similar may be installed without Management's prior written consent. Management will not consent to any security system, monitoring system, alarm or similar that would bring a third person, service, or first responder to the premises. Resident is permitted to install cameras (i.e. nanny cams) that are exclusively monitoring conditions within Resident's apartment. For privacy purposes of other residents, cameras and other monitoring may not be installed so as to monitor any common areas of the premises. All permitted alterations, additions and fixtures shall remain as part of the apartment unless Management otherwise elects.
   i. No interior alterations, painting, or redecorating may be done to the Apartment without written permission of Management. Resident may not install or use additional major appliances such as washers, dryers, freezers, portable dishwashers, etc.
   j. Only small nails may be used for hanging pictures. No adhesive tape hangers or tape shall be applied to the walls, doors, or window casings. No nails or screws shall be driven into the woodwork. No mounting of any kind shall be attached to the ceilings.
   k. No music, other sounds or any other conduct (i.e. exercise equipment, gaming systems, computers, or similar) that may disturb or annoy other tenants is permitted at any time. Subwoofers are not allowed.



l.  Not to act in a loud, boisterous, unruly or thoughtless manner or disturb the rights of the other residents or neighbors near the rental premises, to peace and quiet, or to allow his/her guests to do so. Certain exercise equipment may be prohibited except on the first floor. Any act or omission that disturbs other tenants or tenants' guests is prohibited.

m.  The toilets, basins and other plumbing fixtures shall not be used for any purpose other than for those for which they were designed. Any damage resulting from or related to the misuse of such fixtures shall be paid for by Resident. Nothing but ordinary toilet paper (no wipes!) may be used in any commode.

n.  Use of all recreation and other common area amenity areas/facilities shall be restricted to Resident and limited guests only. Guests are not permitted to use recreational facilities of common area amenities unless accompanied by a Resident or having prior written consent of Management. The use of said facilities shall be in accordance with posted rules that may be changed from time to time.

o.  If Resident installs drapes, they must hang inside the blinds provided by the property and be 2 feet above the heat register.

p.  No rugs, linens, or other linen items shall be hung or shaken from the windows, balconies, stairways, or landings. No rubber backed rugs are permitted as this will damage carpet, vinyl flooring.

q.  Resident agrees not to use balconies or patios for storage. Outdoor furniture and decor designed for outdoor use is required. No feeding of pets, wildlife, or birds are permitted on any balcony, patio, or in any common area. Such feeding creates a risk of attracting pests and vermin. Any planting must have a bowl or protective container to prevent water from staining or leaking to other balconies or areas. No potting soil or materials that could be flammable are permitted in any area. There shall be no open flame equipment or other items (i.e. torches, kerosene lanterns, barbeques, "fire tables", candles, or similar, used on any patio or balcony. Balconies, patios and garage stalls shall be maintained in a neat appearance and free from fire hazard at all times.

r.  All garages and other parking facilities provided by Management may be subject to building specific rules, including any posted rules or policies. Resident must comply with building rules and posted policies. Failure to comply with posted rules and policies may result in vehicles being towed without notice. Most of Management's rental communities require that all Resident vehicles be registered with Management. Failure to register a vehicle, or to provide documentation (such as proof of ownership and current liability insurance) as a condition for registration is a violation of this Lease. Parking facilities are provided for the exclusive use of residents for their regularly used, and standard size cars, SUVs, vans and light duty trucks) Any unused or inoperable vehicle, trailer, boat or recreation vehicle, any vehicle not considered 'street legal', any vehicle parking in a no parking area, and/or any vehicle not displaying the required permit or sticker per property policy will be towed away without notice and at the vehicle owner's expense. Management may prohibit commercial vehicles, busses and large vans or trucks.

s.  Vehicle maintenance and repairs, including oil changes, car washing, are not permitted. Any vehicle that is not operable, or is leaking fluids or causing damage in any way to road ways, garages or parking lots at the community, must be removed at once or may be towed by Management without prior notice.

t.  Motorcycles and bicycles must be parked in designated areas.

u.  Residents are not to do anything in the apartment that results in offensive, pervasive, or strong odors that could disturb other residents in adjoining apartments or common areas. Pervasive odors due to cooking, incense burning, aroma therapy, food preparation, arts and crafts, or any other cause that could reasonably be offensive to other persons in the building must be curtailed, eliminated, or confined to the apartment.

v.  Residents are not to store or keep excess amounts of personal property or other materials in the apartment. If, in Management's sole discretion, Resident has excess personal property or other materials in the apartment so that space in the apartment is unduly cramped and ingress and egress is restricted so that Management believes it could cause health and safety hazards, inhabit the heating and air conditioning performance of the building to maintain proper air flow and climate control, or could impede the efforts of first responders in case of an emergency, or casualty Management may require Resident to remove such personal property and or arrange for alternate storage space at resident's sole expense.

w.  Resident or Resident's guest or family members will not interfere with the Management or maintenance staff at the property including but not limited to failing to allow maintenance access to make repairs and/or scream, yell, or use foul and offensive language with any maintenance or office staff personal.

x.  Management is a fair housing provider. Any speech, conduct, or gesture, by Resident or Resident's guest directed at another tenant, tenant's visitor, Management staff, or a neighboring resident that is harassing, discriminatory, or offensive based on protected class status, is prohibited.

y.  For fire safety purposes, Residents are reminded to not place matches or lighters where children can reach them, to regularly remove and clean grease from cooking range, oven, exhaust fans and vents, do not use worn electrical cords, do not overload electrical outlets, never leave candles or any burning object unattended, always be attentive when cooking. Most household fires are due to inattentive cooking. Do not leave any object that generates heat, such as a curling iron, incense, or any other burning object where it may cause damage (i.e. on a shelf, near a fluttering curtain, in the presence of animals, where it could start a fire). Live Christmas trees and wreaths are not permitted. No fireworks, even "legal" fireworks are permitted anywhere at the rental property. Never leave any paper, flammable, or other object not designed for cooking near stoves or cooktop surfaces. Residents in units that have a water heater, furnace, or other heating unit, should keep all paper and other flammable materials away from any heat source to prevent fire hazard.

MN-MR/S42-05-30-19

11 of 13



Ex.A._011

z.   Employees Only---The "Employee Lease Addendum – MARKET RATE" is part of this Lease, as applicable. The Employee Lease Addenda applies to the "initial" lease as well as to "all future leases".

48. **PEST CONTROL RULE:** All Residents are required to assist Management in pest control procedures. Your participation in our pest control treatment program is MANDATORY. If your unit is not ready when our pest control vendor is treating units, you may be required to pay a re-treatment or second visit fee. You are required to comply with all requests for readying your unit for pest control treatments which may include emptying cupboards, removing materials from under sinks or vanities, and other requests.

Residents are also required to follow any recommendations or treatment control instructions of our pest control provider. Some pests, such as bedbugs, may require Residents to dispose of, or professionally clean (at high temperatures or with chemical treatments) personal property and fabrics. Residents are responsible for all costs of treating or removing personal property, furniture, mattresses, and, fabrics needed to achieve effective pest control. Management will not reimburse or replace personal property that must be treated or eliminated.

Failure to follow the requirements of our pest control vendor is a breach of your Lease. Cleanliness and vigilance are the best preventative medicine in controlling pests. Dispose of all garbage and waste. Do not leave food, dirty dishes, or soft drink bottles/cans lying around. Do not bring cardboard boxes, crates, or other materials that may have been accessible to pests into your Apartment. Storage of foodstuffs, grains, or like materials should only be in plastic or metal sealed containers. Be careful bringing luggage and used furniture or property into your Apartment. Some pests, like bedbugs, can hitchhike on you or your belongings. Even the "cleanest" housekeeper may pick-up a bedbug from clothes at a laundry, luggage and travel.

Please notify Management if you see signs of pests in your apartment or any other place in the building. Failure to promptly notify Management of pests in your unit is a serious violation of your Lease. Prompt notification to Management is necessary to prevent pest infestation and to keep pests from spreading. If Management learns that an Apartment has had an ongoing pest problem that is not reported, this may be grounds for lease termination, non-renewal or charging Resident for lost rents, pest treatments and damages in Resident's Apartment or in other Apartment or common areas.

**ENTIRE AGREEMENT AND ATTACHMENTS.** Management and Resident agree that certain additional documents relating to this Lease exist and form a legally binding part of this Agreement. The additional documents are as noted and acknowledged below and with this Lease constitute the entire Agreement between Management and Resident. Both Resident and Management agree that if any part of the Agreement is found to be illegal or invalid, all other terms of the Agreement shall continue and both parties shall continue to be bound by them. No oral agreements have been entered into.

**I/We Understand that upon signing this lease, I/We have received a copy of the following documents:**

| **Required Addenda** | **If Applicable Addenda** |
|---|---|
| [X] Lease | [ ] Animal License Agreement |
| [X] Addendum to Apartment Lease Tax Credit | [ ] Concession Addendum |
| [ ] Tax Credit Increase and Disclosure Addendum | [X] Early Lease Termination Agreement |
| [ ] Resident Handbook | [ ] Employee Lease Addendum – MARKET RATE |
| [X] Animal/Pet Policies | [ ] EPA Booklet (Lead Based Paint Properties Only) |
| [X] Violence Against Women (Lease Addendum) | [ ] Historical Walls and Ceilings |
| [X] Utility Confirmation | [ ] Lead Based Paint Disclosure |
| [X] Demographics | [X] Lease Agreement Garage/Storage Locker Addendum |
| [ ] HUD 5380 – Notice of Occupancy Rights | [X] Package Room Addendum |
| | [ ] Resident Surety Bond |
| | [X] Smoke Free Addendum |
| | [ ] Utility Addendum - Allocation |
| | [ ] Other: _____ |

Resident(s) Initials _____


Ex.A._012

BY SIGNING THIS DOCUMENT, I ACKNOWLEDGE THAT I HAVE READ THIS LEGALLY BINDING AGREEMENT IN ITS ENTIRETY (LEASE AND APPLICABLE ADDENDA) AND UNDERSTAND AND AGREE TO COMPLY WITH THE TERMS THEREOF. FURTHERMORE, I UNDERSTAND THAT ANY VIOLATIONS OF THE TERMS CONSTITUTES AN INFRACTION OF THE AGREEMENT AND MAY RESULT IN EVICTION FROM THE APARTMENT.  A COPY OF THE EXECUTED AGREEMENT HAS BEEN PROVIDED BY MANAGEMENT.

_____   _____   _____   _____
RESIDENT                                   DATE          RESIDENT                                   DATE


_____   _____   _____   _____
RESIDENT                                   DATE          RESIDENT                                   DATE


_____   _____
DOMINIUM MANAGEMENT SERVICES, LLC, Owners Agent            DATE

MN-MR/S42-05-30-19





**TAX CREDIT LEASE ADDENDUM**

DOMINIUM

Resident(s) Name: Susan Iliff

Unit # _____ 416 _____

THIS ADDENDUM is being attached to, and incorporated by reference in, that certain Apartment Lease (the "Lease") between the undersigned landlord and the undersigned Tenant for the purpose of modifying certain terms and conditions of the Lease. The terms and conditions of this Addendum shall supersede the terms and conditions of the Lease to the extent inconsistent therewith.

1.   Low-Income Housing Credit. The premises are to be operated in accordance with the requirements of the low-income housing credit program under Section 42 of the internal revenue Code of 1986, as amended (the "Program"). Tenant's rights hereunder shall be subject to the requirements that must be met under the Program in order for the Landlord to qualify to take the cost of the premises into basis for calculation of Landlord's tax credit. Tenant shall cooperate with all Landlord requirements related to such compliance and the Program.

2.   Permitted Occupants. Only the following persons will be permitted to occupy the premises:

Susan Iliff

Tenant shall not allow any other person to move into the premises without Landlord's prior written approval.

3.   Income Certification. Tenant has or will complete and execute an Income Certification Form prior to commencement of the lease term, and shall complete and execute further Income Certification Forms at Landlord's request at least annually hereafter. Upon request by Landlord, Tenant shall recertify Tenant's household income to Landlord or any governmental or quasi-governmental agency in a manner satisfactory to Landlord, and shall complete any and all other certifications and supply further documentation with respect to income and occupancy of the premises as may be reasonably requested by Landlord. Failure to provide accurate and timely income certification will constitute a breach of this lease.

4.   Recertified Income. Tenant acknowledges that the annual recertification of Tenant's household income must meet the limitations imposed by the Program for continued occupancy of the premises.

5.   Information Supplied. Tenant hereby certifies that the information supplied by tenant to Landlord that was taken into consideration by Landlord in determining Tenant's qualifications to rent the premises, including Tenant's Application, Income Certification and Recertification, is accurate, complete, and true in all respects.

6.   Increased Income. If, upon annual recertification, Tenant's household income exceeds 140% of the applicable Program limits, Landlord may: (a) increase Tenant's monthly rent to the Maximum Allowable Rent, or (b) move Tenant to a market rate unit. This does not pertain to 100% tax credit properties.

7.   Certain Changes. Tenant shall notify Landlord immediately in writing if Tenant's household size changes and/or Tenant become(s) a full time student. If Tenant becomes a full time student the tenant or household may not qualify for tax credit housing.



**Ex.A._014**

8. Smoke Detector. Landlord and Tenant each hereby acknowledge that state law requires the owner (Landlord) of a dwelling to install a functional smoke detector in the basement of the dwelling and on each floor level of each dwelling unit, except the attic or storage area of a dwelling unit. State law further requires the occupant (Tenant) to maintain any smoke detector in the premises unless the occupant (Tenant) or a government building inspector gives written notice to the owner (Landlord) that the smoke detector is not functional. Owner (Landlord) shall within 5 days after receipt of such a notice provide any maintenance necessary to make the smoke detector functional. Upon discovery that a smoke detector in the premises requires maintenance, occupant (Tenant) agrees to immediately either provide any maintenance necessary to make that smoke detector functional or provide owner (Landlord) written notification of the required maintenance.

9. Barrier-Free Units. If the premises are barrier-free and neither Tenant nor any member of Tenant's household uses a wheelchair, Landlord may require Tenant to relocate to a non barrier-free unit upon ten (10) days written notice if (a) a non barrier-free unit to which Tenant may relocate is available, and this unit is suitable for (b) a person who uses a wheelchair wishes to lease the premises.

10. Security Deposit. Tenant hereby authorizes Landlord to deposit the security deposit funds required by the Lease in a interest-bearing account in any bank, savings and loan association, credit union or elsewhere as permitted by applicable law. Interest earned may be disbursed to Landlord, except interest required by applicable law to accrue to the benefit of Tenant, which interest shall be disbursed as required to Tenant.

11. Drug Free Housing. In consideration of the execution or renewal of a lease of the dwelling unit identified in the lease, Management and Resident agree to the following pertaining to Drug Free Housing:
    a. Resident, any member of Resident's household, or a guest or other person shall not engage in drug-related activity, on or near the premises. "Drug-related activity" means the illegal manufacture, sale, distribution, use or possession with the intent to manufacture, sell, distribute or use of a Controlled Substance 21 U.S.C. 802.
    b. Resident, any member of the Resident's household, or a guest or other person shall not engage in any act intended to facilitate drug-related activity, on or near property premises.
    c. Resident or members of the household will not permit the dwelling to be used for, or to facilitate drug-related activity, regardless of whether the individual engaging in such activity is a member of the household or a guest.
    d. Resident or members of the household will not engage in the manufacture, sale or distribution of illegal drugs at any location, whether on or near property premises or otherwise.
    e. VIOLATION OF ANY OF THE ABOVE PROVISIONS SHALL BE A MATERIAL VIOLATION OF THE LEASE AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this addendum shall be deemed a serious violation and a material noncompliance with the lease. It is understood and agreed that a single violation shall be good cause for termination of lease.
    f. Resident, any member of the Resident's household, or a guest or other person shall not engage in acts of violence or threats of violence, including, but not limited to, the lawful discharge of firearms on or near property premises.

IN WITNESS WHEREOF, the undersigned have duly executed the addendum or caused it to be duly executed as of the date of the Lease.

**Resident(s):**                                     **Owner's Agent:**

_____ /

Signature                          Date

_____          _____
Signature                          Date      Authorized Representative          Date

_____
Signature                          Date

_____
Signature                          Date



Ex.A._015

 **MINNESOTA HOUSING**

### RESIDENT NOTIFICATION LETTER

As a resident of _River North_ (*name of property*), a property funded under the Low Income Housing Tax Credit Program (HTC Program), you have certain rights stated in your lease and the attached Lease Rider. Your landlord must follow federal and state rules for the HTC Program. One of the important protections provided by federal law is that you cannot be evicted from your home or have your tenancy terminated without good reason or "good cause."

Your landlord may not evict you or terminate your tenancy (including refusing to renew your lease) without good cause. Good cause is (a) serious or repeated violation(s) of the material terms and conditions of your lease. The landlord must state, in writing, the good cause in any eviction, lease non-renewal or termination of tenancy notice. If you did not do what your landlord claims in the notice, or if you think it was not serious enough for your lease to be terminated or not renewed, you can ask the landlord if there is an appeal process. If there is no appeal process, you may request that the termination be retracted and discuss your reasons why. If you receive a notice of eviction, you have a right to contest the eviction in court by explaining to the judge why you disagree with the reasons for terminating your lease. Visit www.lawhelpmn.org to see if you qualify for free or low-cost legal assistance.

In addition, your landlord may not increase the amount of rent stated on your lease more than once annually.

The attached Lease Rider should already be signed by your landlord. You and all members of your household age 18 or older must also sign the Lease Rider in order to make it part of your lease.

The Lease Rider needs to be signed each time you sign a new lease. If at any time additional adult household members enter the unit or a child who lives in that unit turns 18, they should add their signature to the existing Lease Rider with the current date.

Your landlord also has a legal obligation to comply with the statutory requirements found in Section 601 of the Violence Against Women Reauthorization Act of 2013 (VAWA).

Under VAWA, you may not be denied admission, denied assistance, terminated from participation, or evicted on the basis that you are or have been a victim of domestic violence, dating violence, sexual assault or stalking, if you otherwise qualify for admission, assistance, participation or occupancy.

You should have received the following when you were approved for occupancy or at some time during your occupancy:

- HUD Form 5380 – Notice of Occupancy Rights under the Violence Against Women Act; and
- HUD Form 5382 – Certification of Domestic Violence, Dating Violence, Sexual Assault, or Stalking, and Alternate Documentation.

The landlord must also include these documents with any notice of eviction, lease non-renewal or termination of tenancy. You may also have signed a VAWA Lease Addendum.

If you have any questions concerning this matter, please contact your resident manager, _Shannon Potter_ _____, or your landlord at _703 - 702 - 4702_____ (*phone and email*).

river.north @ dominiuminc.com

Sincerely,

_Konna Yong, Konna Yong_      _12/01/2020_
Property Representative Name (print and sign)          Date

 **MINNESOTA HOUSING**

## LOW INCOME HOUSING TAX CREDIT LEASE RIDER
*(attach to resident lease)*

Property Name: River North

Building/Unit #: 01 / 416

Head of Household Name: Susan Iliff

12/01/2020
The Lease dated 06/04/2020 is hereby amended by adding the following provisions:
initial :

1. Owner/Landlord may not evict or terminate the tenancy (including refusing to renew this Lease) except for good cause. Good cause means (a) serious or repeated violation(s) of the material terms and conditions of the Lease. Any eviction, lease non-renewal or termination of tenancy notice must be in writing and must state the specific violation(s). The notice must comply with all requirements of Minnesota law and other applicable programs.

2. Owner/Landlord may not increase the lease rent more than once annually, regardless of the term of the Lease.

To the extent that any terms contained in the Lease or any other agreement between the owner and the tenant contradict the terms of this Lease Rider, the provisions of this Lease Rider shall control.

**By signing below, I indicate my consent to this Lease Rider:**

Korina Xiong _____ , Xoma Vang _____ 12/01/2020
Property Representative Name (print)          (signature)          Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**By signing below, I indicate my consent to this Lease Rider. I/we have been given a copy of this Lease Rider.**

| Susan Iliff | | |
|---|---|---|
| Resident Name (print) | (signature) | Date |
| | | |
| Resident Name (print) | (signature) | Date |
| | | |
| Resident Name (print) | (signature) | Date |
| | | |
| Resident Name (print) | (signature) | Date |



## DOMINIUM

### DOMINIUM MANAGEMENT SERVICES, LLC
### ANIMAL LICENSE AGREEMENT

Management agrees to extend a license to permit Resident(s) to keep the animal or animals described below (referred to as "animal" whether one or more) in Resident(s)' unit. The license only applies to the animal described below and is nontransferable. A new agreement, is required to add or replace an animal. Resident(s) understand that the following rules and restrictions must be followed or this license may be terminated. Upon termination it is Resident(s)' responsibility to immediately and permanently remove the animal from the rental premises. A breach of this Agreement is a breach of the lease and gives Management all rights and remedies it has to enforce the lease.

Resident(s) may keep the animal described below in the rental unit subject to the following rules and conditions:

1. Resident(s) shall provide Management with evidence from a veterinarian or other like authority, such as the Humane Society, that the animal has been spayed or neutered. Evidence from a veterinarian on the age, breed, and in the case of dogs weight, of the animal is required.

2. Upon request, Resident(s) shall provide Management with proof that all animal vaccinations and other appropriate veterinary care has been obtained. Any license, tags or other requirements of any municipality where the rental community is located shall be obtained. Proof of such compliance must be provided to Management as requested.

3. Resident(s) must provide names and contact information for two alternate animal care providers. In the event there is any question that the animal owned by Resident(s) is receiving appropriate care, or Resident(s)' whereabouts are not known, Management in its sole discretion shall have the right to contact an alternate animal caregiver to come and take the animal or to otherwise arrange for care and boarding of the animal. Management shall have no duty or obligation to contact Resident(s)' alternate animal caregiver if there is any doubt or question about the appropriate care, health, or behavior of the animal. Management shall be free to contact the local Animal Human Society or Animal Control or similar authority or agency herein to remove the animal in lieu of efforts to contact an alternate animal care provider or if efforts to contact the alternate animal care provider are not successful.

4. When outside of Resident(s)' unit, animal must be on a leash, or otherwise in a secure animal container, and under actual physical control at all times.

5. Resident acknowledges that other residents or guests may have spiritual or cultural objections to animals or have allergies, fears, or health sensitivities. Resident(s) agrees to reasonably work with Management to respond to complaints or concerns raised by neighbors and other residents. Management may set, or change, rules from time to time restricting animals (with the exception of service animals) from common areas. Further, Management may restrict animal/pet ownership to certain areas, floors, or buildings of the rental community to the extent this is permitted by law and/or as limited by Management's duty to allow animals necessary to accommodate a disability.

6. Animals may not be left unattended at any time outside of your unit. This includes patios and balconies.

7. Resident(s) is responsible for containing the animal or having Resident(s), or an animal sitter, if requested by Management, in the unit to care for the animal when Management gives notice that it needs to enter the unit for repairs, inspections, or showings.

1



8.    Dogs are required to urinate and defecate in outdoor areas only. Dogs may not urinate or defecate in the unit, or on any patio or balcony, or in common hallways. "Pee pods" or fake indoor grass are not allowed for any type of animal. Management may designate areas of the community as animal relief areas and these areas must be used. Any damage done to grass, shrubbery, plantings, carpet, or other property in the building, in common areas, or to outdoor areas by Resident(s)' animal will be charged to Resident(s) and must immediately be paid. Management reserves the right to implement, and to require, that a DNA sample be provided in advance of any animal being approved. The DNA sample may be used to determine the source of any animal waste. If any waste that is not completely removed or properly cleaned matches Resident's animal, Resident(s) may be charged testing costs and issued a lease violation. Repeat violation is a basis for termination of this License Agreement, lease termination, and/or eviction.

9.    Cats must be litter box trained. Residents must change cat litter at least twice a week, or more, if needed to avoid odors in the unit or in common areas. Litter must be disposed of in sealed bags and carried to appropriate trash containers. Disposal of litter or animal waste in any drain or toilet in your unit or the community is prohibited.

10.   Any complaints about Resident(s)' animal or the animal's condition or behavior from Residents, neighbors, guests, or Management's agents (such as noise, barking, whining, odors, the presence of fleas, ticks, or other pests or conditions, aggressive or nuisance behaviors) shall be grounds for revocation of this license and/or lease enforcement.

11.   Resident(s) agrees to be responsible for any and all damage done by the animal to the unit, or any common area in the rental community, including, but not limited to, stain removal, deodorizing, wood resurfacing and repair/replacement, carpet replacement, etc. These costs may be in excess of any damage deposit paid by Resident(s) and Resident(s)' responsibility is not limited to the amount of any deposit. Resident agrees that Management shall be entitled to use funds in the security deposit to professionally clean the carpet in the entire unit, including treatments or actions for odor treatment, when Resident vacates.

12.   Resident(s) agrees to be responsible for any damages or claims brought by any third person as a result of Resident(s)' animal. Resident(s) will be liable for the entire amount of any damages or claims for injuries to person or property caused by Resident(s)' animal. It is strongly recommended that Residents who own an animal purchase a personal liability insurance policy, such as renters' insurance with a liability rider, to protect against claims or damages. Resident(s) agrees to indemnify and hold Management harmless from any claims brought by any person relating to any damage or injury caused by Resident(s)' animal. Such indemnity shall include reimbursing Management for all costs of defense, including reasonable attorneys' fees, in defending any claim naming Management as a result of Resident(s)' animal.

13.   An animal owner may not alter the interior or any exterior physical structure of a dwelling unit, or yard, to create an animal enclosure or entrance. This includes the installation of any fences.

14.   The bathing of any animal is not be permitted in any laundry room, garage, or any other common area.

15.   Resident(s) shall provide for proper care of the animal on a daily basis. A reason to believe the animal has not received adequate care, has been abused, is unattended, or is in need of veterinary care, are grounds for Management to contact the Humane Society and/or Animal Control or an alternative care provider to remove the animal.

16.   This Animal License Agreement is an additional addendum to Resident's lease. Any violation of this Agreement gives Management the same rights and remedies provided in the lease. Management, in its discretion, may issue a warning or notice to Resident(s) of violation of this Agreement; may give Resident(s) a notice that this License has been revoked and require Resident(s) to provide proof that the animal has been removed from the household; or give Resident(s) a notice of lease termination or eviction. Notwithstanding the forgoing, a notice from any police department or municipal authority that the Resident's animal has been designated a potentially dangerous animal, or any other complaint or report that Resident(s)' animal has bitten or attacked any person or animal, has become threatening, vicious or aggressive, or has

2



**Ex.A._019**

displayed symptoms of an illness or behavior so as to constitute a nuisance or threat to the health or safety of the community, will be grounds for Management to demand that the animal be removed at once.

17. With the exception of service animals or assistance animals needed for a disability, any animal approval fees, additional security deposits per animal, and monthly rent or charges, plus any costs or charges for advance DNA identification testing, must be timely paid. Failure to pay any monthly rent or charge shall be subject to any late fee owed under the lease and to lease enforcement up to and including an eviction action for nonpayment of rent and amounts owed under the lease. Approval fees and deposits are to be paid in advance of this Agreement being signed and before any animal is brought to the premises.

This license applies to the animal described below:

Animal's name: _____     Animal's name: _____
Type of animal: _____     Type of animal: _____

Description of animal - age, color(s), breed:
_____  _____   _____

Description of animal - age, color(s), breed:
_____  _____   _____

For a dog, weight: _____         For a dog, weight: _____

Alternate animal care provider #1:

_____          _____
(Name)                              (Address)

_____          _____
(Phone Numbers)                     (Email)

Alternate animal care provider #2:

_____          _____
(Name)                              (Address)

_____          _____
(Phone Numbers)                     (Email)

**AGREED TO:**

**Resident(s)**          Print unit # and address          Date

_____        _____        _____
(Resident #1)

_____        _____        _____
(Resident #2)

_____        _____        _____
(Resident #3)

**Management will sign this License upon Resident meeting the conditions, and providing the information, required above.**

**By:** _____          **Date:** _____

**Its:** _____

3



DOMINIUM

# ANIMAL/PET POLICIES

Dominium Management Services, LLC (Management) manages a variety of rental communities. Some of the properties we manage allow residents to own one or two cats. Dogs, with the exception of assistance animals necessary to accommodate a disability, are prohibited at many of the rental communities we manage. Applicants and residents should check with the site office for your rental community to determine what animals are permitted and any requirements to pay a nonrefundable animal approval fee, an additional security deposit, or additional monthly pet rent.

Any cat(s) or dog at Management properties are subject to these animal policy requirements. Cat and dog owners are required to have Management consent and to sign an Animal License Agreement. A copy of our standard Animal License Agreement is available on request. Pet owners must use the Animal License Agreement to register their pets with management before the pet is brought on premises and must update registration annually. Registration must include the following: certification of inoculation, information sufficient to identify the pet and demonstrate that it is a common household pet, name, address and phone number of at least one responsible party who will care for pet if owner dies or is unable to provide care.

### Animals Permitted

Birds – limit two. Only species that are normally kept as household pets, such as canaries or parakeets are permitted. Birds must be confined in cages at all times. Birds of prey are not permitted. Management's advance consent to own up to two birds is not required. But complaints about any noise, odors, or problems associated with birds is grounds to terminate resident's right to own or keep a bird(s).

Fish – in tanks or aquariums, not exceeding 20 gallons in capacity. Poisonous or dangerous fish are not permitted. Occupant agrees not to keep or permit a fish tank or aquarium, not exceeding 20 gallons in capacity, unless Occupant is able to provide proof of Renter's Insurance.

No snakes, rodents, reptiles, insects, or other mammals, except cats and dogs as set forth below, are allowed.

Cats and dogs – where cat(s) or a dog are permitted as pets, applicant/resident will be required to pay the fees and deposits in effect at the specific site, as outlined on page two of this document.

### The following rules apply to any cat or dog ownership (if permitted):

Dogs must be housebroken. Cats must be trained to a litter box.

Animals must be at least one year of age. This must be confirmed by documentation from a veterinarian.

Animals must be spayed or neutered.

At the time of approval for any dog, and for cats upon request, you must provide Management with proof that all required vaccinations have been given. Updates on required vaccinations and other appropriate veterinary care must be provided on request.

Management reserves the right to screen any request for approval of an animal and to reject any dog that has any history of aggressive or nuisance behavior, including full or mixed breed dogs that are breeds known for aggressive behaviors. The following breed or breed mixes are prohibited unless already owned by an applicant/resident as an assistance animal for a disability in which case a specific dog of a normally prohibited breed may be subject to individual screening: Pitbulls, Presa Canario, or Mastiffs, American Staffordshire Terrier, Staffordshire Bull Terrier, Chow-Chow, Dalmatian, German Shepard, Rottweiler, and Doberman. Individual sites may have limits based on dog weight.

Proof of any license required by the applicable city or municipality must be provided.



DEHana0517161

Dominium Policy & Procedure
011/07/2016

You should apply for Management's consent to approve an animal, and provide the documentation and fees required to Management, before any cat or dog is brought to your apartment.  It is your responsibility to discuss with Management your intention or desire to own a cat dog as an assistance animal for a disability.  Management will make exceptions (accommodations) in the above rules regarding cat/dog ownership if necessary for a disability related need.

I agree to comply with these Animal Policies and to not allow any animal on the property, except permitted birds and fish, with Management's prior written consent.

I do not own an animal ☐.

I do own an animal(s) and understand I must have a signed Animal License Agreement for each animal ☐.

Agreed to: _____        _____
                     **Resident**                                            **Date**

                     _____        _____
                     **Resident**                                            **Date**

DEHana0517161



## DOMINIUM

## APARTMENT SPECIFIC ANIMAL POLICIES

1 to 2 Cats

_____ Additional Security Deposit Per Cat

_____ Nonrefundable Animal Approval Fee

_____ Per Month per Cat Rent

1 to 2 Dogs

_____ Additional Security Deposit

_____ Nonrefundable Animal Approval Fee

_____ Per Month Dog Rent

Up to 2 Pets



DEHana0517161



**ANIMAL/PET POLICIES**

DOMINIUM

Resident(s) Name: Susan Iliff

Unit # 416

Dominium Management Services, LLC (Management) manages a variety of rental communities. Some of the properties we manage allow residents to own one or two cats. Dogs, except for assistance animals necessary to accommodate a disability, are prohibited at many of the rental communities we manage. Applicants and residents should check with the site office for your rental community to determine what animals are permitted and any requirements to pay a nonrefundable animal approval fee, an additional security deposit, or additional monthly pet rent. Dominium prohibits visiting pets.

Any cat(s) or dog at Management properties are subject to these animal policy requirements. Cat and dog owners are required to have Management consent and to sign an Animal License Agreement. A copy of our standard Animal License Agreement is available on request. Pet owners must use the Animal License Agreement to register their pets with management before the pet is brought on premises and must update registration annually. Registration must include the following: certification of inoculation, sufficient information to identify the pet and demonstrate that it is a common household pet, name, address and phone number of at least one responsible party who will care for pet if owner dies or is unable to provide care.

### Animals Permitted

Birds – limit two. Only species that are normally kept as household pets, such as canaries or parakeets are permitted. Birds must always be confined to cages. Birds of prey are not permitted. Management's advance consent to own up to two birds is not required. But complaints about any noise, odors, or problems associated with birds is grounds to terminate resident's right to own or keep a bird(s).

Fish – in tanks or aquariums, not exceeding 20 gallons in capacity. Poisonous or dangerous fish are not permitted. Occupant agrees not to keep or permit a fish tank or aquarium, not exceeding 20 gallons in capacity, unless Occupant is able to provide proof of Renter's Insurance.

No snakes, rodents, reptiles, insects, or other mammals, except cats and dogs as set forth below, are allowed.

Cats and dogs – where cat(s) or a dog are permitted as pets, applicant/resident will be required to pay the fees and deposits in effect at the specific site, as outlined on page two of this document.

**The following rules apply to any cat or dog ownership (if permitted):**

Dogs must be housebroken. Cats must be trained to a litter box.

Animals must be at least one year of age. This must be confirmed by documentation from a veterinarian.

Animals must be spayed or neutered.

At the time of approval for any dog, and for cats upon request, you must provide Management with proof that all required vaccinations have been given. Updates on required vaccinations and other appropriate veterinary care must be provided on request.

Management reserves the right to screen any request for approval of an animal and to reject any dog that has any history of aggressive or nuisance behavior, including full or mixed breed dogs that are breeds known for aggressive behaviors. The following breed or breed mixes are prohibited unless already owned by an applicant/resident as an assistance animal for a disability in which case a specific dog of a normally prohibited breed may be subject to individual screening: Pitbulls, Presa Canario, or Mastiffs, American Staffordshire Terrier, Staffordshire Bull Terrier, Chow-Chow, Dalmatian, German Shepard, Rottweiler, and Doberman. Individual sites may have limits based on dog weight. The weight limit for this property is

Proof of any license required by the applicable city or municipality must be provided.



You should apply for Management's consent to approve an animal, and provide the documentation and fees required to Management, before any cat or dog is brought to your apartment. It is your responsibility to discuss with Management your intention or desire to own a cat dog as an assistance animal for a disability. Management will make exceptions (accommodations) in the above rules regarding cat/dog ownership if necessary for a disability related need.

I agree to comply with these Animal Policies and to not allow any animal on the property, except permitted birds and fish, without Management's prior written consent. I further agree to furnish payment for all applicable deposits and/or fees.

$_____ One time Refundable Animal/Pet Deposit

$_____ One time Non-Refundable Animal/Pet Deposit

$_____ Monthly Animal/Pet Rent

□ I do not own an animal.

□ I do own an animal(s) and understand I must have a signed Animal License Agreement.

**Resident(s):**                                          **Owner's Agent:**
                                                          DOMINIUM MANAGEMENT SERVICES INC

_____
Signature                          Date

_____
Signature                          Date                  _____
                                                          Authorized Representative        Date

_____
Signature                          Date

_____
Signature                          Date



NOTICE OF OCCUPANCY RIGHTS UNDER          U.S. Department of Housing and Urban Development
THE VIOLENCE AGAINST WOMEN ACT                              OMB Approval No. 2577-0286
                                                                              Expires 06/30/2017

## For all Dominium Residents

## Notice of Occupancy Rights under the Violence Against Women Act[1]

### To all Tenants and Applicants

The Violence Against Women Act (VAWA) provides protections for victims of domestic
violence, dating violence, sexual assault, or stalking. VAWA protections are not only available
to women, but are available equally to all individuals regardless of sex, gender identity, or sexual
orientation.[2] The U.S. Department of Housing and Urban Development (HUD) is the Federal
agency that oversees that **Dominium** is in compliance with VAWA. This notice explains your
rights under VAWA. A HUD-approved certification form is attached to this notice. You can fill
out this form to show that you are or have been a victim of domestic violence, dating violence,
sexual assault, or stalking, and that you wish to use your rights under VAWA."

### Protections for Applicants

If you otherwise qualify for assistance under project based section 8 or tax credits you cannot be
denied admission or denied assistance because you are or have been a victim of domestic
violence, dating violence, sexual assault, or stalking.

### Protections for Tenants

If you are receiving assistance under project based section 8 or tax credits you may not be denied
assistance, terminated from participation, or be evicted from your rental housing because you are
or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

Also, if you or an affiliated individual of yours is or has been the victim of domestic violence,
dating violence, sexual assault, or stalking by a member of your household or any guest, you
may not be denied rental assistance or occupancy rights under project based section 8 or tax
credits solely on the basis of criminal activity directly relating to that domestic violence, dating
violence, sexual assault, or stalking.

Affiliated individual means your spouse, parent, brother, sister, or child, or a person to whom
you stand in the place of a parent or guardian (for example, the affiliated individual is in your
care, custody, or control) or any individual, tenant, or lawful occupant living in your household.

### Removing the Abuser or Perpetrator from the Household

Dominium may divide (bifurcate) your lease in order to evict the individual or terminate the
assistance of the individual who has engaged in criminal activity (the abuser or perpetrator)
directly relating to domestic violence, dating violence, sexual assault, or stalking.

---

[1] Despite the name of this law, VAWA protection is available regardless of sex, gender identity, or sexual
orientation.

[2] Housing providers cannot discriminate on the basis of any protected characteristic, including race, color, national
origin, religion, sex, familial status, disability, or age. HUD-assisted and HUD-insured housing must be made
available to all otherwise eligible individuals regardless of actual or perceived sexual orientation, gender identity, or
marital status.

Form HUD-5380
(12/2016)

If Dominium chooses to remove the abuser or perpetrator, Dominium may not take away the rights of eligible tenants to the unit or otherwise punish the remaining tenants. If the evicted abuser or perpetrator was the sole tenant to have established eligibility for assistance under the program, Dominium must allow the tenant who is or has been a victim and other household members to remain in the unit for a period of time, in order to establish eligibility under the program or under another HUD housing program covered by VAWA, or, find alternative housing.

In removing the abuser or perpetrator from the household, Dominium must follow Federal, State, and local eviction procedures. In order to divide a lease, Dominium may, but is not required to, ask you for documentation or certification of the incidences of domestic violence, dating violence, sexual assault, or stalking.

### Moving to Another Unit

Upon your request, Dominium may permit you to move to another unit, subject to the availability of other units, and still keep your assistance. In order to approve a request, Dominium may ask you to provide documentation that you are requesting to move because of an incidence of domestic violence, dating violence, sexual assault, or stalking. If the request is a request for emergency transfer, the housing provider may ask you to submit a written request or fill out a form where you certify that you meet the criteria for an emergency transfer under VAWA. The criteria are:

> **(1) You are a victim of domestic violence, dating violence, sexual assault, or stalking.** If your housing provider does not already have documentation that you are a victim of domestic violence, dating violence, sexual assault, or stalking, your housing provider may ask you for such documentation, as described in the documentation section below.
>
> **(2) You expressly request the emergency transfer.** Your housing provider may choose to require that you submit a form, or may accept another written or oral request.
>
> **(3) You reasonably believe you are threatened with imminent harm from further violence if you remain in your current unit.** This means you have a reason to fear that if you do not receive a transfer you would suffer violence in the very near future.
>
> **OR**
>
> **You are a victim of sexual assault and the assault occurred on the premises during the 90-calendar-day period before you request a transfer.** If you are a victim of sexual assault, then in addition to qualifying for an emergency transfer because you reasonably believe you are threatened with imminent harm from further violence if you remain in your unit, you may qualify for an emergency transfer if the sexual assault occurred on the premises of the property from which you are seeking your transfer, and that assault happened within the 90-calendar-day period before you expressly request the transfer.

Dominium will keep confidential requests for emergency transfers by victims of domestic violence, dating violence, sexual assault, or stalking, and the location of any move by such victims and their families.

Form HUD-5380
(12/2016)

**Ex.A._027**

Dominium's emergency transfer plan provides further information on emergency transfers, and Dominium must make a copy of its emergency transfer plan available to you if you ask to see it.

**Documenting You Are or Have Been a Victim of Domestic Violence, Dating Violence,**

**Sexual Assault or Stalking**

Dominium can, but is not required to, ask you to provide documentation to "certify" that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking. Such request from Dominium must be in writing, and Dominium must give you at least 14 business days (Saturdays, Sundays, and Federal holidays do not count) from the day you receive the request to provide the documentation. Dominium may, but does not have to, extend the deadline for the submission of documentation upon your request.

You can provide one of the following to Dominium as documentation. It is your choice which of the following to submit if Dominium asks you to provide documentation that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

- A complete HUD-approved certification form given to you by Dominium with this notice, that documents an incident of domestic violence, dating violence, sexual assault, or stalking. The form will ask for your name, the date, time, and location of the incident of domestic violence, dating violence, sexual assault, or stalking, and a description of the incident. The certification form provides for including the name of the abuser or perpetrator if the name of the abuser or perpetrator is known and is safe to provide.
- A record of a Federal, State, tribal, territorial, or local law enforcement agency, court, or administrative agency that documents the incident of domestic violence, dating violence, sexual assault, or stalking. Examples of such records include police reports, protective orders, and restraining orders, among others.
- A statement, which you must sign, along with the signature of an employee, agent, or volunteer of a victim service provider, an attorney, a medical professional or a mental health professional (collectively, "professional") from whom you sought assistance in addressing domestic violence, dating violence, sexual assault, or stalking, or the effects of abuse, and with the professional selected by you attesting under penalty of perjury that he or she believes that the incident or incidents of domestic violence, dating violence, sexual assault, or stalking are grounds for protection.
- Any other statement or evidence that Dominium has agreed to accept.

If you fail or refuse to provide one of these documents within the 14 business days, Dominium does not have to provide you with the protections contained in this notice.

If Dominium receives conflicting evidence that an incident of domestic violence, dating violence, sexual assault, or stalking has been committed (such as certification forms from two or more members of a household each claiming to be a victim and naming one or more of the other petitioning household members as the abuser or perpetrator), Dominium has the right to request that you provide third-party documentation within thirty 30 calendar days in order to resolve the conflict. If you fail or refuse to provide third-party documentation where there is conflicting evidence, Dominium does not have to provide you with the protections contained in this notice.

Form HUD-5380
(12/2016)

## Confidentiality

Dominium must keep confidential any information you provide related to the exercise of your rights under VAWA, including the fact that you are exercising your rights under VAWA.

Dominium must not allow any individual administering assistance or other services on behalf of Dominium (for example, employees and contractors) to have access to confidential information unless for reasons that specifically call for these individuals to have access to this information under applicable Federal, State, or local law.

Dominium must not enter your information into any shared database or disclose your information to any other entity or individual. Dominium, however, may disclose the information provided if:

- You give written permission to Dominium to release the information on a time limited basis.
- Dominium needs to use the information in an eviction or termination proceeding, such as to evict your abuser or perpetrator or terminate your abuser or perpetrator from assistance under this program.
- A law requires Dominium or your landlord to release the information.

VAWA does not limit Dominium's duty to honor court orders about access to or control of the property. This includes orders issued to protect a victim and orders dividing property among household members in cases where a family breaks up.

## Reasons a Tenant Eligible for Occupancy Rights under VAWA May Be Evicted or

## Assistance May Be Terminated

You can be evicted and your assistance can be terminated for serious or repeated lease violations that are not related to domestic violence, dating violence, sexual assault, or stalking committed against you. However, Dominium cannot hold tenants who have been victims of domestic violence, dating violence, sexual assault, or stalking to a more demanding set of rules than it applies to tenants who have not been victims of domestic violence, dating violence, sexual assault, or stalking.
The protections described in this notice might not apply, and you could be evicted and your assistance terminated, if Dominium can demonstrate that not evicting you or terminating your assistance would present a real physical danger that:

1) Would occur within an immediate time frame, and
2) Could result in death or serious bodily harm to other tenants or those who work on the property.

If Dominium can demonstrate the above, Dominium should only terminate your assistance or evict you if there are no other actions that could be taken to reduce or eliminate the threat.

5

**Other Laws**

VAWA does not replace any Federal, State, or local law that provides greater protection for victims of domestic violence, dating violence, sexual assault, or stalking. You may be entitled to additional housing protections for victims of domestic violence, dating violence, sexual assault, or stalking under other Federal laws, as well as under State and local laws.

**Non-Compliance with the Requirements of This Notice**

You may report a covered housing provider's violations of these rights and seek additional assistance, if needed, by contacting or filing a complaint with your local HUD field office.

**For Additional Information**

You may view a copy of HUD's final VAWA rule at https://www.hud.gov/sites/documents/5720-F-03VAWAFinRule.pdf.

Additionally, Dominium must make a copy of HUD's VAWA regulations available to you if you ask to see them.

For questions regarding VAWA, please contact your local HUD office.

For help regarding an abusive relationship, you may call the National Domestic Violence Hotline at 1-800-799-7233 or, for persons with hearing impairments, 1-800-787-3224 (TTY).

VIOLENCE, DATING VIOLENCE
OR STALKING

**U.S. Department of Housing
and Urban Development**
Office of Housing

OMB Approval No. 2502-0204
Exp. 6/30/2017

# LEASE ADDENDUM

## VIOLENCE AGAINST WOMEN AND JUSTICE DEPARTMENT REAUTHORIZATION ACT OF 2005

| TENANT | LANDLORD | UNIT NO. & ADDRESS |
|---|---|---|
| Susan Iliff | River North<br>10940 Crooked Lake Blvd NW,<br>Coon Rapids, MN 55433 | Unit #416    10940 Crooked<br>Lake NW BLVD 416 Coon |

This lease addendum adds the following paragraphs to the Lease between the above referenced Tenant and Landlord.

**Purpose of the Addendum**

The lease for the above referenced unit is being amended to include the provisions of the Violence Against Women and Justice Department Reauthorization Act of 2005 (VAWA).

**Conflicts with Other Provisions of the Lease**

In case of any conflict between the provisions of this Addendum and other sections of the Lease, the provisions of this Addendum shall prevail.

**Term of the Lease Addendum**

12-01-2020
The effective date of this Lease Addendum is ~~Jun 04, 2020~~ . This Lease Addendum shall continue to be in effect until the Lease is terminated. initial _____

**VAWA Protections**

1. The Landlord may not consider incidents of domestic violence, dating violence or stalking as serious or repeated violations of the lease or other "good cause" for termination of assistance, tenancy or occupancy rights of the victim of abuse.
2. The Landlord may not consider criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of that abuse.
3. The Landlord may request in writing that the victim, or a family member on the victim's behalf, certify that the individual is a victim of abuse and that the Certification of Domestic Violence, Dating Violence or Stalking, Form HUD-91066, or other documentation as noted on the certification form, be completed and submitted within 14 business days, or an agreed upon extension date, to receive protection under the VAWA. Failure to provide the certification or other supporting documentation within the specified timeframe may result in eviction.

_____    _____
Tenant                                   Date

_____    _____
Landlord                                 Date

Form **HUD-91067**
**(9/2008)**



**UTILITY CONFIRMATION SHEET**

**DOMINIUM**

Resident(s) Name: _Susan Iliff_

Unit # _____416_____.

New Address: (Include Bldg. /Unit #, City, State and Zip)
_10940 Crooked Lake NW BLVD, Unit #416, Coon Rapids, MN 55433_

This form is to be given to the future resident prior to move in so they have an opportunity to transfer and set up their utilities.

Future Resident- Please complete and return to the Management Office prior to move in.

**Utility Information**

| Utility Type | Company Name | Contact Information | Utility Transfer Date | Utility Transfer Confirmation # |
|---|---|---|---|---|
| Electric | JIT | | | |
| Gas (if applicable) | centerpoint energy | | | |
| Telecommunications (Phone/TV/Internet) | | | N/A | N/A |
| Trash (if applicable) | | | | |
| Water (if applicable) | | | | |





**Minnesota Housing**
Finance Agency

# Head of Household and Household Member Demographic Information

**Instructions:** This form is to be completed by the head of household and additional household members only after occupancy has been approved. Head of household, please complete page 1. Make copies as needed, and complete a separate page 2 for **each** additional household member.

Your approval for occupancy will not be affected if you choose not to respond. The owner will submit this information to Minnesota Housing for assessment of households being served by its financing programs. Your cooperation is much appreciated.

| Housing Information (this section to be completed by owner/agent) | |
|---|---|
| Property Name | River North |
| Minnesota Housing D# | |
| Building Address | 10940 Crooked Lake NW BLVD, Coon Rapids, MN 55433 |
| Unit # | 416 |

| Head of Household Information | |
|---|---|
| Name | Susan C. Iliff |
| Date of birth (month/day/year) | ____/____/____ |
| Ethnicity | ☐ Hispanic or Latino<br>☐ Not Hispanic or Latino<br>☐ I choose not to respond |
| Gender | ☐ Female<br>☐ Male<br>☐ I choose not to respond |
| Race (check all that apply) | ☐ American Indian/Alaska Native ☐ Native Hawaiian/ Other Pacific Islander<br>☐ Asian ☐ White<br>☐ Black/African American ☐ I choose not to respond |
| Are you mobility impaired and requiring features of an accessible unit? | ☐ Yes<br>☐ No<br>☐ I choose not to respond |
| Do you have a disability other than mobility impairment? | ☐ Yes<br>☐ No<br>☐ I choose not to respond |
| Main source of household income (check only one) | ☐ Salary/wages ☐ Interest/dividends/rental income<br>☐ Self-employment ☐ Unemployment/disability<br>☐ Social Security ☐ Public assistance<br>☐ Retirement /pension/annuity ☐ No income<br>☐ Alimony/child support |

**Ex.A._033**


**Minnesota Housing**
Finance Agency

**Household Member Demographic Information**

**Instructions:** Complete a separate page 2 for **each** household member that is not the Head of Household. Parents or guardians, please complete the form for your minor child(ren).

Your approval for occupancy will not be affected if you choose not to respond. The owner will submit this information to Minnesota Housing for assessment of households being served by its financing programs. Your cooperation is much appreciated.

| Housing Information (this section to be completed by owner/agent) | |
|---|---|
| Property Name | River North |
| Building Address: | 10940 Crooked Lake NW BLVD, Coon Rapids, MN 55433 |
| Unit # | 416 |

| Household Member Information | |
|---|---|
| Name | |
| Date of birth (month/day/year) | ____/____/____ |
| Ethnicity | ☐ Hispanic or Latino<br>☐ Not Hispanic or Latino<br>☐ I choose not to respond |
| Gender | ☐ Female<br>☐ Male<br>☐ I choose not to respond |
| Race (check all that apply) | ☐ American Indian/Alaska Native  ☐ Native Hawaiian/ Other Pacific Islander<br>☐ Asian  ☐ White<br>☐ Black/African American  ☐ I choose not to respond |
| Are you mobility impaired and requiring features of an accessible unit? | ☐ Yes<br>☐ No<br>☐ I choose not to respond |
| Do you have a disability other than mobility impairment? | ☐ Yes<br>☐ No<br>☐ I choose not to respond |

**Ex.A._034**

**Exhibit B**
**Certification of Tenant Eligibility**
(AGE CERTIFICATION)

| Project: | River North |
|----------|-------------|
| Owner: | DMS |
| Unit: | 416 |

1.  I/We, the undersigned, being first duly sworn, state that I/we have read and answered fully, frankly and personally each of the following questions for all persons (including minors) who are to occupy the unit in the above apartment building for which application is made, all of who are listed below:

| Name of Members of the Household | Relationship to Head of Household | Age |
|----------------------------------|-----------------------------------|-----|
| Susan Iliff | Self | 63 |
| | | |
| | | |

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION SET FORTH ABOVE IS TRUE AND CORRECT.  THE UNDERSIGNED ACKNOWLEDGE THAT THE LEASE FOR THE UNIT TO BE OCCUPIED BY THE UNDERSIGNED WILL BE CANCELLED UPON 10 DAYS WRITTEN NOTICE IF ANY OF THE INFORMATION.



Head of Household

_____
Co-Applicant

Subscribed and sworn to before me this **16** day of **November** , 20**20**

(Notary Seal)



THUIN G GATWECH
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2025

Notary Public in and for the

State of **Minnesota**

My Commission Expires: **01/31/2025**

OPPM 8.15.17

Ex.A._035



**LEASE TERMINATION POLICY ACKNOWLEDGEMENT**

**DOMINIUM**

Resident(s) Name: Susan Iliff
Unit # 416

Outlined below are the procedures and guidelines for Early Lease Termination. If Resident wishes to terminate the lease prior to the lease expiration, all Residents must sign the Lease Termination Agreement and abide by the following:

1. Resident agrees to, and in fact does, completely vacate and surrender the Apartment and the Community on the date agreed on in the Lease Termination Agreement.
2. Simultaneously with the execution of the Lease Termination Agreement, Resident pays to Management electronically or through WIPS an early lease termination fee in an amount equal to two months rent.
3. Resident shall fulfill all covenants and obligations under the Lease applicable to the period prior to and including the Early Termination Date, including the payment of all rent, repayment of concessions and other charges and fees due and owing up to and including the Early Termination Date; and
4. Resident shall obtain final utility bills and pay all outstanding charges for utility services up to and including the Early Termination Date.
5. A 2 month written notice required. During which time the resident will continue to pay the monthly rent due for the notice period.
6. Lease Termination Agreement cannot be exercised in order to vacate the apartment in the months of November, December, January and February.
7. If resident resides at a Section 42 property at least six full months of occupancy must be fulfilled.

Termination of the Lease pursuant to the Lease Termination Agreement will only release Resident from any further rent obligations after the Early Termination Date. Management will retain all remedies for other non-compliance with the Lease and Resident will remain liable for any and all damage to the Apartment or the Community resulting from such non-compliance. In the event Resident fails to meet any of the foregoing conditions (unless such condition is waived by Management in writing), the reduction of obligations contained in the Lease Termination Agreement will be ineffective and Management will be entitled to the total amount of rent and other charges which can rightfully be claimed by Management pursuant to the Lease through the end of the Lease Term.

Resident acknowledges that Resident will voluntarily surrender possession of the Apartment to Management. Resident will remove all of Resident's belongings from the Apartment and the Community on or before the Early Termination Date and any belongings or other items left in the Apartment or the Community after such date may be disposed of by Management in a manner determined by Management in their sole discretion. Resident will kennel pets, if applicable, during showings of the apartment to potential future renters.

| **Resident(s):** | | **Owner's Agent:** | |
|---|---|---|---|
| Signature | Date | | |
| Signature | Date | Authorized Representative | Date |
| Signature | Date | | |
| Signature | Date | | |





**GARAGE, PARKING AND STORAGE ACCESS GATE ADDENDUM**

**DOMINIUM**

Resident(s) Name: Susan Iliff
Unit # 416
Rentable Item Lease Term Start Date: 12/01/2020

☐ Does not apply

**Check all that apply:**

| | | |
|---|---|---|
| ☐ Parking | Assigned # ____ | Monthly Rent Amount $____ |
| ☐ Parking | Assigned # ____ | Monthly Rent Amount $____ |
| ☐ Parking | Assigned # ____ | Monthly Rent Amount $____ |
| ☒ Garage | Assigned # 89 | Monthly Rent Amount $75.00 |
| ☐ Garage | Assigned # ____ | Monthly Rent Amount $____ |
| ☐ Garage | Assigned # ____ | Monthly Rent Amount $____ |
| ☒ Storage Locker | Assigned # 90 | Monthly Rent Amount $15.00 |
| ☐ Storage Locker | Assigned # ____ | Monthly Rent Amount $____ |
| ☐ Storage Locker | Assigned # ____ | Monthly Rent Amount $____ |

All parking, garage and/or storage rent is due on or before the first of each month. A late fee as specified in your apartment lease agreement is due and payable if rent is not paid in full. Resident understands and agrees to pay rent for the entire lease term of the Agreement and any lease term, which continues after such term expires.

Resident understands the garage and/or parking is for the sole purpose of vehicle storage and cannot be used for temporary or permanent residency. Storage of personal items and repairs to vehicle are prohibited.

**Rules For Using Vehicle Gates and Garages:** Always approach entry/exit gates and garages with caution and at a very slow rate of speed. Never stop your car where the gate or a garage door could hit your vehicle as it opens or closes. Never follow another vehicle into an open gate. Always use your card/remote to gain entry. Report to management the vehicle license plate number of any vehicle that piggybacks through the gate. Never force the gate or garage door open with your car. Never get out of your vehicle while the gates are opening or closing. If you are using the gates and have a trailer, or something similar, the length and width may cause recognition problems with the safety loop detector and could cause damage. Do not operate the gate or garage doors if there are people nearby who might get caught in it as it opens or closes. If you lose your card, please contact the management office immediately. Do not tamper with gates or garages or allow your occupants or guests to tamper or play with. Please follow height restrictions for underground garages, attached and detached garages and carports.

**Damaged, Lost Or Unreturned Remote Controls, Cards Or Code Changes:** If a remote control or gate card is lost, stolen or damaged, the replacement fee stated on your lease will be charged for a replacement. If a remote control or card is not returned or is returned damaged when you move out, there will be a deduction from the security deposit for the amount outlined in your lease. We may change the code(s) at any time and notify you accordingly. Do not give your card or code to anyone else.

**Report Damage or Malfunctions:** Please immediately report to the office any malfunction or damage to gates, fencing, garage doors, locks or related equipment. If the gates or garages are damaged by you or other occupants, guests or invitees through negligence or misuse, you are liable for the damages under your lease, and collection of damage amounts will be pursued. We cannot predict malfunctions. Any mechanical or electronic objects may malfunction from time to time and will be repaired by Management as promptly as possible.



**Suspicious Activity, Personal Injury And/Or Personal Property Damage:** We make no representations or guarantees to you concerning security of the community. Fencing, gates or other devices will not prevent crime. No security system or device is foolproof or 100% successful in deterring crime. You should call 911 if a crime occurs or is suspected. We are not liable to any resident, family member, guest, occupant or invitee for personal injury, death or damage/loss of personal property from incidents related to perimeter fencing, garages, automobile access gates and/or pedestrian access gates. We reserve the right to modify or eliminate security systems other than those statutorily required. You will be held responsible for the actions of any persons to whom you provide access to the community.

Management is not responsible for damage or theft of any vehicle/item stored in parking, garage or storage space.

**Vehicle Information**

| Type      | | Type      | | Type      | |
|-----------|--|-----------|--|-----------|--|
| Model     | | Model     | | Model     | |
| License # | | License # | | License # | |
| Make      | | Make      | | Make      | |
| Year      | | Year      | | Year      | |
| Permit #  | | Permit #  | | Permit #  | |

**Resident(s):**

Owner's Agent:
DOMINIUM MANAGEMENT SERVICES INC

_____
Signature                    Date

_____
Signature                    Date

Authorized Representative        Date

_____
Signature                    Date

_____
Signature                    Date





**AMENITIES ADDENDUM**

DOMINIUM

Resident(s) Name: Susan Iliff

Unit # 416

GENERAL CONDITIONS FOR USE OF APARTMENT PROPERTY AND RECREATIONAL AMENITIES.

Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Apartment Community is a privilege and license granted by Owner's Agent, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner's Agent at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner's Agent reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's Agent's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. Owner and management may make changes to the Rules for use of any Amenity at any time. Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's use of the amenities at the Community. Resident(s) agrees to hold Owner and Owner's Agent harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and Owner's Agent and that are in any way related to or arise from such use. This provision shall be enforceable to the fullest extent of the law.

THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.

**POOL, SPA, SAUNA**   This Community ☐ DOES;   ☒ DOES NOT have a pool.

When using the pool, Resident(s) agrees to the following: Residents and guests will adhere to the age limits, rules, regulations posted in the pool area and Management policies. All swimmers swim at their own risk. Owner is not responsible for accidents or injuries. For their safety, Residents should not swim alone. Hours are posted. No one is allowed in the pool area outside of posted hours. No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only. Proper swimming attire is required at all times. No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in pool areas, disposing of trash, and keeping pool gates closed. Resident(s) must accompany their guests. Resident(s) must notify Owner any time there is a problem or safety hazard at the pool. Resident is responsible for all guests and guests will be held accountable to these rules/regulations. IN CASE OF EMERGENCY DIAL 911.

**FITNESS CENTER**   This Community ☒ DOES;   ☐ DOES NOT have a fitness center.

When using the fitness center, Resident(s) agrees to the following: Residents and guests will adhere to the rules and regulations posted in the fitness center and Management policies. The fitness center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment. Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous. Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well any other person's use that appears to be dangerous or in violation of Management Rules and Policies. Resident(s) shall consult a physician before using any equipment in the fitness center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician. Resident(s) will keep fitness center locked at all times during Resident's visit to the fitness center. Resident(s) will not admit any person to the fitness center who has not registered with the Management Office. Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the fitness center. Resident is responsible for all guests and guests will be held accountable to these rules/regulations.



**Ex.A._039**

**BUSINESS CENTER**   This Community ☒ DOES;   ☐ DOES NOT have a business center.

Resident(s) agrees to use the business center at Resident(s) sole risk and according to the rules and regulations posted in the business center and Management policies. Owner is not responsible for data, files, programs or any other information lost or damaged on business center computers or in the business center for any reason. No software may be uploaded or installed on business center computers without the written approval of Community Management. No inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) may be viewed or loaded onto the business center computers at any time. Residents will limit time on computers to 30 minutes if others are waiting to use them. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center.

**CLUBHOUSE**   This Community ☒ DOES;   ☐ DOES NOT have a clubhouse.

Communities may have a clubhouse available for resident activities, which will be announced throughout the year. At some communities, you may have the option to rent or reserve the clubhouse for personal gatherings. Fees for renting the clubhouse space and required deposits vary by property. Please inquire at the Management office for specific details regarding clubhouse rental fees. The security deposit will be refunded provided that the clubhouse is returned in the same condition it was found in, and all conditions in the applicable reservation agreement have been met. Residents and guests are expected to adhere to the rules and regulations of the community and clubhouse.

**PLAYGROUND/SPORT COURT**   This Community ☐ DOES;   ☒ DOES NOT have a playground/sport court

When using the playground and/or sport court, Resident(s) agrees to the following: Residents and guests will adhere to the rules and regulations posted and Management policies. The playground and sport courts are not supervised. Resident(s) are solely responsible for their own appropriate use of equipment. Proper footwear is required. Glass, pets, and alcoholic beverages are NOT permitted. Skateboarding, rollerblading and/or bike riding is not allowed in the sport court or playground. Vandalism, foul language, and aggressive behaviors may result in a lease violation. Resident is responsible for all guests and guests will be held accountable to these rules/regulations. Resident is responsible for any damages caused by their household and/or guests of their household.

| Resident(s): | | Owner's Agent: | |
|---|---|---|---|
| | | | |
| Signature | Date | | |
| | | | |
| Signature | Date | Authorized Representative | Date |
| | | | |
| Signature | Date | | |
| | | | |
| Signature | Date | | |



Ex.A._040



**PACKAGE ACCEPTANCE AGREEMENT**

# DOMINIUM

Resident(s) Name: Susan Iliff
Unit # 416

With the increase in volume of packages being delivered on behalf of our residents, the Management Office will accept and sign for packages/parcels for your convenience.

**Package(s) will be placed:**

☑ In the package room. Residents will have FOB access to this room 24 hours per day. <u>Be advised that this room will not be monitored by management.</u>

☐ ~~In the Management Office and available for pick up during office hours.~~

Due to size constraints, you must be home to accept deliveries of oversized packages. Packages that are not picked up within ten (10) days may be returned to the sender. Should the package area reach capacity, packages of any size will not be delivered.

If you prefer not to have packages accepted and stored as indicated above, you must make arrangements for delivery to your home with the shipper. This is solely the responsibility of the recipient.

**I have read and understand the package policy.** I/We understand that by signing this form, Dominium, its successors, employees, agents, officers, and management are released from any liability regarding damage to contents, loss or theft of any parcels delivered to my address.

**Resident(s):**                                          **Owner's Agent:**

_____
Signature                          Date

_____          _____
Signature                          Date           Authorized Representative          Date

_____
Signature                          Date

_____
Signature                          Date





**DOMINIUM**

**SMOKE-FREE ADDENDUM**

Resident(s) Name: Susan Iliff
Unit # 416

Resident and all members of Resident's family or household are parties to a written lease with Landlord (the Lease). This Addendum states the following additional terms, conditions and rules which are hereby incorporated into the Lease. A breach of this Lease Addendum shall give each party all the rights contained herein, as well as the rights in the Lease.

**1. Purpose of No-Smoking Policy.** The parties desire to mitigate (i) the irritation and known health effects of secondhand smoke; (ii) the increased maintenance, cleaning, and redecorating costs from smoking; (iii) the increased risk of fire from smoking; and (iv) the higher costs of fire insurance for a non-smoke-free building;

**2. Definition of Smoking.** Inhaling, exhaling, breathing, or carrying any lighted cigar, cigarette, or other tobacco product or similar lighted product in any manner or form.  This also includes e-cigarettes, vapes and electronic smoking mechanisms.

**3. Smoke-Free Complex.** Resident agrees and acknowledges that the premises to be occupied by Resident and members of Resident's household have been designated as a smoke-free living environment. Resident and members of Resident's household shall not smoke anywhere in the unit rented by Resident, or the building where the Resident's dwelling is located or in any of the common areas or adjoining grounds of such building or other parts of the rental community, nor shall Resident permit any guests or visitors under the control of Resident to do so.  It is the responsibility of the residents to inform any guests of the smoke free policy of our building.

**4. Resident to Promote No-Smoking Policy and to Alert Landlord of Violations.** Resident shall inform Resident's guests of the no-smoking policy. Further, Resident shall promptly give Landlord a written statement of any incident where tobacco smoke is migrating into the Resident's unit from sources outside of the Resident's apartment unit.

**5. Landlord to Promote No-Smoking Policy.** Landlord shall post no-smoking signs at main entry or clubhouse.

**6. Landlord Not a Guarantor of Smoke-Free Environment.** Resident acknowledges that Landlord's adoption of a smoke-free living environment, and the efforts to designate the rental complex as smoke-free, do not make the Landlord or any of its managing agents the guarantor of Resident's health or of the smoke-free condition of the Resident's unit and the common areas. However, Landlord shall take reasonable steps to enforce the smoke-free terms of its leases and to make the complex smoke-free. Landlord is not required to take steps in response to smoking unless Landlord knows of said smoking or has been given written notice of said smoking.

**7. Effect of Breach and Right to Terminate Lease.** A breach of this Addendum shall be a material breach of the lease and grounds for immediate termination of the Lease by the Landlord.

**8. Violations.** First offense will result in a $100.00 fine. Second offense a $200.00 fine.  Third offense a $300.00 fine and may lead to non renewal of lease or eviction.



**Ex.A._042**

**9. Disclaimer by Landlord.** Resident acknowledges that Landlord's adoption of a smoke-free living environment, and the efforts to designate the rental complex as smoke-free, does not in any way change the standard of care that the Landlord or managing agent would have to a Resident household to render buildings and premises designated as smoke-free any safer, more habitable, or improved in terms of air quality standards than any other rental premises. Landlord specifically disclaims any implied or express warranties that the building, common areas, or Resident's premises will have any higher or improved air quality standards than any other rental property. Landlord cannot and does not warranty or promise that the rental premises or common areas will be free from secondhand smoke. Resident acknowledges that Landlord's ability to police, monitor, or enforce the agreements of this Addendum is dependent in significant part on voluntary compliance by Resident and Resident's guests. Residents with respiratory ailments, allergies, or any other physical or mental condition relating to smoke are put on notice that Landlord does not assume any higher duty of care to enforce this Addendum than any other landlord obligation under the Lease.

**Resident(s):**                                    **Owner's Agent:**

_____    _____

Signature                          Date

_____    _____        _____    _____

Signature                          Date           Authorized Representative          Date

_____    _____

Signature                          Date

_____    _____

Signature                          Date



Ex.A._043

**ANNUAL STUDENT CERTIFICATION**

Effective Date: 12-01-2020
Move-in Date: 12-14-2016
(MM/DD/YYYY)

This Annual Student Certification is being delivered in connection with the undersigned's application/occupancy in the following apartment:

Head of Household Name: Susan Iliff          Unit Number: 416

Building Address: 10940 Crooked Lab MN Blvd.

Check A, B, or C, as applicable (note that students include those attending public or private elementary schools, middle or junior high schools, senior high schools, colleges universities, technical, trade, or mechanical schools, but does not include those attending on-the-job training courses):

A. _____ Household contains at least one occupant who is not a student and has not been/will not be a student for five months or more out of the current and/or upcoming calendar year (months need not be consecutive). If this item is checked, no further information is needed. Sign and date below.

B. _____ Household contains all students, but is qualified because the following occupant(s) _____ is/are a PART TIME student(s). Verification of part time student status is required for at least one occupant.

C. _____ Household contains all FULL TIME students for five months or more out of the current and/or upcoming calendar year (months need not be consecutive). If this item is checked, questions 1-5, below must be completed:

1. Are the students married and entitled to file a joint tax return? (attach marriage certificate or tax return)    YES    NO

2. Is at least one student a single-parent with child(ren) *and* this parent is not a dependent of someone else, *and* the child(ren) is/are not dependent(s) of someone other than a parent? (attach student's and if applicable, divorce/custody decree or other parent's most recent tax return)    YES    NO

3. Is at least one student receiving Temporary Assistance to Needy Families (TANF), otherwise known as Minnesota Family Investment Program (MFIP)? (provide release of information for verification purposes)    YES    NO

4. Does at least one student participate in a program receiving assistance under the Job Training Partnership Act, Workforce Investment Act, or under other similar, federal, state or local laws? (attach verification of participation)    YES    NO

5. Does the household consist of at least one student who was, within 5 years of the effective date of the initial income certification, under the care and placement responsibility of the state agency responsible for administering foster care? (provide verification of participation)    YES    NO

*Full-time student households that are income eligible and satisfy one of the above conditions are considered eligible. If questions 1-5 are marked NO, or verification does not support the exception indicated, the household is considered ineligible.*

Under penalties of perjury, I/we certify that the information presented in this Annual Student Certification is true and accurate to the best of my/our knowledge and belief. I/we agree to notify management immediately of any changes in this household's student status. The undersigned further understands that providing false representations herein constitutes an act of fraud. False, misleading or incomplete information may result in the termination of the lease agreement.

All household members age 18 or older must sign and date.

| Signature | *(Date)* | Signature | *(Date)* |
|-----------|----------|-----------|----------|
| Signature | *(Date)* | Signature | *(Date)* |

Annual Student Certification                                    MN Housing 1/13

**Ex.A._044**

**Exhibit B**
**Certification of Tenant Eligibility**
(AGE CERTIFICATION)

| Project: | River North |
|----------|-------------|
| Owner: | DMS |
| Unit: | 416 |

1. I/We, the undersigned, being first duly sworn, state that I/we have read and answered fully, frankly and personally each of the following questions for all persons (including minors) who are to occupy the unit in the above apartment building for which application is made, all of who are listed below:

| Name of Members of the Household | Relationship to Head of Household | Age |
|----------------------------------|-----------------------------------|-----|
| Susan Iliff | | |
| | | |
| | | |

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION SET FORTH ABOVE IS TRUE AND CORRECT. THE UNDERSIGNED ACKNOWLEDGE THAT THE LEASE FOR THE UNIT TO BE OCCUPIED BY THE UNDERSIGNED WILL BE CANCELLED UPON 10 DAYS WRITTEN NOTICE IF ANY OF THE INFORMATION.

_____

Head of Household

_____

Co-Applicant

Subscribed and sworn to before me this 1st day of December , 20 20

(Notary Seal)

Stacy Lynn Galvin
Notary Public
Minnesota
My Commission Expires January 31, 2022

Notary Public in and for the

State of Minnesota

My Commission Expires: 1-31-22



OPPM 8.15.17

## INSTRUCTIONS and FUNDING REQUESTS

*Workbook Version: 09/24/2014 v1.1.1*

Please complete the Funding Request section below and then click on the "Continue" button. Additional Workbook tabs will appear based on your funding request. Please complete all of the tabs that appear. Additional instructions can be found below the Funding Request section.

## FUNDING REQUEST

Indicate the type(s) of funding you are requesting by placing a checkmark next to the desired funding type(s). The applicable tabs will become available based on the type(s) of funding checked.

### First Mortgage / Deferred Loan Request

- ☐ Minnesota Housing First Mortgage
- ☐ Minnesota Housing Tax Exempt Bonds - Long Term
- ☐ Minnesota Housing Tax Exempt Bonds - Short Term
- ☐ Deferred Loan(s) (includes Minnesota Housing, Family Housing Fund, Greater Minnesota Housing Fund, and DEED resources)
- ☐ Rental Rehabilitation Deferred Loan – Project Specific *(NOTE: Applications for RRDL ineligible for other types of funding)*

### Housing Tax Credit Request

| Type of Tax Credits requested from Minnesota Housing: | Tax Credit Pool | Request Status: | Issuance Date: |
|---|---|---|---|
| ☑ Housing Tax Credits - 4% | ☑ Metro | ☐ Reservation | |
| ☐ Housing Tax Credits - 9% | ☐ Greater MN | ☐ Carryover | |
| ☐ This is part of dual 4% / 9% application | ☐ N/A | ☑ 8609 | |
| | | ☐ Qualified Contract | |
| **Tax Credit Request Type:** | **Tax Credit Set-Aside** | ☐ 42 M3 Letter | |
| ☑ First Request | ☐ Nonprofit | ☐ NA | |
| ☐ Supplemental Request | ☐ Rural Development | | |
| ☐ Repeat Request - not selected | ☑ N/A | | |
| ☐ N/A | | | |

Are you also applying to a Suballocator for Tax Credits? Select Suballocator:

Who are you applying for bonds from, if other than Minnesota Housing?   City of Coon Rapids

**Previously Awarded Tax Credits:**

| Allocator | | Amount | |
|---|---|---|---|
| Allocator | | Amount | |
| Allocator | | Amount | |

### Rental Assistance Request

The following types of Rental Assistance are available through the Multifamily Consolidated RFP. In order to be considered for project based vouchers you must make a selection below. This will activate the applicable Workbook tabs. Be sure to complete the 'Proposed Rental Assistance and/or Operating Subsidy Funding' section on the Sources tab where you will indicate the source of assistance, term, number of units and amount of subsidy requested.

- ☐ Metro HRA Project Based Vouchers
- ☐ St. Paul PHA Project Based Vouchers
- ☐ N/A

Other Rental Assistance Request for Proposals: Refer to Request for Proposals information on Minnesota Housing's website. Your selection of a rental assistance type will activate the applicable Workbook tabs. Be sure to complete the 'Proposed Rental Assistance and/or Operating Subsidy' section on the Sources tab where you will indicate the source of assistance, number of units, and amount of subsidy requested.

- ☐ Housing Opportunities for Persons with AIDS (HOPWA)
- ☐ Housing Trust Fund (HTF) Rental Assistance
- ☐ Section 811 Project Based Rental Assistance (811 PRA)
- ☐ N/A

## ADDITIONAL INSTRUCTIONS

The **current version** of the Workbook must be used when applying to Minnesota Housing for housing tax credits, first mortgages, deferred loans, rental assistance, operating subsidies, and Rental Rehab Deferred Loans (RRDL).

A completed Workbook along with the required documentation and exhibits comprise a complete application package. Please refer to www.mnhousing.gov for complete instructions on submitting an application.

### Data Entry and Validation

Light blue cells indicate where information is required from the applicant. In some cases, incomplete data entry will result in other required fields being left unpopulated.

Light blue cells indicate where information is required from the applicant.

White cells indicate standard text or formulas that are locked from editing.

### Cell Comments/Instructions

Many cells have imbedded comments, indicated by a small red triangle in the upper right hand corner. These comments contain important information related to populating the Workbook and the cell.

### Warning Messages

Some cells and sheets have inputs and limits that if not completed, exceeded or not met, will generate an error message or warning in red text. If a warning pops up in any cell, justification is required.

EXHIBIT

**B**

SUMMARY PAGE                                                                          Print

| Development Name | River North |
| Primary Address | 10940 Crooked Lake Blvd. NW |
| City | Coon Rapids |
| Zip Code | 55433 |
| County | Anoka |

**ACTIVITY TYPE**

Acquisition
New Construction

| App Date | 6/16/2017 |
| Dev # | |
| Project # | |
| HTC # | |
| HDO | |
| HMO | |
| Architect | |
| SHO | |

## DEVELOPMENT TEAM

| Developer | Coon Rapids Leased Housing Development IV, LLC |
| Owner | Coon Rapids Leased Housing Associates IV, LLLP |
| Management Co | Dominium Management Services, LLC |
| Service Provider | Not Applicable |
| Architect | BKV Group |

## STRATEGIC PRIORITIES

New Affordable Housing

## TARGET HOUSEHOLDS

| # Units | Target |
|---|---|
| 167 | Elderly |
| | |
| | |
| | |
| | |

## First Mortgage / Deferred Loan Request

| TYPE | AMOUNT |
|---|---|
| ☐ Minnesota Housing First Mortgage | |
| ☐ Minnesota Housing Tax Exempt Bonds - Long Term | |
| ☐ Minnesota Housing Tax Exempt Bonds - Short Term | |
| ☐ Deferred Loan(s) | |
| ☐ RRDL | |

| Subsidy Funding | Amount |
|---|---|
| Rental Assistance | 0 |
| Operating Subsidy | 0 |

## UNIT SUMMARIES

| Unit Type | # Units |
|---|---|
| 0BR/SRO | 0 |
| 1BR | 105 |
| 2BR | 43 |
| 3BR | 19 |
| 4BR | 0 |
| 5BR | 0 |
| 6BR | 0 |
| TOTAL UNITS | 167 |

| Program Type | # Units |
|---|---|
| HTC | 167 |
| HOME | 0 |
| LTH | 0 |
| Market Rate | 0 |
| Employee Occupied | 0 |
| Owner Occupied | 0 |
| Rent Assistance | 0 |
| Operating Subsidy | 0 |

## Housing Tax Credit Request

**Type of Tax Credits requested from Minnesota Housing:**
☑ Housing Tax Credits - 4%
☐ Housing Tax Credits - 9%
☐ Dual Application

**HTC Request Amount**                                              841,228

| Tax Credit Pool | Request Status |
|---|---|
| ◉ Metro | ○ Reservation |
| ○ Greater MN | ○ Carryover |
| | ◉ 8609 |
| | ○ Qualified Contract |
| | ○ 42 M1 Letter |

| Tax Credit Request Type | Tax Credit Set-Aside |
|---|---|
| ○ First Request | ○ Nonprofit |
| ○ Supplemental Request | ○ Rural Development |
| ○ Repeat Request - not selected | ◉ N/A |

Application to suballocator                                              0
Bond issuer if not MHFA                        City of Coon Rapids

**Previously Awarded Tax Credits:**

| Allocator | 0 | Amount | 0 |
| Allocator | 0 | Amount | 0 |
| Allocator | 0 | Amount | 0 |

SUMMARY PAGE                    Print

## RENT GRID

| Unit Type | # of Units | Approx Sq Ft | Monthly Contract Rent | Monthly Gross Rent | Rent Limit | Income Limit | HTC | HOME | LTH | RRDI | Emp Occ | Own Occ | Rent Asst | Op Subs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1BR | 105 | 815 | 939 | 1,017 | 60% | 60% | ☑ | | | | | | | |
| 2BR | 2 | 915 | 1,126 | 1,221 | 60% | 60% | ☑ | | | | | | | |
| 2BR | 26 | 1,198 | 1,126 | 1,221 | 60% | 60% | ☑ | | | | | | | |
| 3BR | 19 | 1,350 | 1,410 | 1,410 | 60% | 60% | ☑ | | | | | | | |
| 2BR | 15 | 915 | 991 | 1,086 | 60% | 60% | ☑ | | | | | | | |
| | | | | | | | | | | | | | | |
| **TOTALS** | 167 | | $2,035,572 | | | | | | | | | | | |

## INCOME & EXPENSE

| Income | Amount |
|---|---|
| Housing Income | 2,035,572 |
| Covered Parking | 104,400 |
| Surface Parking | |
| Commercial | 0 |
| | |
| Gross Potential Rent | 2,139,972 |
| Total Other Income | 73,741 |
| Total Rental Loss | 0 |
| **Net Rental Income** | **2,092,587** |

| Expense | Amount |
|---|---|
| Administrative | 340,884 |
| Maintenance | 98,253 |
| Utilities | 127,197 |
| Unique Operating Expenses | |
| Insurance | 52,772 |
| **Total M & O** | **619,105** |
| Reserves & Escrows | 217,814 |
| **Effective Gross Expense** | **836,919** |

| Net Operating Income | Amount |
|---|---|
| NOI | 1,255,668 |

| EXPENSE SUMMARY | |
|---|---|
| Total expense per Unit($) | 5,011 |
| Total expense per Unit(% of Revenue) | 40% |
| M & O Per Room | 917 |
| M & O/Unit/Year | 3,707 |

## UNDERWRITING ASSUMPTIONS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Residential Vacancy | 5.0% | Income Inflator | 2.00% | DCR Year 1 | 1.20 | Loan Rate | 4.33% |
| Parking Vacancy | 15.0% | Expense Inflator | 3.00% | DCR Year 15 | 1.44 | MIP | 0.00% |
| Commercial Vacancy | 0.0% | Cap Rate | 7.00% | | | | |

## SOURCES AND USES

### Permanent Capital Funding Sources

| Source | Amount | Per Unit | Committed |
|---|---|---|---|
| First Mortgage | 18,980,000 | 113,653 | ☑ |
| General Partner Cash | | 0 | ☐ |
| Syndication Proceeds | 8,496,403 | 50,877 | ☑ |
| State Historic Proceeds | | 0 | ☐ |
| Federal Historic Proceeds | | 0 | ☐ |
| Deferred Loan Request | | 0 | ☐ |
| City of Coon Rapids - EDA Loan | 300,000 | 1,796 | ☑ |
| Series B TIF Mortgage | 1,443,000 | 8,641 | ☑ |
| Deferred Developer Fee | 2,185,791 | 13,089 | ☑ |
| GP/SLP Equity | 210 | 1 | ☑ |
| | | 0 | ☑ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| Deferred Developer Fee | | 0 | ☐ |
| **Total Permanent Financing** | **31,405,404** | **188,056** | |
| FUNDING GAP REMAINING | 0 | 0 | |

### Uses

| Description | Amount | Per Unit | % of Total |
|---|---|---|---|
| Acquisition or Refinance | 958,750 | 5,741 | 3% |
| New Construction | 19,806,549 | 0 | 63% |
| Rehabilitation | 0 | 135,206 | 0% |
| Contractor Fees and Contingency | 2,772,917 | 0 | 9% |
| Environmental Abatement | 0 | 0 | 0% |
| Professional Fees | 2,380,374 | 14,254 | 8% |
| Developer Fees | 2,879,882 | 17,245 | 9% |
| Syndicator Fees | 88,750 | 531 | 0% |
| Financing Costs | 1,625,929 | 9,736 | 5% |
| **Total Mortgageable** | **30,513,151** | **182,713** | **97%** |
| Reserves and Non-Mortgageable | 892,253 | 5,343 | 3% |
| **Total Development Cost** | **31,405,404** | **188,056** | **100%** |

### Construction Sources

| Source | Amount | Per Unit | Committed |
|---|---|---|---|
| U.S. Bank, N.A. | 24,816,000 | 148,599 | ☑ |
| Syndication Proceeds | 1,356,548 | 8,123 | ☑ |
| City of Coon Rapids - EDA Loan | 300,000 | 1,796 | ☑ |
| SLP Equity | 210 | 1 | ☐ |
| **Total of Construction Financing** | **26,472,758** | **158,520** | |

### Subsidy Funding Sources

| Source | Amount | Per Unit | Committed |
|---|---|---|---|
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| **Total of Subsidy Funding** | **0** | **0** | |

## AFFIRMATIVE ACTION STATEMENT

The Minnesota Human Rights Act states that any person or organization having 40 or more employees in the last 12 months in the State of Minnesota and involved in any transaction of $100,000 or more with state agency must have Affirmative Action Plan approved by the State Department of Human Rights. Therefore, no applications for $100,000 or more will be accepted unless they include either:

A.   A Certificate of Compliance from the State Department of Human Rights (For information call 651-296-5663) (for organizations with 40 or more employees); or

B.   A notarized statement stating that the applying organization has had less than 40 employees in the State of Minnesota in the last 12 months.

C.   Provide information on how you intend to make opportunities available for women-owned or minority-owned business enterprises.

This application is submitted by the undersigned with the full knowledge and consent of the governing body and is accurate in all details, to the undersigned's best knowledge.

|  |  |
|---|---|
|  | 6/16/2017 |
| **Signature** | **Date** |

The Minnesota Housing Finance Agency does not discriminate on the basis of race, color, national origin, sex, religion, age, or disability in employment or the provision of services.

**Equal Opportunity Housing and Equal Opportunity Employment**

## TAX CREDIT STATEMENT AND CERTIFICATION OF APPLICANT/OWNER

Individually, or as the general partner(s) or officers of the applicant entity (hereinafter referred to as "Owner"), we are familiar with the provisions of the Tax Reform Act of 1986 and subsequent revisions with respect to the Low Income Housing Tax Credit (HTC), and to the best of our knowledge and belief, the applicant entity has complied, or will comply with all of the requirements which are prerequisite to issuance of the HTC by Minnesota Housing Finance Agency (Minnesota Housing). We understand that the HTC Program will be governed and controlled by rules and regulations issued by the Internal Revenue Service (IRS). We also understand that we must comply with the Minnesota Statues 462A and Housing Tax Credit Program Procedural Manual and Allocation Plan of Minnesota Housing concerning Low-Income Housing Tax Credits.

I (We) hereby make application to Minnesota Housing for allocation of HTC. The undersigned hereby acknowledges that the making of an allocation by Minnesota Housing does not warrant that the project is deemed qualified to receive such allocation. I (We) agree that neither Minnesota Housing nor any of its directors, officers, employees, and agent will be held reponsible or liable for any representations made to the undersigned or its investors relating to the HTC. I (We) assume the risk of all damages, losses, costs, and expenses related thereto and agree to indemnify and save harmless Minnesota Housing or any of its directors, officers, employees and agents against any and all claims, suits, losses, damages, costs and expenses of any kind and of any nature that the Minnesota Housing may hereinafter suffer, incur, or pay arising out of its decision concerning the application for HTC or the use of the information concerning the HTC Program.

I (We) also understand and agree that:
(1) The information requested on this application and any attachments hereto are being collected to determine eligibility of the project under Section 42.
(2) Minnesota Housing may request additional information in order to evaluate this application.
(3) An applicant who fails to complete all information requested will not be eligible for a reservation of HTC.

(4) Certain provisions of Internal Revenue Code (IRC) Section 42 and regulations thereunder and Minnesota Statute Chapter 462A may change and as a result of said change may require the submission of additional documentation to Minnesota Housing.

(5) Information requested in this application is public data which is accessible to the public pursuant to Minnesota Statutes, Chapter 13.

I (We) hereby certify that the information contained in this application is true, correct and complete. I (We) understand that any misrepresentations and/or fraudulent information made in this application may result in the termination of HTC by Minnesota Housing and may bar me(us) and related parties from future program participation, and reporting of such misrepresentation and fraudulent information to the IRS.

**Signature of General Partner**

| by: | |
|---|---|
| of: | Coon Rapids Leased Housing Associates IV, LLC |
| its: | General Partner |
| Print name of signatory, | Mark Moorhouse |
| Date | 6/16/2017 |

The foregoing instrument was acknowledged before me this _____ day of _____, 20____;

by _____, the

       (name)

of _____ a _____

    (Name of corporation)

Notary Public

                        (title)

## TAX CREDIT STATEMENT AND CERTIFICATION OF APPLICANT/OWNER

Signature of Nonprofit Partner (if applicable)

by: _____

of: _____

its: _____

Print name
of signatory, _____
Date

ss

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____.

by _____, the _____
　　　　　　　(name)　　　　　　　　　　　　　　　　　　　　(title)

of _____ a _____
　　　　(Name of corporation)

Notary Public

# PROJECT DESCRIPTION

## DEVELOPMENT LOCATION

**Application Date**       6/16/2017

| MHFA USE ONLY: | |
|---|---|
| Date | |
| D# | |
| Project # | |
| HTC # | |

| | |
|---|---|
| Development Name | River North |
| Primary Address | 10940 Crooked Lake Blvd. NW |
| City | Coon Rapids |
| Zip Code | 55433 |
| County | Anoka |
| Latitude | #VALUE! |
| Longitude | #VALUE! |

Enter Primary Address above. If multiple buildings check box below.

☐ Check if Multiple Buildings

Provide Latitude if no current address.
Provide Longitude if no current address.

## ACTIVITY TYPE (check all that apply)

| | | | | |
|---|---|---|---|---|
| ☑ | Acquisition | ☑ | New Construction | |
| ☐ | Refinance | ☐ | Conversion/Adaptive Re-use | |
| ☐ | Rehabilitation | ☐ | Stabilization | |
| ☐ | Historic Pres/Renovation | ☐ | Scattered Site Development | |
| ☐ | Demolition | ☐ | Other: | |
| ☐ | Rental Subsidy | ☐ | Other: | |

## MINNESOTA HOUSING STRATEGIC PRIORITIES (Check all that apply)

| | | | |
|---|---|---|---|
| ☐ | Preservation of Federally Assisted Housing | ☐ | Preservation of Existing Housing Tax Credits |
| ☐ | Long Term Homeless | ☐ | Foreclosure |
| ☑ | New Affordable Housing | ☐ | Critical Need (Critical needs are determined annually. Refer to RFP Guide.) |

## PROPOSED HOUSING TYPE (Enter the number of units of each applicable housing type.)

| # Units | Housing Type |
|---|---|
| 167 | Permanent Rental |
| | Permanent Supportive Housing |
| | Emergency Shelter |
| | Transitional (up to 24 months) |

## TARGET HOUSEHOLDS (Enter the number of units of each applicable population type being applied for.)

| # Units | Population | # Units | Population |
|---|---|---|---|
| | General Occupancy | | At Risk of Homelessness |
| | Families | | Homeless (not LTH) |
| | Single Head of Households with Minor Children | | LTH Family |
| | Individuals and Households of Color | | LTH Single Adults |
| | Youth | | LTH Unaccompanied Youth |
| | Single Men | | Drug Dependent |
| | Single Women | | Permanent Physical Disabilities |
| 167 | Elderly | | Developmental Disability |
| | Disabled Individuals | | Brain Injury |
| | Persons with HIV/AIDS | | Serious Mental Illness |
| | Other: | | Serious and Persistent Mental Illness |

## PROPERTY INFORMATION

### SITE DESCRIPTION

| | | | | |
|---|---|---|---|---|
| Acres | 4.73 | Project located in: | | Census Tract Number |
| Total Site Area Sq. Footage | 206,039 | ☐ Qualified Census Tract | | 27003050605 |
| Density (units/acre) | 35.31 | ☐ Difficult Development Area | | *If continued site enter it for primary bldg* |
| | | ☐ State Designated Basis Boost | | |

Unusual Site Features *(Check all that apply and complete Form "Applicant Certification of Environmental Issues.")*

| | | |
|---|---|---|
| ☐ Within 1000 ft of railroad | ☐ Towers (Power, TV, microwave) | ☐ Creek, lake, etc. |
| ☐ Within 3000 ft of airport | ☐ Industrial/environmental hazard (REC & HREC) | ☐ High water table |
| ☐ Within 5 miles of civil airport | ☐ Rock formations | ☐ Poor drainage |
| ☐ Within 15 miles of military airport | ☐ Steep ravines or grades | ☐ Unstable soil |
| ☐ High-tension wires | ☐ Floodplain | ☐ Fill |

### BUILDING DESCRIPTION

| Housing Space | Type of Building | Number of Residential Buildings | Number of Stories | Number of Units | Gross Sq Feet |
|---|---|---|---|---|---|
| New Construction | Elevator | 1 | 4 | 167 | 234,802 |
| | | | | | |
| | | | | | |
| | | | | | |
| **TOTALS** | | 1 | 4 | 167 | 234,802 |

| Parking | Type | Number of Parking Spaces | Number Parking Spaces / Unit | Gross Sq Ft |
|---|---|---|---|---|
| Covered Parking | Underground | 116 | 0.69 | 46,230 |
| Surface Parking | | | | |
| **TOTALS** | | 116 | 0.69 | 46,230 |

| Non-Housing Space | Describe | Gross Sq Ft |
|---|---|---|
| Administration/Programmatic | | |
| Commercial | | |
| Storage Lockers | | |
| Club House | | |
| Swimming Pool | | |
| Community Service Facility | | |
| Office | | 339 |
| Other | | 30,274 |
| **TOTAL Non-Hsg Gross Sq Ft** | | 30,613 |

### DEVELOPMENTS INVOLVING ACQUISITION

| | | | |
|---|---|---|---|
| Will the property be acquired from a related party? | ○ Yes | ● No | |
| Has the property been acquired from a related party? | ○ Yes | ● No | If yes, when? |
| Has the property been acquired from an unrelated party in the last three years? | ○ Yes | ● No | If yes, when? |

**Existing Indebtedness on the Property/Building**

| Name of Lender(s) of Existing Loans, Subsidies and Grants (secured and unsecured) | Original Loan Amount | Interest Rate | Term (Yrs) | Unpaid Balance | Date of Unpaid Balance | Date of Maturity | Number of Restricted Units | Restricted to Special Populations? | Loan Will be Paid Off in this Transaction? | Income Limits (%) | Rent Limits (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| None | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| **TOTAL** | 0 | | | 0 | | | | | | | |

**Existing Federal Subsidies**

| Federal Subsidy | # of Units | Exp. Date | Are the existing federally assisted units at risk of loss? | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Existing State and Local Subsidies**

| State or Local Subsidy | Subsidy Type | # of Units | Exp. Date | Describe if Other |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**HOUSING INCOME**

## TENANT PAID UTILITY ALLOWANCE

| Utility | Utility Type | 0BR/SRO | 1BR | 2BR | 3BR | 4BR | 5BR | 6BR |
|---|---|---|---|---|---|---|---|---|
| Heating | Natural Gas | | 34 | 38 | 43 | | | |
| Cooking | Electric | | 7 | 10 | 13 | | | |
| Water Heating | Natural Gas | | | | | | | |
| Electric | | | 37 | 47 | 57 | | | |
| A/C | | | | | | | | |
| Water/Sewer | | | | | | | | |
| Service Fee | | | | | | | | |
| Other | | | | | | | | |
| **Total Tenant Paid:** | | 0 | 78 | 95 | 113 | 0 | 0 | 0 |

| Source: | Metro Housing and Redevelopment Authority | Effective Date: 12/1/2016 |
|---|---|---|

## UNIT / RENT GRID

| Unit Type | # of Bathrooms | # of Units | Unit Sq Ft | Monthly Contract Rent | Total Annual Contract Rent | Tenant Paid Utilities | Monthly Gross Rent | Rent Limit | Income Limit | Program Type HTC | HOME | LTH | RRDL | Empl Occ | Owner Occ | Rent Asst | Op Subs | Rooms Per Unit | Total Rooms |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1BR | 1.00 | 105 | 815 | 939 | 1,183,140 | 78 | 1,017 | 60% | 60% | ☑ | | | | | | | | 3.5 | 367.5 |
| 2BR | 1.00 | 2 | 915 | 1,126 | 27,024 | 95 | 1,221 | 60% | 60% | ☑ | | | | | | | | 4.5 | 9.0 |
| 2BR | 2.00 | 26 | 1,198 | 1,126 | 351,312 | 95 | 1,221 | 60% | 60% | ☑ | | | | | | | | 4.5 | 117.0 |
| 3BR | 2.00 | 19 | 1,350 | 1,297 | 295,716 | 113 | 1,410 | 60% | 60% | ☑ | | | | | | | | 6.0 | 114.0 |
| 2BR | 1.00 | 15 | 915 | 991 | 178,380 | 95 | 1,086 | 60% | 60% | ☑ | | | | | | | | 4.5 | 67.5 |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |
| | | | | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |

| Total Units | 167 | Rental Hsg Potential | 2,035,572 | Total Rooms | 675 |
|---|---|---|---|---|---|

## INCOME

| | | | | | Total | Per Unit | Per Room | Comments |
|---|---|---|---|---|---|---|---|---|
| **GROSS POTENTIAL RENT** | | | | | | | | |
| Rental Housing Potential | | | | | 2,035,572 | 12,189 | 3,016 | |
| Parking / Garage Rent Potential | | | | | | | | |
| Covered Parking | # of spaces | 116 | Mo Fee | 75 | 104,400 | 625 | 155 | |
| Surface Parking | # of spaces | 0 | Mo Fee | | | | | |
| Commercial Rent Potential | Not Applicable | | | | | | | |
| **Gross Potential Rent** | | | | | 2,139,972 | 12,814 | 3,170 | |
| **OTHER INCOME FROM OPERATIONS (excluding TIF)** | | | | | | | | |
| Tenant Fees | | | | | 35,075 | 210 | 52 | |
| Laundry Equipment | | | | | 0 | 0 | 0 | |
| Other | Storage Locker Income & Pet Income | | | | 37,831 | 227 | 56 | |
| Other | | | | | | | | |
| Forfeited Security Deposits | | | | | 0 | 0 | 0 | |
| Interest Income | | | | | 835 | 5 | 1 | |
| **Total Other Income** | | | | | 73,741 | 442 | 109 | |
| **RENTAL LOSS** | | | | | | | | |
| Rental Housing Vacancy | | Vacancy Rate | 5.0% | | 105,466 | 632 | 156 | |
| Parking / Garage Vacancy | | Vacancy Rate | 15.0% | | 15,660 | 94 | 23 | |
| Commerical Vacancy | | Vacancy Rate | 0.0% | | | | | |
| Other | | | | | 0 | 0 | 0 | |
| Other | | | | | | | | |
| **Total Rental Loss** | | | | | 121,126 | 725 | 179 | |
| **NET RENTAL INCOME** | | | | | | | | |
| **Net Rental Income / Total Revenue** | | | | | 2,092,587 | 12,530 | 3,100 | |

## MANAGEMENT & OPERATING EXPENSES (M&O)

| | | | | Total | Per Unit | Per Room | Comments |
|---|---|---|---|---|---|---|---|
| **ADMINISTRATIVE** | | | | | | | |
| Advertising and Marketing | | | | 33,400 | 200 | 49 | |
| Property Management Fee | | % Revenue | $/Unit/Mo | 83,703 | 501 | 124 | |
| Percent of Total Revenue (OR) | | 4.0% | $41.77 | | | | |
| Per Unit Per Month | | | | | | | |
| Professional Fees (Specify in Comments) | | | | 0 | | | |
| Applicant Screening/Collection Expense | | | | 4,273 | 26 | 6 | |
| Site Office Expense (Specify in Comments) | | | | 15,936 | 95 | 24 | |
| On-Site Management Payroll (Specify in Comments) | | | | 192,050 | 1,150 | 285 | |
| Other Administration (Specify in Comments) | | | | 11,522 | 69 | 17 | |
| **Administrative Subtotal** | | | | 340,884 | 2,041 | 505 | |
| **MAINTENANCE** | | | | | | | |
| Elevator Maintenance/Contract | | | | 4,192 | 25 | 6 | |
| Security | | | | 1,187 | 7 | 2 | |
| Rubbish Removal | | | | 14,753 | 88 | 22 | |
| Other Contract Services (Includes Exterminating) | | | | 3,175 | 19 | 5 | |
| Maintenance/Janitor Supplies | | | | 0 | | | |
| Grounds Maintenance | | | | 7,971 | 48 | 12 | |
| Snow Removal | | | | 5,160 | 31 | 8 | |
| Heat & A/C Repair Services | | | | 3,759 | 23 | 6 | |
| General Repair Services | | | | 7,945 | 48 | 12 | |
| Painting/Decorating Materials | | | | 23,319 | 140 | 35 | |
| Maintenance/Janitor Payroll (Specify in Comments) | | | | 0 | | | Included in Payroll Above |
| Other Maintenance and Operating (Specify in Comments) | | | | 26,792 | 160 | 40 | Janitor/Cleaning contract |
| **Maintenance Subtotal** | | | | 98,253 | 588 | 146 | |
| **UTILITIES** | | | | | | | |
| Electricity | | | | 32,060 | 192 | 47 | |
| Water & Sewer | | | | 53,177 | 318 | 79 | |
| Gas and Oil | | | | 41,960 | 251 | 62 | |
| **Utilities Subtotal** | | | | 127,197 | 762 | 188 | |
| **SUPPORTIVE HOUSING** | | | | | | | |
| Unique Operating Expenses (For supportive Housing) (Specify in comments) | | | | | | | |

INCOME

| INSURANCE | | | | | |
|---|---|---|---|---|---|
| Property and Liability Insurance Expense | | 52,772 | 316 | 78 | |
| **TOTAL MANAGEMENT AND OPERATING** | | | | | |
| Total Management and Operating | | 619,105 | 3,707 | 917 | |
| **REAL ESTATE TAXES AND RESERVES** | | | | | |
| Real Estate Taxes | | 176,064 | 1,054 | 261 | |
| Replacement Reserve | | 41,750 | 250 | 62 | |
| Miscellaneous Reserves | | | | | |
| Reserves & Escrows Subtotal | | 217,814 | 1,304 | 323 | |
| **EFFECTIVE GROSS EXPENSE** | | | | | |
| Effective Gross Expense | | 836,919 | 5,011 | 1,240 | |
| **NET OPERATING INCOME** | | | | | |
| Net Operating Income | | 1,255,668 | 7,519 | 1,860 | |
| **TEMPORARY INCOME (i.e. TIF, IRP, etc)** | | | | | |
| Specify | TIF Reimbursement - City of Coon Rapids | 118,329 | 709 | 175 | |
| Specify | | | | | |
| Specify | | | | | |
| TotalTemporary Income | | 118,329 | 709 | 175 | |

## MORTGAGE CALCULATION

### INCOME AVAILABLE FOR DEBT SERVICE

|  | Change on the Cash Flow tab: |  | Year 1 | Year 15 |
|---|---|---|---|---|
| Net Operating income | Income Inflator | 2.00% | 1,255,668 | 1,532,774 |
| Temporary Income (excluding TIF) | Expense Inflator | 3.00% |  |  |
| Income Available for Debt Service |  |  | 1,255,668 | 1,532,774 |

### SUBORDINATED DEBT PAYMENTS

| Lender/Loan | Check if MN Hsg | Principal | Rate | Term (Years) | Amort (Years) | Debt Service Year 1 | Debt Service Year 15 |
|---|---|---|---|---|---|---|---|
| City of Coon Rapids - EDA Loan | ☐ | 300,000 | 1.00% | 18 | 0 | 0 |  |
|  | ☐ |  |  |  |  |  |  |
|  | ☐ |  |  |  |  |  |  |
|  | ☐ |  |  |  |  |  |  |
|  | ☐ |  |  |  |  |  |  |
|  | ☐ |  |  |  |  |  |  |
| **Total Subordinated Debt Payments** |  |  |  |  |  | **0** | **0** |
| **Income Available after Subordinated Debt** |  |  |  |  |  | 1,255,668 | 1,532,774 |
| Minimum Debt Coverage Ratio |  |  |  |  |  | 1.1500 | 1.1500 |
| **Net Income Available for Debt Service** |  |  |  |  |  | 1,091,885 | 1,332,847 |

### FIRST MORTGAGE CALCULATION

| | |
|---|---|
| Lowest Income Available for Debt Service | 1,091,885 |
| Term | 15 |
| Amort | 35 |
| Interest Rate | 4.33% |
| MIP | 0.00% |
| Debt Service Constant (including MIP) | 0.055534065 |
| Maximum Calculated Mortgage | 19,661,540 |
| **Maximum NOI Supported Mortgage (rounded)** | **19,661,000** |

### TIF INCOME

| | |
|---|---|
| Annual TIF Payment | 118,329 |
| Minimum Debt Coverage Ratio | 1.1500 |
| Available TIF for Debt Service | 102,895 |
| Amortization (Years) | 25 |
| Total Permanent Note Rate: | 4.33% |
| Mortgage Insurance Premium: | 0.00% |
| Debt Service Constant (including MIP) | 0.065547290 |
| Maximum Calculated TIF Mortgage | 1,569,777 |
| **Maximum TIF Supported Mortgage (rounded)** | **1,569,000** |

| | |
|---|---|
| **Combined Total Mortgage Based on Debt Coverage** | **21,230,000** |

### ACTUAL MORTGAGE

| | | | |
|---|---|---|---|
| Principal | Check if MN Housing ☐ | Revert to Original | 18,980,000 |
| Amortization (Years) | | | 35 |
| Interest Rate | | | 4.33% |
| MIP | | | 0.00% |
| Debt Service | | | 1,054,037 |
| First Year DCR - All Amortizing Debt | | | 1.30 |

CASH FLOW

**Development Name:** River North

| | |
|---|---|
| Total Units | 197 |
| Cap Rate | 7.00% |
| Vacancy Rate / Credit Allowance | 5.0% |
| Income Inflator | 2.00% |
| Expense Inflator | 3.00% |

| INCOME | Initial Inflator | Future Inflator | Begin In Year | Actuals Two Years Ago | Actuals One Years Ago | Actuals Current Year | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rental Income | 2.00% | | | | | | 2,035,572 | 2,076,283 | 2,117,809 | 2,160,165 | 2,203,369 | 2,247,436 | 2,292,385 | 2,338,232 | 2,384,997 | 2,432,697 | 2,481,351 | 2,530,978 | 2,581,597 | 2,633,229 | 2,685,894 |
| Parking Income | 2.00% | | | | | | 104,000 | 106,488 | 108,618 | 110,790 | 113,006 | 115,266 | 117,571 | 119,923 | 122,321 | 124,768 | 127,263 | 129,809 | 132,405 | 135,053 | 137,754 |
| Commercial Income | 2.00% | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Gross Potential Rent** | | | | 0 | 0 | 0 | 2,139,572 | 2,182,771 | 2,226,427 | 2,270,955 | 2,316,375 | 2,362,702 | 2,409,956 | 2,458,155 | 2,507,318 | 2,557,465 | 2,608,614 | 2,660,786 | 2,714,002 | 2,748,282 | 2,823,648 |
| Other Income (from Operations incl Laundry) | 2.00% | | | | | | 73,741 | 75,216 | 76,720 | 78,255 | 79,820 | 81,416 | 83,044 | 84,705 | 86,399 | 88,127 | 89,890 | 91,688 | 93,521 | 95,392 | 97,300 |
| Other | | | | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | | |
| **Total Other Income** | | | | 0 | 0 | 0 | 73,741 | 75,216 | 76,720 | 78,255 | 79,820 | 81,416 | 83,044 | 84,705 | 86,399 | 88,127 | 89,890 | 91,688 | 93,521 | 95,392 | 97,300 |
| Rental Vacancy | 5.0% | 2.00% | | | | | 105,469 | 107,575 | 109,726 | 111,921 | 114,159 | 116,443 | 118,771 | 121,147 | 123,570 | 126,041 | 128,562 | 131,133 | 133,756 | 136,431 | 139,160 |
| Parking Vacancy | 15.0% | 2.00% | | | | | 15,600 | 15,973 | 16,293 | 16,619 | 16,951 | 17,290 | 17,636 | 17,988 | 18,348 | 18,715 | 19,089 | 19,471 | 19,861 | 20,258 | 20,663 |
| Commercial Vacancy | 0.0% | 2.00% | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | | 2.00% | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | | 2.00% | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Rental Loss** | | | | 0 | 0 | 0 | 121,126 | 128,548 | 126,019 | 128,540 | 131,110 | 133,733 | 136,407 | 139,135 | 141,918 | 144,756 | 147,651 | 150,605 | 153,617 | 156,689 | 159,823 |
| **Net Rental Income** | | | | 0 | 0 | 0 | 2,092,587 | 2,134,499 | 2,177,128 | 2,220,670 | 2,265,084 | 2,310,386 | 2,356,593 | 2,403,725 | 2,451,800 | 2,500,836 | 2,550,852 | 2,601,869 | 2,653,907 | 2,706,985 | 2,761,125 |
| **EXPENSES** | | | | | | | | | | | | | | | | | | | | | |
| Property Management Fee | 4.00% | 2.00% | | | | | 83,703 | 85,378 | 87,085 | 88,827 | 90,603 | 92,415 | 94,264 | 96,149 | 98,072 | 100,033 | 102,034 | 104,075 | 106,156 | 108,279 | 110,445 |
| Administrative Expenses (less Prop Mgmt Fee) | 3.00% | | | | | | 257,380 | 264,898 | 272,842 | 281,028 | 289,459 | 298,142 | 307,087 | 316,299 | 325,788 | 335,562 | 345,629 | 355,997 | 366,677 | 377,678 | 389,008 |
| Maintenance Expenses | 3.00% | | | | | | 98,253 | 101,200 | 104,236 | 107,363 | 110,584 | 113,902 | 117,319 | 120,838 | 124,464 | 128,197 | 132,043 | 136,005 | 140,085 | 144,287 | 148,616 |
| Utilities | 3.00% | | | | | | 127,397 | 131,019 | 134,949 | 138,992 | 143,161 | 147,456 | 151,880 | 156,436 | 161,129 | 165,963 | 170,942 | 176,070 | 181,352 | 186,793 | 192,397 |
| Unique Operating Expenses | 3.00% | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance   M&C/Unit/Mo | $308 | 3.00% | | | | | 52,772 | 54,355 | 55,986 | 57,665 | 59,395 | 61,177 | 63,013 | 64,903 | 66,850 | 68,855 | 70,921 | 73,049 | 75,240 | 77,497 | 79,822 |
| Real Estate Taxes | 3.00% | | | | | | 176,064 | 181,346 | 186,786 | 192,390 | 198,161 | 204,106 | 210,230 | 216,536 | 223,033 | 229,723 | 236,615 | 243,714 | 251,025 | 258,556 | 266,312 |
| Reserves   Reserve/Unit | $250 | 0.00% | 0.00% | | | | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 | 41,750 |
| **Effective Gross Expense** | 39.99% | | | | 0 | 0 | 836,919 | 859,937 | 883,629 | 908,015 | 933,114 | 958,949 | 985,541 | 1,012,912 | 1,041,085 | 1,070,045 | 1,099,935 | 1,130,660 | 1,162,286 | 1,194,841 | 1,228,351 |
| Net Operating Income | | | | 0 | 0 | 0 | 1,255,668 | 1,274,562 | 1,293,499 | 1,312,656 | 1,331,436 | 1,351,436 | 1,371,052 | 1,390,813 | 1,410,714 | 1,430,791 | 1,450,918 | 1,471,210 | 1,491,620 | 1,512,144 | 1,532,774 |
| Temporary Income | | | | 0 | 0 | 0 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 | 118,329 |
| **Total Income for Debt Service** | | | | 0 | 0 | 0 | 1,373,997 | 1,392,831 | 1,411,828 | 1,430,985 | 1,450,286 | 1,469,765 | 1,489,381 | 1,509,142 | 1,529,043 | 1,549,080 | 1,569,247 | 1,589,538 | 1,609,949 | 1,630,473 | 1,651,103 |
| **DEBT SERVICE** | | | | | | | | | | | | | | | | | | | | | |
| First Mortgage | | | | | | | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 | 1,054,037 |
| City of Coon Rapids  LIDA Loan | | | | | | | 0 | | | | | | | | | | | | | | |
| | | | | | | | 0 | | | | | | | | | | | | | | |
| | | | | | | | 0 | | | | | | | | | | | | | | |
| | | | | | | | 0 | | | | | | | | | | | | | | |
| | | | | | | | 0 | | | | | | | | | | | | | | |
| Other   TIF Mortgage Debt Service | | | | | | | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 | 94,585 |
| Other | | | | | | | | | | | | | | | | | | | | | |
| **Total Debt Service** | | | | 0 | 0 | 0 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 | 1,148,622 |
| **Total Debt Service Coverage** | | | | 0.00 | 0.00 | 0.00 | 1.20 | 1.21 | 1.23 | 1.25 | 1.26 | 1.28 | 1.30 | 1.31 | 1.33 | 1.35 | 1.37 | 1.38 | 1.40 | 1.42 | 1.44 |
| Cash Flow | | | | | | | 225,375 | 244,209 | 263,206 | 282,363 | 301,677 | 321,144 | 340,759 | 360,520 | 380,421 | 400,458 | 420,625 | 440,917 | 461,328 | 481,851 | 502,481 |
| Funds from Debt Service Reserve  Enter the amt in Dev Costs, Reserves | $0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Adjusted Cash Flow | | | | 0 | 0 | 0 | 225,375 | 244,209 | 263,206 | 282,363 | 301,677 | 321,144 | 340,759 | 360,520 | 380,421 | 400,458 | 420,625 | 440,917 | 461,328 | 481,851 | 502,481 |
| **Adjusted Debt Service Coverage** | | | | 0.00 | 0.00 | 0.00 | 1.20 | 1.21 | 1.23 | 1.25 | 1.26 | 1.28 | 1.30 | 1.31 | 1.33 | 1.35 | 1.37 | 1.38 | 1.40 | 1.42 | 1.44 |
| **Expenses to be paid from Available Cash:** | | | | | | | | | | | | | | | | | | | | | |
| Limited Partner Asset Management Fee | | | | | | | 5,000 | 5,150 | 5,305 | 5,464 | 5,628 | 5,796 | 5,970 | 6,149 | 6,334 | 6,524 | 6,720 | 6,921 | 7,129 | 7,343 | 7,563 |
| Minnesota Housing Compliance Monitoring Fee | | | | | | | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 | 4,175 |
| General Partner Asset Management Fee | | | | | | | 10,000 | 10,311 | 10,630 | 10,949 | 11,278 | 11,616 | 11,964 | 12,323 | 12,693 | 13,074 | 13,466 | 13,870 | 14,286 | 14,715 | 15,156 |
| Compliance Fee - Dominium Management Services, LLC | | | | | | | 8,267 | 8,514 | 8,770 | 9,033 | 9,304 | 9,583 | 9,871 | 10,167 | 10,472 | 10,786 | 11,110 | 11,443 | 11,786 | 12,140 | 12,504 |
| Tax Returns and Audit - Partnership | | | | | | | 8,250 | 8,498 | 8,752 | 9,015 | 9,285 | 9,564 | 9,851 | 10,146 | 10,451 | 10,764 | 11,087 | 11,420 | 11,763 | 12,115 | 12,479 |
| Other Partnership Expenses | | | | | | | 7,500 | 7,725 | 7,957 | 8,195 | 8,441 | 8,695 | 8,956 | 9,224 | 9,501 | 9,786 | 10,079 | 10,382 | 10,693 | 11,014 | 11,344 |
| Additional Capital Improvements | | | | | | | 90,514 | 93,229 | 96,026 | 98,907 | 101,874 | 104,931 | 108,078 | 111,321 | 114,660 | 118,100 | 121,643 | 125,293 | 129,051 | 132,923 | 136,911 |
| Deferred Developer Fee | | | | | | | 91,650 | 106,597 | 121,591 | 136,625 | 151,692 | 166,784 | 181,894 | 197,014 | 212,136 | 227,249 | 242,345 | 257,414 | 223,777 | 45,881 | |
| | | | | | | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48,718 | 226,336 | 302,849 |

Cash Flow - Page 13 of 26   **Ex.B._013**   7/16/2019

DEVELOPMENT COSTS

| | | Total Costs | Per Unit | 4% Credit Basis | 9% Credit Basis | Historic Credits Basis | Inter-med. Costs | Comments |
|---|---|---|---|---|---|---|---|---|
| **ACQUISITION or REFINANCE EXISTING DEBT** | | | | | | | | |
| Land | | 900,000 | 5,389 | | | | | |
| Existing Structures | | 0 | 0 | | | | | |
| Demolition | | 0 | 0 | | | | | |
| **Acquisition/Refinance Subtotal** | | **900,000** | **5,389** | **0** | **0** | **0** | | |
| Special Assessments | | 0 | 0 | | | | | |
| Other | Acquisition - Legal | 58,750 | 352 | | | | | |
| Other | | 0 | 0 | | | | | |
| Holding Costs | | 0 | 0 | | | | ☑ | |
| Holding Costs | | 0 | 0 | | | | ☑ | |
| **Acquisition/Refinance Total** | | **958,750** | **5,741** | **0** | **0** | **0** | | |
| **CONSTRUCTION** | | | | | | | | |
| **New Construction** | | | | | | | | |
| Residential | | 19,016,343 | 113,870 | 19,016,343 | | | | |
| Garages | $ per stall: $2,198.28 | 255,000 | 1,527 | 0 | | | | |
| Accessory Structures | | 192,697 | 1,154 | 0 | | | | Laundry/Storage Lockers |
| On Site Work | | | 0 | | | | | |
| Off Site Work | | | 0 | | | | | |
| Other | Builder's Risk | 85,474 | 512 | 85,474 | | | | |
| Other | Performance Bonds and Building Permit | 257,035 | 1,539 | 257,035 | | | | |
| **New Construction Subtotal** | | **19,806,549** | **118,602** | **19,358,852** | **0** | **0** | | |
| **Rehabilitation** | | | | | | | | |
| Residential | | | 0 | | | | | |
| Garages | $ per stall $0.00 | | 0 | | | | | |
| Accessory Structures | | | 0 | | | | | |
| On Site Work | | | 0 | | | | | |
| Off Site Work | | | 0 | | | | | |
| Other | | | 0 | | | | | |
| Other | | | 0 | | | | | |
| **Rehabilitation Subtotal** | | **0** | **0** | **0** | **0** | **0** | | |
| **New and Rehabilitation Subtotal** | | **19,806,549** | **118,602** | **19,358,852** | **0** | **0** | | |
| General Requirements | 6.00% | 1,188,393 | 7,116 | 284,819 | | | | |
| Contractor's Overhead | 2.00% | 396,131 | 2,372 | 195,146 | | | | |
| Contractor's Profit | 6.00% | 1,188,393 | 7,116 | 620,552 | | | | |
| **Construction Contract Amount** | | **22,579,466** | **135,206** | **20,459,369** | **0** | **0** | | |
| Construction Contingency | 0.00% | 0 | 0 | 0 | | | | |
| **Total Construction Costs** | | **22,579,466** | **135,206** | **20,459,369** | **0** | **0** | | |
| **ENVIRONMENTAL ABATEMENT** | | | | | | | | |
| Soil Abatement | | | 0 | | | | | |
| Lead Abatement | | | 0 | | | | | |
| Asbestos Abatement | | | 0 | | | | | |
| Other | | | 0 | | | | | |
| Abatement Contingency (Agency determined) | | | 0 | | | | | |
| **Abatement Total** | | **0** | **0** | **0** | **0** | **0** | | |
| **PROFESSIONAL FEES** | | | | | | | | |
| Architect's Fee Total | 2.9% 645,697 | | | | | | | |
| Architect's Fee - Design | | 484,273 | 2,900 | 484,273 | | | ☑ | |
| Architect's Fee - Supervision | | 161,424 | 967 | 161,424 | | | ☑ | |
| Architect's Reimburseables | | 23,288 | 139 | 23,288 | | | ☑ | |
| Marketing | | 48,855 | 293 | 0 | | | ☑ | |
| Surveys | | 71,791 | 430 | 71,791 | | | ☐ | |
| Soil Borings | | 6,950 | 42 | 6,950 | | | ☐ | |
| Payment & Performance Bond Premium | | 0 | 0 | | | | ☐ | |
| Building Permit(s) | | 0 | 0 | | | | ☐ | |
| Sewer-Water Access Charge | | 313,785 | 1,879 | 313,785 | | | ☐ | |
| Other Local Fees | Redevelopment Fees - City of Coon Rapids | 500,000 | 2,994 | 500,000 | | | ☐ | |
| Appraisal Fee | | 0 | 0 | 0 | | | ☑ | |
| Energy Audit | | 0 | 0 | 0 | | | ☑ | |
| Energy Consultant | | 0 | 0 | 0 | | | ☑ | |
| Environmental Assessment | | 10,547 | 63 | 10,547 | | | ☑ | |

DEVELOPMENT COSTS

| | Total Costs | Per Unit | 4% Credit Basis | 9% Credit Basis | Historic Credits Basis | Inter-med. Costs | Comments |
|---|---|---|---|---|---|---|---|
| Cost Certification/Audit | 9,000 | 54 | 0 | | | ☑ | |
| Market Study | 14,400 | 86 | 14,400 | | | ☑ | |
| Tax Credit Fees (% of credits) | 67,667 | 405 | 0 | | | ☑ | |
| Compliance Fees (1st year) | 0 | | 0 | | | ☑ | |
| Furnishings and Equipment | 241,413 | 1,446 | 241,413 | | | ☐ | |
| Legal Fees | 201,221 | 1,205 | 144,873 | | | ☑ | |
| Relocation Costs | 0 | 0 | 0 | | | ☑ | |
| Other Fees   Park Dedication | 225,760 | 1,352 | 225,760 | | | ☑ | |
| Other Fees | | 0 | | | | ☑ | |
| Other Fees | | 0 | | | | ☑ | |
| Other Fees | | 0 | | | | ☑ | |
| **Professional Fees Total** | **2,380,374** | **14,254** | **2,198,504** | **0** | **0** | | |
| **DEVELOPER FEE** | | | | | | | |
| Developer Fee | 2,879,882 | 17,245 | 2,879,882 | | | ☑ | |
| Processing Agent | | 0 | | | | ☑ | |
| Owner's Construction Representative | | 0 | | | | ☑ | |
| Other Consultant Fees | | 0 | | | | ☑ | |
| Other | | 0 | | | | ☑ | |
| **Developer Fee Total**   10.1% | **2,879,882** | **17,245** | **2,879,882** | **0** | **0** | | |
| **SYNDICATOR/INVESTOR FEES** | | | | | | | |
| Organization Fees | 63,750 | 382 | 0 | | | ☑ | |
| Bridge Loan | 0 | 0 | 0 | | | ☑ | |
| Tax Opinion | 0 | 0 | 0 | | | ☑ | |
| Due Diligence Fees | 25,000 | 150 | 0 | | | ☑ | |
| Other Fees | 0 | 0 | 0 | | | ☑ | |
| **Syndicator/Investor Fees Total** | **88,750** | **531** | **0** | **0** | **0** | | |
| **FINANCING COSTS** | | | | | | | |
| **Construction Period Costs** | | | | | | | |
| Hazard and Liability Insurance | 0 | 0 | 0 | | | ☐ | |
| Construction Interest at:   2.67%   3 | 965,788 | 5,783 | 746,436 | | | ☑ | |
| Builder's Risk Insurance | 0 | 0 | 0 | | | ☑ | |
| Taxes During Construction | 36,584 | 219 | 33,469 | | | ☑ | |
| MN Hsg Bridge Loan Origination Fee | 0 | 0 | 0 | | | ☑ | |
| Construction Loan Origination Fee | 198,715 | 1,190 | 136,675 | | | ☑ | |
| MN Hsg Inspection Fee | 0 | 0 | | | | ☑ | |
| Other Inspection Fee | | 0 | | | | ☑ | |
| Other   Construction lender - 3rd party costs & legal | 0 | 0 | 0 | | | ☑ | |
| **Permanent Financing Costs** | | | | | | | |
| MN Hsg 1st Mortgage Application Fee | | 0 | | | | ☑ | |
| MN Hsg 1st Mortgage Origination Fee | | 0 | | | | ☑ | |
| HUD/FHA MIP | | 0 | | | | ☑ | |
| HUD/FHA Exam Fee | | 0 | | | | ☑ | |
| HUD/FHA Inspection Fee | | 0 | | | | ☑ | |
| Other Permanent Origination Fee | 179,376 | 1,074 | 12,161 | | | ☑ | |
| Mortgage Insurance Premium   0.25% | | 0 | | | | ☑ | |
| Bond Issuance Fee | 123,309 | 738 | 3,851 | | | ☑ | |
| Bond Counsel | 56,500 | 338 | 3,507 | | | ☑ | |
| Underwriter Counsel | | 0 | | | | ☑ | |
| Trustee Fee | 2,500 | 15 | 155 | | | ☑ | |
| Rating Agency | | 0 | | | | ☑ | |
| Other Bond Fees | 0 | 0 | 0 | | | ☑ | |
| Title and Recording | 63,157 | 378 | 63,157 | | | ☑ | |
| Other | 0 | 0 | 0 | | | ☑ | |
| Other | 0 | 0 | 0 | | | ☑ | |
| Other | 0 | 0 | 0 | | | ☑ | |
| **Financing Costs Total** | **1,625,929** | **9,736** | **999,411** | **0** | **0** | | |
| **TOTAL MORTGAGEABLE COSTS** | **30,513,151** | **182,713** | **26,537,166** | **0** | **0** | | |

**DEVELOPMENT COSTS**

| | | | Total Costs | Per Unit | 4% Credit Basis | 9% Credit Basis | Historic Credits Basis | Inter-med. Costs | Comments |
|---|---|---|---|---|---|---|---|---|---|
| **RESERVES AND NON-MORTGAGEABLE COSTS** | | | | | | | | | |
| Operating Reserve | | | 499,025 | 2,988 | 0 | | | | |
| Other | (please specify) | Property Tax and Insurance E | 226,601 | 1,357 | 0 | | | | |
| Other | (please specify) | Lease Up Expenses | 118,627 | 710 | 0 | | | | |
| Other | (please specify) | TIF Reserve | 48,000 | 287 | 0 | | | | |
| | | | | 0 | | | | | |
| **Non-Mortgageable Costs Total** | | | 892,253 | 5,343 | 0 | 0 | 0 | | |
| **TOTAL DEVELOPMENT COST** | | | | | | | | | |
| **Total Development Costs** | | | 31,405,404 | 188,056 | | | | | |
| **Total Basis for Tax Credits** | | | | | 26,537,166 | 0 | 0 | | |
| **Total Intermediary Costs** | % of total | 18.60% | 5,840,996 | | | | | | |
| **RRDL Total Soft Cost - Owner's Match** | | | | | | | | | |
| **RRDL Eligible Construction Costs** | | | | | | | | | |

## SOURCES

| Total Development Cost from Development Costs tab: | | | $31,405,404 | | | |
|---|---|---|---|---|---|---|

### CONSTRUCTION SOURCES

| Name of Source | Term | Rate | Amount | Per Unit | Committed | Notes |
|---|---|---|---|---|---|---|
| U.S. Bank, N.A. | 36 | 2.67% | 24,816,000 | 148,599 | ☑ | |
| Syndication Proceeds | | | 1,356,548 | 8,123 | ☑ | |
| City of Coon Rapids - EDA Loan | 18.25 | 1.00% | 300,000 | 1,796 | ☑ | |
| SLP Equity | | | 210 | 1 | ☑ | |
| | | | | 0 | ☐ | |
| **Total Construction Financing** | | | **26,472,758** | **158,520** | | |

### PERMANENT CAPITAL SOURCES OF FUNDING

| Name of Source | Term | Rate | Amount | Per Unit | Committed | Include in HTC Gap | Notes (Enter info about status and estimated timing of funding) |
|---|---|---|---|---|---|---|---|
| First Mortgage | 15 | 4.33% | 18,980,000 | 113,653 | ☑ | ☑ | |
| General Partner Cash | | | 0 | | ☐ | | |
| Syndication Proceeds | | | 8,496,403 | 50,877 | ☑ | | |
| State Historic Proceeds | | | 0 | | ☐ | ☐ | |
| Federal Historic Proceeds | | | 0 | | ☐ | ☐ | |
| Deferred Loan Request | | | 0 | | ☐ | ☐ | |
| City of Coon Rapids - EDA Loan | 18.25 | 1.00% | 300,000 | 1,796 | ☑ | ☑ | |
| Series 8 TIF Mortgage | 15 | 4.33% | 1,443,000 | 8,641 | ☑ | ☑ | |
| Deferred Developer Fee | | | 2,185,791 | 13,089 | ☑ | ☑ | |
| GP/SLP Equity | | | 210 | 1 | ☑ | | |
| | | | | 0 | ☑ | | |
| | | | | 0 | ☐ | ☐ | |
| | | | | 0 | ☐ | ☐ | |
| | | | | 0 | ☐ | ☐ | |
| | | | | 0 | ☐ | ☐ | |
| | | | | 0 | ☐ | ☐ | |
| | | | | 0 | ☐ | ☐ | |
| | | | | 0 | ☐ | ☐ | |
| Deferred Developer Fee | | | 0 | | ☐ | | |
| **Total Permanent Financing** | | | **31,405,404** | **188,056** | | | |
| FUNDING GAP REMAINING | | | 0 | 0 | | | |

### PROPOSED RENTAL ASSISTANCE OR OPERATING SUBSIDY FUNDING

| Type of Source | Name of Source | Term | # of Units | Amount | Per Unit | Committed |
|---|---|---|---|---|---|---|
| | | | | | 0 | ☐ |
| | | | | | 0 | ☐ |
| | | | | | 0 | ☐ |
| | | | | | 0 | ☐ |
| **Total Proposed Rental Assistance or Operating Subsidy Funding** | | | 0 | 0 | 0 | |

### ADDITIONAL COSTS NOT INCLUDED IN TOTAL DEVELOPMENT COST

| Minnesota Housing 1st Mortgage Escrow Requirements | | Amount |
|---|---|---|
| Working Capital Escrow | Revert to Standard | 0 |
| Rent Up Escrow | Revert to Standard | 0 |
| Insurance Escrow | | |
| Tax Escrow | | |
| Other | | |
| Other | | |

### FEDERAL/LOCAL/PHILANTHROPIC CONTRIBUTIONS (Must be completed for inclusion in HTC Scoring for Federal/Local/Philanthropic Contributions, refer to HTC Scoring.)

| Contribution | Total Amount | Per Unit Amount | Committed |
|---|---|---|---|
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |
| | | 0 | ☐ |

## HOUSING TAX CREDIT INFORMATION

**Credit Type** (Check all that apply)

- [ ] Newly constructed and not federally subsidized
- [x] Newly constructed and federally subsidized
- [ ] Rehabilitiation expenditures not federally subsidized
- [ ] Rehabilitiation expenditures federally subsidized
- [ ] Existing Building
- [ ] Allocation subject to non profit set aside under sec. 42(h)(5)

**Minimum Set-Aside** (At this time the Owner "irrevocably" elects one of the minimum set-aside requirements stated by Section 42 of the Internal Revenue Code)

- ( ) 20% of the units serving households at 50% of the area median
- (•) 40% of the units serving households at 60% of the area median

### TENANT FACILITIES / AMENITIES

| Common Space - Non Unit | | Sq Ft | Fee | Included in Basis? |
|---|---|---|---|---|
| Parking / Garages | | 46,230 | 75 | [ ] |
| Storage Lockers | | 0 | 25 | [ ] |
| Club House | | 0 | | [ ] |
| Swimming Pool | | 0 | | [ ] |
| Community Service Facility | | 0 | | [ ] |
| Office | | 339 | | [x] |
| Other | Lobby, Salon, Exam, Theater, Fitness, Card, Mail, Clubro | 30,274 | | [x] |

### OTHER BASIS CONSIDERATIONS

**Will any of the project financing be treated as or considered to be a Federal Grant or Tax-Exempt obligation**
**(Code Sec. 103)?** (•) Yes ( ) No

If yes, provide the following information:

Source of Funds: City of Coon Rapids - Housing Revenue Bonds
Amount: 24,816,000

| Select one of the following: | | Select one of the following: |
|---|---|---|
| ( ) N/A | | ( ) N/A |
| (•) 4% credit | | ( ) 4% credit |
| ( ) Subtract from basis | | ( ) Subtract from basis |

### TAX EXEMPT BOND FINANCING

Are tax exempt bonds to be issued? (•) Yes ( ) No

If yes, complete the following:

| | |
|---|---|
| Total Aggregate Basis | 27,437,166 |
| Total Tax Exempt Bonds | 24,816,000 |
| Name of Bond Issuer | City of Coon Rapids |
| Date of allocation of bond volume cap | 8/31/2015 |

### ACQUISITION/REHABILITATION

| | | |
|---|---|---|
| Total Rehabilitation Expense | | 0 |
| Lowest average rehabilitation attributable qualified basis per low income unit/building | | |
| Average rehabilitation expense per low income unit per project | | 0 |
| Adjusted basis | x 20% = | 0 |

HOUSING TAX CREDIT INFORMATION

| BUILDING GRID | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 |
|---|---|---|---|---|---|---|---|
| Address of Building *(list all buildings separately)* | Date of Substantial Rehab by Seller | Date of Acquisition by Seller | Date of Original Certificate of Occupancy | Actual / Proposed Date of Rehab by Applicant | Number of Years Between Placed in Service (later of column 2, 3 or 4) and Rehab | Is 10 year rule violated for this project? | Average rehabilitation attributable qualified basis per low income unit for this building |
| 10940 Crooked Lake Blvd. NW | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **Total Buildings** | 1 | | | | | | |

If less than 10 years since last placed in service, is the project eligible for a waiver under 42(d)(6)(B) or exemption under 42(d)(6)(A) or 42(d)(2)(D)?

　⃝ **Waiver**　⃝ **Exempt**　⃝ **No**　⃝ **N/A**

If eligible for waiver under 42(d)(6)(B), what is the actual or proposed waiver date?

## DETERMINATION OF CREDIT

### PROJECT APPLICABLE FRACTION

| Type of Residential Rental Units | # of Units | Sq Ft |
|---|---|---|
| HTC Low Income Units | 167 | 157,960 |
| Market Rate Units / Non-HTC Units | 0 | 0 |
| TOTAL # HTC LOW INCOME + MARKET RATE | 167 | 157,960 |
| Unit and Area Fractions | 100.00% | 100.00% |
| APPLICABLE FRACTION (Lesser of Unit or Area Fraction) | 100.00% | |
| Employee / Common Space Units | 0 | 0 |
| Total # and Sq Ft of Units | 167 | 157,960 |

### HISTORIC CREDITS

| | State | Federal |
|---|---|---|
| Qualified Rehabilitation Expenditures | 0 | 0 |
| Applicable Percentage | 20% | 20% |
| Historic Tax Credits | 0 | 0 |
| Investor Ownership Percentage | | |
| Investor Tax Credits | 0.00 | 0.00 |
| Equity Factor | | |
| Historic Credit Syndication Proceeds | 0 | 0 |

### TAX CREDIT BASIS CALCULATION

| | 4% | 9% | Total |
|---|---|---|---|
| **TOTAL BASIS** | 26,537,166 | 0 | 26,537,166 |
| Less federal grant(s) used to finance qualifying development costs | | | 0 |
| Less amount of nonqualifying nonrecourse financing | | | 0 |
| Less nonqualifying excess portion of higher quality units | | | 0 |
| Less Historic Tax Credit (Residential Portion Only) | | | 0 |
| Less Rebates | | | 0 |

*Portion not elig for High Cost Adj*

| | 4% | 9% | | 4% | 9% | Total |
|---|---|---|---|---|---|---|
| **TOTAL ELIGIBLE BASIS** | | | | 26,537,166 | 0 | 26,537,166 |
| High Cost Adjustment | | | | 0 | 0 | 0 |
| Total Eligible Basis Adjusted for the High Cost | | | | 26,537,166 | 0 | 26,537,166 |
| Applicable Fraction | | | | 1.0000 | 1.0000 | |

| | 4% | 9% | Total |
|---|---|---|---|
| **TOTAL QUALIFIED BASIS** | 26,537,166 | 0 | 26,537,166 |
| Applicable Percentage | 3.17% | | |
| **TAX CREDIT POTENTIAL FOR PROJECT** | 841,228 | 0 | |
| **ANNUAL TAX CREDITS FROM BASIS CALCULATION** | 841,228 | | |

### TAX CREDIT EQUITY GAP CALCULATION

Applicable Sources will populate from the Capital Sources of Funding Grid

| Source | Amount |
|---|---|
| First Mortgage | 18,980,000 |
| | |
| | |
| | |
| | |
| City of Coon Rapids - EDA Loan | 300,000 |
| Series B TIF Mortgage | 1,443,000 |
| Deferred Developer Fee | 2,185,791 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total Sources of Funds from above** | 22,908,791 |
| Total Development Costs | 31,405,404 |
| Funding Gap | 8,496,613 |

## DETERMINATION OF CREDIT

| | |
|---|---|
| Equity Factor/Syndication Rate | 1.0100 |
| 10 Year Credit Gap | 8,412,488 |
| Annual Credit Gap | 841,249 |
| Annual Basis Credit | 841,228 |
| | |
| Maximum Tax Credit Allowed | 841,228 |
| MN Housing Approved Maximum Tax Credit | 841,228 |
| Credit Amount Previously Allocated and/or Reserved | |
| Maximum Credit Requested at this time | 841,228 |
| **Total Calculated Credit Allocation** | **841,228** |
| Manual Credits Requested at this time | |

☐ Requesting waiver of limit per development

| | |
|---|---|
| Ten Year Gross Tax Credits | 8,412,280 |
| Equity Factor | 1.0100 |
| Investor Ownership Percentage | 100.00% |
| **Gross Syndication Proceeds** | **8,496,403** |
| Manual Syndication Proceeds | 8,496,403 |

### TAX CREDIT SYNDICATION

If individual, attach a description explaining how the tax benefits will be used.

Type of Offering: ⦿ **Syndicated**  ◯ **Individual/Private Placement**

#### Housing Tax Credits

| Pay-In Amount | % of Proceeds | Anticipated Date of Pay-In | Describe Milestones | Required Reserve Amounts | Developer Fee Amount |
|---|---|---|---|---|---|
| 1,356,548 | 15.97% | 8/1/2015 | Closing | | 0 |
| 3,798,333 | 44.71% | 2/1/2017 | Construction Completion | | 0 |
| 3,129,033 | 36.83% | 10/1/2017 | 8609 Completion | 499,025 | 481,602 |
| 212,489 | 2.50% | 3/1/2018 | Stabilization | | 212,489 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **8,496,403** | **100.00%** | | | **499,025** | **694,091** |

#### Historic Tax Credits

| Pay-In Amount | % of Proceeds | Anticipated Date of Pay-In | Describe Milestones | Required Reserve Amounts | Developer Fee Amount |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **0** | | | | **0** | **0** |

**DEVELOPMENT TEAM**

| | | | | |
|---|---|---|---|---|
| Project Sponsor / Parent Company | Dominium Development & Acquisition, LLC. | | | Guarantors. Please list each below |
| | | | | Armand E. Brachman |
| Address | 2905 Northwest Blvd., Suite 150 | | | Mark S. Moorhouse |
| City | Plymouth | State MN | Zip Code 55441 | Paul R. Sween |
| Federal Tax ID # | | | | Dominium Holdings I, LLC |
| | | | | Dominium Holdings II, LLC |
| Executive Director/ CEO/President | Armand Brachman, Mark Moorhouse, Paul Sween | | | |
| Phone | (763) 354-5500 | Fax | (763) 249-8694 | |
| Email | mmoorhouse@dominiuminc.com | | | |
| Contact Person and Title | Ryan Lunderby      /   Vice President | | | |
| Phone | (763) 354-5634 | Fax | (763) 249-8694 | |
| Email | rlunderby@dominiuminc.com | | | |

| | | | | |
|---|---|---|---|---|
| Developer | Coon Rapids Leased Housing Development IV, LLC | Architect | BKV Group | |
| Contact Person | Ryan Lunderby | Contact Person | Mike Krych | |
| Address | 2905 Northwest Blvd., Suite 150 | Address | 222 North Second Street | |
| City | Pohlitz | City | Minneapolis | |
| State | MS  Zip Code 55441 | State | MN  Zip Code 55401 | |
| Phone | (763) 354-5634  Cell Phone | Phone | (612) 373-9134  Cell Phone | |
| Email | rlunderby@dominiuminc.com | Email | mkrych@bkvgroup.com | |
| | Is Project Sponsor a Related Entity?  Yes | | Is Project Sponsor a Related Entity?  No | |

| | | | | |
|---|---|---|---|---|
| Owner/Mortgagor | Coon Rapids Leased Housing Associates IV, LLLP | Management Company | Dominium Management Services, LLC | |
| Contact Person | Ryan Lunderby | Contact Person | Jack Sipes | |
| Address | 2905 Northwest Blvd., Suite 150 | Address | 2905 Northwest Blvd., Suite 150 | |
| City | Plymouth | City | Plymouth | |
| State | MN  Zip Code 55441 | State | MN  Zip Code 55441 | |
| Phone | (763) 354-5634  Cell Phone | Phone | (763) 354-5500  Cell Phone | |
| Email | rlunderby@dominiuminc.com | Email | jsipes@dominiuminc.com | |
| | Is Project Sponsor a Related Entity?  Yes | | Is Project Sponsor a Related Entity?  Yes | |

| | | | | |
|---|---|---|---|---|
| General Partner 1 | Coon Rapids Leased Housing Associates IV, LLC | Service Provider | Not Applicable | |
| Contact Person | Ryan Lunderby | Contact Person | | |
| Address | 2905 Northwest Blvd., Suite 150 | Address | | |
| City | Plymouth | City | | |
| State | MN  Zip Code 55441 | State | Zip Code | |
| Phone | (763) 354-5634  Cell Phone | Phone | Cell Phone | |
| Email | rlunderby@dominiuminc.com | Email | | |
| | Is Project Sponsor a Related Entity?  Yes | | Is Project Sponsor a Related Entity? | |
| % of ownership | 0.0100% | | | |

| | | | | |
|---|---|---|---|---|
| General Partner 2 | | Tax Credit Syndicator | RBC Capital Markets | |
| Contact Person | | Contact Person | Craig Wagner | |
| Address | | Address | 2101 Rexford Road | |
| City | | City | Charlotte | |
| State | Zip Code | State | NC  Zip Code 28211 | |
| Phone | Cell Phone | Phone | (980) 233-6459  Cell Phone | |
| Email | | Email | Craig.Wagner@rbccm.com | |
| | Is Project Sponsor a Related Entity? | | Is Project Sponsor a Related Entity?  No | |
| % of ownership | | | | |

DEVELOPMENT TEAM

| General Partner 3 | |
|---|---|
| Contact Person | |
| Address | |
| City | |
| State | Zip Code |
| Phone | Cell Phone |
| Email | |
| Is Project Sponsor a Related Entity? | |
| % of ownership | |

| Processing Agent | |
|---|---|
| Contact Person | |
| Address | |
| City | |
| State | Zip Code |
| Phone | Cell Phone |
| Email | |
| Is Project Sponsor a Related Entity? | |

| General Contractor | Eagle Building Company, LLC |
|---|---|
| Contact Person | Chad Weis |
| Address | 6636 Cedar Ave S. Suite 140 |
| City | Minneapolis |
| State | MN  Zip Code 55124 |
| Phone | 612-378-1115  Cell Phone |
| Email | chadweis@eaglebuildingllc.com |
| Is Project Sponsor a Related Entity? | No |

| Attorney | Winthrop & Weinstine |
|---|---|
| Contact Person | John Stern |
| Address | 225 South Sixth Street, Suite 3500 |
| City | Minneapolis |
| State | MN  Zip Code 55402 |
| Phone | (612) 604-6588  Cell Phone |
| Email | jstern@winthrop.com |
| Is Project Sponsor a Related Entity? | No |

## IDENTITY OF INTEREST

The purpose of this tab is to show if any individual or entity for the Project is Controlled By, In Control Of, Affiliated With, a Related Party to, or has an Identity of Interest with any of the other individuals or entities for the Project. The Project Sponsor/Parent Company column will be pre-populated with checkmarks from the Development Team tab if the answer to the question 'Is Project Sponsor a Related Entity' is 'Yes'. Corrections to this column must be made on the Development Team tab. Indicate all other applicable Identities of Interest on this tab by checking the applicable boxes. Include a detailed description of any of the relationships having an Identity of Interest.

| | Project Sponsor/Parent Company | Developer | Owner/Mortgagor | General Partner 1 | General Partner 2 | General Partner 3 | Architect | Management Company | Service Provider | Tax Credit Syndicator | Processing Agent | General Contractor | Attorney |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Developer | ✓ | | | | | | | | | | | | |
| Owner/Mortgagor | ✓ | ✓ | | | | | | | | | | | |
| General Partner 1 | ✓ | ✓ | ✓ | | | | | | | | | | |
| General Partner 2 | | | | | | | | | | | | | |
| General Partner 3 | | | | | | | | | | | | | |
| Architect | | | | | | | | | | | | | |
| Management Company | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| Service Provider | | | | | | | | | | | | | |
| Tax Credit Syndicator | | | | | | | | | | | | | |
| Processing Agent | | | | | | | | | | | | | |
| General Contractor | | | | | | | | | | | | | |
| Attorney | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | |

Explanation of identified Identities of Interest:

The two owners of Dominium Management Services, LLC are also members of the General Partner and Developer entities.

**BUILDINGS**

Complete the following information for all buildings in the Project.        Enter Primary Address on Project Description Tab.

| Building Number | Address | City | Zip | County | Latitude | Longitude | Number of Units | Year Built | Construction Type | Occupied? |
|---|---|---|---|---|---|---|---|---|---|---|
| Primary | 10940 Crooked Lake Blvd. NW | Coon Rapids | 55433 | Anoka | #VALUE! | #VALUE! | 167 | 2016 | New Construction | Yes |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |
| 11 | | | | | | | | | | |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | | | | | | | | |
| 15 | | | | | | | | | | |
| 16 | | | | | | | | | | |
| 17 | | | | | | | | | | |
| 18 | | | | | | | | | | |

**Ex.B._025**   *9/16/2019*

## PRESERVATION

NOTE: This tab must be completed ONLY if you are requesting RFP resources for Insertion or High Risk Preservation. All green finish represent answers keyed from completed fields on other tabs. All items highlighted in light blue require completion by the applicant. Additional documentation and narrative answers, as required per the Application Checklist, must adequately support all answers below.

### PROJECT INFORMATION

| | | | |
|---|---|---|---|
| Development Name | River North | Dev Number | |
| Development City | Coon Rapids | Census Tract Number | 27003050605 |
| Developer | Coon Rapids Leased Housing Development IV, LLC | | |
| Total Units | 167 | Jobs Growth Area | |
| First Lease-Up Year | | HH Growth Area | |
| | | Rent Burdened Area | |

| Target Population | # Units |
|---|---|
| General Occupancy | 0 |
| Single | 0 |
| Family | 0 |
| Elderly | 167 |
| LTH | 0 |
| Disabled | 0 |
| Supportive Housing | 0 |

### PRESERVATION ACTIVITY

| Type of Federal Subsidy | # of Units | % of Total Units | At Risk of Loss? | Subject to Long-term Use Restrictions? |
|---|---|---|---|---|
| | | 0% | | |
| | | 0% | | |
| | | 0% | | |
| | | 0% | | |
| | 0 | | | |

| Preservation of Existing HTC | |
|---|---|
| Imminent Risk? | ☐ |
| High Risk? | ☐ |
| # HTC Units | 167 |
| % of Total Units | 100% |

| Stabilization | |
|---|---|
| Stabilization Plan? | ☐ |
| # of Affrdble Units | |
| % of Total Units | 0% |

| Supportive Housing | |
|---|---|
| Existing Supp Hsg? | |
| # of Supp Hsg Units | |
| % of Total Units | 0% |

### EXPIRATION OF FEDERAL ASSISTANCE OR HTC

| | | Earliest Eligible Date |
|---|---|---|
| ☐ | Opt-Out | |
| ☐ | Pre-Payment | |
| ☐ | Mortgage Maturity | |
| ☐ | Qualified Contract Eligibility (HTC Only) | |

| Contract Terms | |
|---|---|
| Begin Date | |
| Expiration Date | |
| Most Recent Renewal Date | |
| Renewal Type | |

### RFP FUNDS REQUESTED

| Capital Funding | Amount |
|---|---|
| LMIR First Mortgage | |
| Deferred Loans | |
| HTC | $841,228 |
| ☐ Agency Allocation | |
| ☐ Subaliocator | |
| Subsidy Funding | |
| Rental Assistance | $0 |
| Operating Subsidy | $0 |
| TOTAL FUND REQUEST | $841,228 |

### CONSTRUCTION COSTS

| Description | Amount | Per Unit |
|---|---|---|
| TDC | $31,405,404 | $188,056 |
| Total Rehab | $0 | $0 |
| Total of "Immediate Physical Needs" as defined in Narratives | | |
| Property Cash and Reserves Available as defined in Narratives | | |

### PROPERTY VALUE

| Description | Amount |
|---|---|
| Acquisition Price | $958,750 |
| Outstanding Debt | $0 |
| Estimated Proceeds to Seller | $0 |
| As-is Appraisal | |
| Income-Based Value | $17,338,116 |
| 7.0% Cap Rate | |

### PROJECT RENTS AND MARKET COMPARABLE RENTS

| Unit Type | # of Units | Approx Sq Ft | Monthly Contract Rent | Mkt Rent - Based on Comps | Market Differential | Total Annual Contract Rent | Tenant Paid Utilities | Monthly Gross Rent | Rent Limit | Program Type HTC | HOME | HTF | Rent | Own Occ | Emp Occ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1BR | 100 | 815 | 939 | | | 1,183,140 | $78 | $1,017 | 60% | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2BR | 7 | 915 | 1,126 | | | 27,024 | $95 | $1,221 | 60% | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2BR | 26 | 1189 | 1,126 | | | 351,312 | $95 | $1,221 | 60% | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 3BR | 19 | 1350 | 1,297 | | | 295,716 | $113 | $1,410 | 60% | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2BR | 15 | 915 | 991 | | | 178,380 | $95 | $1,086 | 60% | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | 0 | | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TOTALS | 167 | | $1,016 Avg | 50 Avg | -$1,016 Avg | 2,035,572 | | | | | | | | | |

### VALUE OF SUBSIDY PRESERVED

| | |
|---|---|
| Avg Contract Rent Charged | $1,016 |
| Less Avg Tenant Portion | |
| Equals Avg Subsidy | $1,016 |
| Times # of Subsidized Units | 0 |
| Times Months | 12 |
| Equals Annual Avg Subsidy | $0 |
| Applicable Federal Rate (AFR) | |
| Times Years Preserved | 30 |
| Eq Value of Subsidy Preserved | $0 |
| Present Value of Subsidy Pmts | $0 |

### ANNUAL INCOME GENERATED BY CONVERSION TO MARKET RATE (Imminent Risk Only)

| | |
|---|---|
| Rent Differential | -$1,016 |
| Times # of Assisted Units | 0 |
| Times Months/Year | 12 |
| Equals Estimated Add'l Annual Revenue Generated by Market Conversion | $0 |